UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| V. | ) ) | CASE NO: 1:21-CR-00564 |
| MATTHEW DASILVA, | ) ) ) | |
| DEFENDANT. | ) ) | |

**MOTION TO DISMISS FOR SELECTIVE PROSECUTION**

Pursuant to the Federal Rule of Criminal Procedure 12(b)(3)(A)(iv), *Wayte v. United States*, *United States v. Armstrong,* and the Fifth Amendment to the United States Constitution, the defense moves to dismiss Counts One, Two, Five, and Seven of the Superseding Indictment for selective prosecution of the defendant following his participation in the January 6 political protest in front of the Capitol. *Wayte v. United States*, 470 U.S. 598, 608 (1985); *United States v. Armstrong*, 517 U.S. 456 (1996). The defendant, in the alternative and on the same grounds, seeks discovery on the issue of selective prosecution pursuant to *Armstrong*. 470 U.S. at 469-70.

**I. Legal Standard**

Selective prosecution claims are judged "according to ordinary equal protection standards." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (citing *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). In Footnote 9 of *Wayte*, the Supreme Court explained that although the Fifth Amendment does not contain an equal protection clause, "it does contain an equal protection component." *Wayte,* 470 U.S. 598, n. 9; *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). The

Supreme Court's treatment of Fifth Amendment equal protection claims has been "precisely the same as to equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638, n. 2 (1975).

A selective prosecution claim begins through a defendant's assertion that the government has brought a criminal charge against a particular defendant for reasons forbidden by the Constitution and a corresponding demand for discovery on the matter. *United States v. Armstrong*, 517 U.S. 456 (1996). The defendant's initial assertion of selective prosecution does not require conclusive proof; rather, the assertion simply entitles the defendant to discovery in aid of his claim — if he reaches the "rigorous" standard that is outlined in *Armstrong* — "a credible showing of different treatment of similarly situated persons." 517 U.S. at 468-70. To meet his burden, the defendant must demonstrate that the government's prosecutorial decisions had a discriminatory effect *and* were motivated by a discriminatory purpose. *Id*. But the defendant does not need to prove this by a preponderance of the evidence, nor by clear and convicting evidence. Instead, for purposes of supporting his discovery request, the defendant need only show "some evidence tending to show the existence of the essential elements" of a selective prosecution claim. *Armstrong,* 517 U.S. 469-70.

Generally, the government benefits from a "presumption of regularity" in deciding when and whether to institute criminal proceedings, on what charge, and whether to dismiss a proceeding once brought. *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016). However, "the Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's 'political beliefs.'" *United States v. Judd*, 1:21-cr-00040 (TNM) (D.D.C. Dec. 28, 2021) (citing *Branch Ministries v. Rossotti*, 40 F. Supp. 2d 15, 21 (D.D.C.

1999), aff'd 211 F.3d 137 (D.C. Cir. 2000)). The exercise of constitutional rights, such as First Amendment rights, may not affect the government's decision to selectively prosecute a particular defendant. *Wayte,* 470 U.S. at 608; see also *Fedorov v. United States*, 600 A.2d 370, 607 (D.C. Cir. 1991) ("appellants have made a *prima facie* showing of a government policy that, by its own terms, more severely punishes those who exercise protected constitutional rights than those who do not"). When similarly situated individuals are not prosecuted, but "committed roughly the same crime under roughly the same circumstances," the defendant may compare his case to theirs to show the disparity. *See United States v. Khanu,* 664 F. Supp. 2d 28, 32 (D.D.C. 2009).

To lay the foundation for discovery on the issue of selective prosecution, a defendant must (1) make "a credible showing of different treatment of similarly situated persons," and, (2) show that the government's prosecutorial process had "a discriminatory purpose." *Armstrong*, 517 U.S. at 465. The defense may rely on indirect evidence to show the government's discriminatory intent. *United States v. Judd*, 1:21-cr-00040 (TNM) (D.D.C. Dec. 28, 2021); see also *United States v. Khanu*, 664 F. Supp. 2d 28, 33 (D.D.C. 2009).

Once the defendant meets his burden of proof, the standard for the government's production of discovery on selective prosecution is "rigorous." *Armstrong*, 517 U.S. at 457.

## II. Case Summary

According to the Government, on January 6, 2021, "from approximately 2:30 until 5:05, the defendant is in the crowd on the Lower West Terrace" in front of the Capitol Building. ECF No. 42, *32. The government calls this crowd a "heave-ho." *Id.* At one point, "the defendant

used a flagpole against the door that led into the Capitol." *Id.* at *27.[1] Sometime later, the defendant "lowers his body and holds onto, grabs onto the riot shield of officers and is very clearly pushing against the officers," the Government alleges. *Id*. *33. "And, I think, there's also an argument that the jury could find that he's also pulling the riot shield back," the Government claims. *Id*.[2] The defendant then engages "verbally with the officers" regarding "their service that day… trash talking or sort of egging on the officers," the Government claims. *Id*. Mr. DaSilva never entered the Capitol Building. This is the extent of the allegations of criminal conduct in Mr. DaSilva's case.

The Government characterizes the 2020 election protest in front of the Capitol on January 6, 2021, as "the attack on the U.S. Capitol that disrupted a joint session of the U.S. Congress in the process of affirming the presidential election results."[3] The protest began peacefully, in support of election integrity and Republican candidate Donald J. Trump but devolved into a civil disorder.[4]

Counts One, Two, Five, and Seven of the Superseding Indictment charge Mr. DaSilva with interfering with law enforcement during a civil disorder, assault on a federal officer, and engaging in physical violence on restricted grounds and on Capitol Grounds based on these allegations.[5]

---

[1] It is not disputed by either party that there were no officers on either side of that door during this incident.

[2] The defendant's disagreement with these allegations, that the video does not depict such conduct or interaction, is irrelevant for purposes of this motion.

[3] *See 28 Months since the Jan. 6 Attack on the Capitol*, THE UNITED STATES DEPARTMENT OF JUSTICE, May 6 2023, https://www.justice.gov/usao-dc/28-months-jan-6-attack-capitol.

[4] Jenni White, *What I Saw at the 'Save America Rally' in Washington, DC on Jan. 6*, THE FEDERALIST, Jan. 11 2021, https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6.

[5] The other three Counts are related to physical presence on restricted grounds and acting disorderly on those grounds, but they are not the subject of this motion.

To review similar case dispositions, undersigned counsel began looking for similar cases, similar prosecutions, of defendants being charged for an *actus reus* related to pushing on a police shield or being present during a civil disorder as a basis for prosecution. None could be found. Not in the District of Columbia, nor in any other federal district. It appears that in all the years of political protests, most notably the ones of the 1960s that led to the development of most of the criminal laws under which Mr. DaSilva is charged today, there are no criminal prosecutions of anyone pushing against a police shield or being present during a civil disorder, nor for "trash talking or sort of egging on the officers."

While Mr. DaSilva may be the first to be prosecuted for this type of *actus reus*, he is certainly not the first to engage in this type of behavior during a protest that devolved into a riot. Video footage of protests throughout America, throughout the last few decades, depict protestors pushing on police shields during civil disorders. The DOJ has no history of charging these protestors with interfering with law enforcement officers based on their presence during the civil disorders, nor with assaults for pushing on police shields.

Most notably, in the summer of 2020, protestors who held opposing political views from those of Mr. DaSilva were rioting in Washington DC, right outside of the White House, on federal grounds. The protesters engaged with federal law enforcement officers, many of whom were pictured in photographs and seen on television as pushing on police shields. None were charged for the same conduct on which Mr. DaSilva is about to be criminally tried. The Government did not accuse the White House protesters of assault for pushing on a police shield, nor claim that their presence in a disorderly crowd during a riot or "trash talking" with an officer was an obstruction of an officer.

### III. Argument

In May of 2020, in front of the White House, on federal territory, progressive protesters clashed with federal law enforcement.[6] Depicted in the video released by the Department of the Interior and U.S. Park Police, protesters are pushing against police shields (many doing even worse).[7] But none were charged for the conduct of pushing against the riot shields held by federal officers. Protesters are heard screaming a potpourri of insults at the officers. Of course, the government would not dare indict protected speech in any criminal filings for these progressive-issue protesters. Yet, Mr. DaSilva's alleged words made at a pro-Trump protest (the defense disputes he even made the statements), are being used against him and he is being charged for pushing against a police shield.

In various incidents in front of the White House on May 30, 2020, in broad daylight, protesters



---

[6] *Secret Service Statement on Pennsylvania Avenue Demonstrations*, UNITED STATES SECRET SERVICE, May 31 2020, https://www.secretservice.gov/newsroom/releases/2020/05/secret-service-statement-pennsylvania-avenue-demonstrations-0; Shawn McCreesh, *Protests Near White House Spiral Out of Control Again*, THE NEW YORK TIMES, May 31 2020, https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.

[7] Video available at https://twitter.com/BrentScher/status/1275874602032513025?s=20.



were seen pushing against police shields in the middle of a riot. D.C. Journalist Alejandro Alvarez posted a variety of videos depicting this conduct.[8] CNN televised protesters tugging a protective barrier away from federal officers.[9] None of these individuals were investigated or charged for their conduct.

Why is Mr. DaSilva treated differently? The main difference in the case of Mr. DaSilva is the political background of the event he attended. Mr. DaSilva was present in front of the Capitol on January 6, for a pro-Trump protest that devolved into disorder.

The Government is anticipated to respond that January 6 is different, that it caused an unprecedented disturbance at or damage to the Capitol. But the same can be said of the disturbance at and damage to Lafayette Square.[10] Moreover, the Capitol has seen much more serious disturbance and damage than what happened on January 6 — such as the terrorist attack on Congressmen on March 1, 1954, in which "a group of armed Puerto Rican nationalists fired onto the House Floor from the public galleries wounding five U.S. Representatives."[11] Or, the 1983 left-wing extremist bombing at the Capitol that blew out "a wall partition and windows, ripping through the Republican Cloakroom, and damaging several works of art on the second

---

[8] Available as a Twitter thread at https://twitter.com/aletweetsnews/status/1266839233387511820?s=20.

[9] CNN video is available here: https://twitter.com/MrAndyNgo/status/1479249186587660290?s=20.

[10] See *Review of U.S. Park Police Actions at Lafayette Park,* OFFICE OF INSPECTOR GENERAL, June 8 2021, https://www.oversight.gov/sites/default/files/oig-reports/DOI/SpecialReviewUSPPActionsAtLafayetteParkPublic.pdf

[11] *Timeline of 1954 Shooting Events*, Office of the Historian, UNITED STATES HOUSE OF REPRESENTATIVES, https://history.house.gov/Exhibitions-and-Publications/1954-Shooting/Essays/Timeline.

floor."[12] Of note, the damage from communist-motivated bombing cost "at least $1 million to repair," in 1980's currency, according to the Post, which would be over $3.14 million in today's value when accounting for inflation. The combined damage from January 6 is a number that the government keeps raising, but it is still less than $3 million.[13]

The most accurate comparison of January 6 is to the events at the White House in late May of 2020, when President Trump had to take shelter in a bunker underground, just as Vice President Pence had to shelter on January 6.[14] The events were only six months apart, in the same jurisdiction, and both involved a large and politically-motivated crowd of protesters engaging in a variety of civil disturbance malfeasances. But the January 6 participants were hunted down one by one and prosecuted for every offense, even for climbing statues. Yet, participants in the riot outside of the White House were not investigated, even though more than 60 Secret Service officers and 49 U.S. Park Police federal officers were injured protecting the White House; A.G. Bill Barr estimated a week after the protests subsided that a total of 150 federal officers were injured protecting the White House.[15]

The clear difference between the two— politics.

---

[12] Ronald Kessler, *Capitol Bombing*, THE WASHINGTON POST, December 9 1983, https://www.washingtonpost.com/archive/politics/1983/11/09/capitol-bombing/ed242af4-418f-4d8d-8819-3ba860b425ba.

[13] Throughout 2021, the Government claimed that the damage to the Capitol from January 6 was $1.5 million. See https://www.justice.gov/usao-dc/one-year-jan-6-attack-capitol. Then in July of 2022, the Government increased this number to $2,734,783. See https://www.justice.gov/usao-dc/18-month-jan-6-attack-capitol. In May of 2023, the number is higher still, at $2,881,360.20. See https://www.justice.gov/usao-dc/28-months-jan-6-attack-capitol. The defense has not seen evidence to corroborate the calculations of damage.

[14] Nicholas Reimann, *Trump Hid From Protests In Underground Bunker, Report Says*, FORBES, May 31 2020, https://www.forbes.com/sites/nicholasreimann/2020/05/31/trump-hid-from-protests-in-underground-bunker-report-says.

[15] See *Review of U.S. Park Police Actions at Lafayette Park,* OFFICE OF INSPECTOR GENERAL, June 8 2021, https://www.oversight.gov/sites/default/files/oig-reports/DOI/SpecialReviewUSPPActionsAtLafayetteParkPublic.pdf; *Secret Service Statement on Pennsylvania Avenue Demonstrations*, UNITED STATES SECRET SERVICE, May 31 2020, https://www.secretservice.gov/newsroom/releases/2020/05/secret-service-statement-pennsylvania-avenue-demonstrations-0; *Transcript: Attorney General William Barr on "Face the Nation," June 7, 2020*, CBS NEWS, https://www.cbsnews.com/news/bill-barr-george-floyd-protests-blm-face-the-nation-transcript.

For someone like Mr. DaSilva, who never entered the Capitol Building, his involvement in the civil unrest is not clearly distinguishable from the protesters who did the same outside of the White House. Thus, for someone like Mr. DaSilva, to be charged for pushing on a police shield, while similarly situated individuals who are protesting from the opposite side of the political spectrum are ignored by the same authorities, is inherently suspect. What is evident is that Mr. DaSilva was *singled out for prosecution* among other political protesters who were similarly situated. The White House protest individuals are similarly situated to Mr. DaSilva because their circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them. *See Branch Ministries v. Rossotti*, 211 F.3d 137, 145 (D.C. Cir. 2000). There is no explanation for the Government's "discretion" to pursue the conduct of a conservative pro-Trump protester but to ignore the identical conduct of a progressive protester other than due to a political motive

There is a growing body of evidence showing that the Government's decision to pursue Donald Trump and his followers is unique and politically motivated. For example, in an unprecedented report, Special Counsel John H. Durham accused the FBI of political bias in their pursuit of a criminal investigation of Donald Trump.[16] The investigation into identifying every participant on January 6 is also unique— there is no other example in U.S. history of the Government investing the majority of its resources into the pursuit of and prosecution of every riot participant. A public database listing every defendant who has been prosecuted in connection

---

[16] *Report on Matters Related to Intelligence Activities and Investigations Arising Out of the 2016 Presidential Campaigns*, OFFICE OF SPECIAL COUNSEL JOHN H DURHAM, May 12 2023, https://www.justice.gov/storage/durhamreport.pdf.

to the protest is also unique.[17] In line with this pattern, Mr. DaSilva's prosecution is unique — accused of assault for pushing against a police shield during a civil disorder.

Further context of the political malice is found through whistleblower revelations. Whistleblowers employed by the Federal Government have just recently testified to a bias in the FBI against conservative Trump supporters— the same agency that investigated and arrested Mr. DaSilva.[18] In an unconscionable move, the FBI has even labeled a "veteran-led disaster organization a 'terror' group over government criticism" consistent with conservative beleiefs, according to another whistleblower.[19] Yet another FBI whistleblower revealed that the Government classified conservative symbols such as the Gadsden Flag and the Betsy Ross Flag as "extremist."[20] A decade prior, the IRS targeted, investigated, and harassed Tea Party conservatives, a predecessor to Trump supporters, based solely on their right-leaning beliefs.[21] Interestingly, the FBI, led by the same individuals who chose to pursue unverifiable claims against Donald Trump (as recently revealed by Special Counsel John Durham), declined to prosecute anyone from the IRS for the abuse of power over the persecution of conservatives.[22]

---

[17] See https://www.justice.gov/usao-dc/capitol-breach-cases.

[18] See *Hearing on the Weaponization of the Federal Government*, HOUSE OF REPRESENTATIVES JUDICIARY COMMITTEE, May 18 2023, https://judiciary.house.gov/committee-activity/hearings/hearing-weaponization-federal-government-2.

[19] Lawrence Richard, *FBI labeled veteran-led disaster organization a 'terror' group over government criticism, whistleblower says*, FOX NEWS, September 15 2022, https://www.foxnews.com/politics/fbi-labeled-veteran-disaster-organization-terror-group-government-criticism-whistleblower.

[20] *FBI Whistleblower LEAKS Bureau's 'Domestic Terrorism Symbols Guide' on 'Militia Violent Extremists' Citing Ashli Babbitt as MVE Martyr*, PROJECT VERITAS, August 2 2022, https://www.projectveritas.com/news/fbi-whistleblower-leaks-bureaus-domestic-terrorism-symbols-guide-on-militia.

[21] Gregory Korte, *IRS knew of Tea Party profiling in 2011, report shows*, USA TODAY, May 11 2013, https://www.usatoday.com/story/news/politics/2013/05/11/irs-tea-party-investigation-timeline/2153007.

[22] Reuters Staff, *FBI doesn't plan charges over IRS scrutiny of Tea Party: WSJ*, REUTERS, January 13 2014, https://www.reuters.com/article/us-usa-tax-teaparty/fbi-doesnt-plan-charges-over-irs-scrutiny-of-tea-party-wsj-idUSBREA0D03420140114.

Accordingly, there is a verifiable bias against conservatives in federal agencies, especially in the FBI, and especially against Trump supporters.

Indication of the Government's bias against Mr. DaSilva's politics is corroborated by its unique decision to prosecute his conduct while ignoring the identical conduct of politically opposed individuals. Yet, the Equal Protection Clause does not permit the Government to exercise power against Mr. DaSilva due to his political orientation in this manner. The Government's exercise of prosecution powers in Mr. DaSilva's case is unjust. The Government's conduct is reminiscent of what was described in *Yick Wo v. Hopkins*, in which the Supreme Court stated that even when a law is otherwise neutral on its face— if it is "applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution." *Yick Wo* v. *Hopkins,* 118 U. S. 356, 373-74 (1886).

To pervail on this motion, Mr. DaSilva must demonstrate that the federal prosecutorial policy "had a discriminatory effect and that it was motivated by a discriminatory purpose." *Armstrong,* 470 U.S. at 465. Mr. DaSilva has shown that the discriminatory effect is that only he, a Trump supporter, was criminally prosecuted for pushing against a police shield, yet no progressive protester engaging in identical conduct, in the same jurisdiction, around the same period, was prosecuted for the same.[23] The defendant, while not in possession of direct proof, has nonetheless shown through deductive reasoning. based on revelations about the political bias

---

[23] The defense has not been able to identify whether there are other individuals prosecuted for January 6 conduct for assault by pushing against a police shield. It appears Mr. DaSilva may be the only such defendant.

within the Federal Government, that the discriminatory purpose of his prosecution is politically motivated.

In *Yick Wo*, 118 U. S. at 374, the Court found that the similarly situated requirement was met when an ordinance was applied against Chinese nationals but not against other laundry-shop operators. *Armstrong,* 470 U.S. at 466. Here, the assault law for pushing on a police shield is being applied against a Trump supporter but not against the progressive, anti-Trump protesters, who committed the same acts under similar conditions. The "same acts under similar conditions" requirement is met in this case through proof of occurrence of these acts and the Government's lack of prosecution thereof. *See* 470 U.S. at 466. As discussed *supra*, Journalist Alejandro Alvarez documented multiple instances of shield-pushing behavior, as did CNN and the U.S. Park Police.[24] The Government had ready access to the evidence if they wished to pursue charges. The Government chose not to. The defendant has to "produce some evidence that similarly situated defendants… could have been prosecuted, but were not." 470 U.S. at 469. The publicly-available videos of the conduct, including a video provided by a federal agency, are indeed proof that similarly situated defendants could have been prosecuted, but were not.

The deliberate choice not to prosecute one man but to prosecute another, distinguishable only through their political participation, is exactly the type of selective prosecution that *Wayte* and *Armstrong* sought to preclude. The prosecution choice made by the Government clearly has a discriminatory effect on Mr. DaSilva when the Government deliberately fails to prosecute similarly situated individuals. Because these individuals "committed roughly the same crime

---

[24] U.S. Park Police release video available here: https://twitter.com/BrentScher/status/1275874602032513025?s=20; CNN Video is available here: https://twitter.com/MrAndyNgo/status/1479249186587660290?s=20; Alejandro Alvarez' videos are available here: https://twitter.com/aletweetsnews/status/1266844117654478851?s=20.

under roughly the same circumstances" but were not prosecuted, Mr. DaSeilva may compare his case to theirs to show the disparity. *See United States v. Khanu,* 664 F. Supp. 2d 28, 32 (D.D.C. 2009).

Mr. DaSilva's case is different from the ones in which claims of selective prosecution were denied. *See, e.g.*, *Armstrong*, 517 U.S. at 470 (defendants cannot rely on "personal conclusions based on anecdotal evidence"); *Irish People*, 684 F.2d at 946 ("no showing that the selection was improperly motivated" and "no showing that there had been any selection at all"); *United States v. Stone*, 394 F. Supp. 3d 1 (D.C. 2019) (defendant did not compare his case to similarly situated persons and did not identify *any* plausible reason for disparate charging decisions); *Judd*, 1:21-cr-00040 ("the Portland defendants are not similarly situated to [a January 6 defendant]"). Mr. DaSilva has pointed to an identifiable group of people, in the same jurisdiction, acting under similar circumstances and performing the same acts. Mr. DaSilva has shown evidence of an underlying political bias at the FBI with respect to his politics, the agency that investigated and arrested him, as the improper motivating factor in the discriminatory decision.

### IV. Conclusion

Mr. DaSilva has made a "credible showing of different treatment of similarly situated persons." See *Armstrong*, 517 U.S. at 470. Mr. DaSilva has demonstrated that progressive political protestors engaged in identical or worse behavior in front of the White House in May of 2020 were not charged for their conduct yet Mr. DaSilva, appearing at a pro-Trump protest, was criminally charged. Mr. DaSilva has presented "some evidence" showing the discriminatory

effect of the government's charging policy based on political beliefs, relying on the decisions not to prosecute progressive protesters for identical conduct. See *Armstrong,* 517 U.S. at 469-70; *Att'y Gen. v. Irish People, Inc.*, 684 F.2d 928, 932 (D.C. Cir. 1982). The defense, therefore, has met its initial burden on both prongs of a selective prosecution claim.

The defendant seeks dismissal of his charges, or, in the alternative, rigorous discovery of the government's charging decisions and discriminatory investigative policies with a list of discoverable items that should be determined separately after or in conjunction with a hearing on this motion.

Respectfully submitted,
By Counsel:

_____/s/_____
Marina Medvin, Esq.
*Counsel for Defendant*
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel: 888.886.4127
Email: contact@medvinlaw.com

**CERTIFICATE OF SERVICE FOR CM/ECF**

I hereby certify that on May 19, 2023, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

_____/s/_____
Marina Medvin, Esq.

