**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) CRIMINAL CASE NO: 1:21-CR-00564 |
| | ) |
| **MATTHEW DASILVA,** | ) |
| | ) |
| DEFENDANT. | ) |
| | ) |

**RULE 29(A) MOTION FOR JUDGMENT OF ACQUITTAL**
**AT THE CLOSE OF DEFENDANT'S EVIDENCE**

Pursuant to Rule 29(a) of the Federal Rules of Criminal Procedure, at the close of the defendant's evidence, on July 18, 2023, the defendant moved orally for a judgment of acquittal on each of the seven counts of his indictment based on the insufficiency of the evidence to support a conviction. The Court, pursuant to Fed. R. Crim. P. 29(b), deferred decision on the motion until after the verdict.

On July 19, 2023, the Court reached a verdict of Guilty on six of the seven counts of the Second Superseding Indictment.

The Defense submits this brief in support of its argument that Counts Two, Three, Four, Five, and Seven, each of which received a Guilty verdict, must be dismissed pursuant to Defendant's Rule 29(a) motion.

**Legal Standard**

The purpose of a Rule 29 motion is to safeguard the rights of the defendant:

> [E]vidence might raise a question in a reasonable man's mind. But that is not enough. Guilt, according to a basic principle in our jurisprudence, must be established beyond a reasonable doubt. And, unless that result is possible on the evidence, the judge must not let the jury act; he must not let it act on what would necessarily be only surmise and conjecture, without evidence.

*Cooper v. United States*, 218 F.2d 39, 42 (D.C. Cir. 1954) (reversing a trial court's conviction and entering a judgment of acquittal); *see also Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir.), cert. denied, 331 U.S. 837, reh'g denied, 331 U.S. 869 (1947) (if "a reasonable mind must be in balance as between guilt and innocence, a verdict of guilt cannot be sustained").

In reviewing the Rule 29 motion, "the prosecution's evidence is to be viewed in the light most favorable to the government, drawing no distinction between direct and circumstantial evidence." *United States v. Foster,* 783 F.2d 1087, 1088 (D.C. Cir. 1986). Nonetheless, "the government must articulate a rational basis in the evidence" upon which "a legitimate and nonspeculative inference of guilt may arise." *United States v. Recognition Equipment Inc.*, 725 F. Supp. 587, 588 (D.C. 1989). Accordingly, the trial court "is obligated to take a hard look at the evidence and accord the government the benefit of only legitimate inferences." *Id.*; *see also Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir.), cert. denied, 331 U.S. 837, reh'g denied, 331 U.S. 869 (1947); *Cooper v. United States*, 218 F.2d 39, 41-42 (D.C. Cir. 1954). "In other words, this court will not indulge in fanciful speculation or bizarre reconstruction of the evidence" to aid the government. *United States v. Recognition Equipment Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989). Accordingly, the trial court must grant a defendant's Rule 29 motion when the jury has no evidentiary basis for its action, or if the court finds that a reasonable trier of fact would have a reasonable doubt as to the existence of *any* of the essential elements of the crime. *See United States v. Campbell*, 702 F.2d 262 (D.C. Cir. 1983); *Recognition Equipment Inc.*, 725

F. Supp. at 588. Thus, a finding that even a single element of a statute was not proven by the government in its case-in-chief is sufficient grounds for dismissal. *See, e.g. Campbell*, 702 F.2d 262; *Recognition Equipment Inc.*, 725 F. Supp. at 602; *Cooper*, 218 F.2d at 42; *United States v. Sheets*, No. 3: 07-CR-68 (E.D. Tenn. Mar. 27, 2009).

<u>**Argument**</u>

I.   <u>**Counts Three, Four, and Five Lack Evidence that Capitol Grounds were "Otherwise Restricted" when Mr. DaSilva Entered**</u>

Counts Three, Four, and Five require the Government to prove that Defendant committed a prohibited act in an area that was "posted, cordoned off, or otherwise restricted." 18 U.S.C. § 1752(c)(1).

According to the evidence, the time when Mr. DaSilva first enters the western part of the Capitol Grounds is sometime after 2:30 PM. The Government has presented no evidence to support the proposition that the Capitol Grounds were restricted *in the meaning of the statute* at the time that Mr. DaSilva entered.

Indeed, through witnesses and photo exhibits, the Government proved that Capitol Police intended for the Capitol Grounds around the Capitol Building, including the western area in front of the Building, to have been restricted. Capitol Police cordoned off the area they intended to be restricted and posted signs on fencing to indicate a restriction on entry. Nonetheless, the signs and physical barriers delineating the restricted perimeter around the western parts of the Capitol Grounds were removed sometime before 1 PM on January 6, 2021. See Defense Exhibits 1A, 1B.

At the time that Mr. DaSilva entered the area, he did not pass any restrictions that were posted or which cordoned off the western part of the Capitol Grounds that he entered.

The Government's Capitol Police witness, Capt. Mendoza, admits that after the posted signs and physical barriers cordoning off the area had been removed by protesters on January 6, 2021, these restrictions were not replaced. The restricted perimeter was not visibly delineated in any other way.

The use of the term "otherwise restricted" in 18 U.S.C. § 1752(c)(1) means restricted in a similar manner to the preceding restrictions. See *Begay v. United States,* 553 U.S. 137, 140-43 (2008); *United States v. Fischer*, 64 F.4th 329, 345  (D.C. Cir. 2023) (when a statute "includes a list of examples followed by 'otherwise' in a single, unbroken sentence within the same subparagraph… the position of 'otherwise' [] inherently relates the word to the list immediately before it"). The terms in 18 U.S.C. § 1752(c)(1) before the phrase "otherwise restricted" are the terms "posted" and "cordoned off" — which are ***types of solid, visible or physical restrictions that objectively delineate or designate a defined perimeter as restricted***. Therefore, the code section requires evidence of a similar type of solid, visible, or physical restriction. In order to sustain a conviction under 18 U.S.C. § 1752, the evidence of restriction that must be presented is a posting, a cordoning off, or something inherently similar to posting or cordoning off—something that objectively defines a perimeter as restricted.

The Government has failed to present any evidence that at the time that Mr. DaSilva entered and remained on the Grounds of the Capitol that there was any designation of a restricted perimeter as is required for conviction under 18 U.S.C. § 1752. Indeed, none of the crowd photos

presented by the Government show that any physical restrictions remained in place after 1 PM, certainly not after 2:30 PM when the Defendant entered and remained on the Grounds.

The Government presented evidence that law enforcement officers deployed OC gases at certain times, in areas around the Capitol Building. But gas dissipates moments after it is expelled and has multiple meanings. Gas is used as a general crowd control tactic, as opposed to a specific, solid delineator of perimeters as is contemplated by the statute. Mr. DaSilva was gassed three times, he stated. Nonetheless, the gas is not a type of visual, physical, solid, objective delineator of a perimeter that is similar to a posted sign or physical barrier cordoning off an area that the statute requires for conviction. OC is simply a temporary burst of gas.

The area which Mr. DaSilva entered was thus unrestricted as defined under 18 U.S.C. § 1752. The evidence in this case, accordingly, does not satisfy the legal requirements of a "restricted area." Accordingly, Mr. DaSilva could not have knowingly entered such an area without passing by or through the requisite physical perimeter restrictions.

For all of these reasons, Mr. DaSilva could not have *knowingly* entered the restricted grounds as they are defined by the statute — since the area was not visibly restricted by physical perimeter delineators when he entered — nor could he have *knowingly* engaged in any of the acts specifically prohibited *within* areas restricted under the statute.


## II. Counts Two, Five, and Seven Lack Evidence of an Assault

Counts Two, Five, and Seven require proof of an assault. An assault is defined as (a) an attempt to cause or purposely, knowingly, or recklessly cause bodily injury to another; or (b) negligently cause bodily injury to another with a deadly weapon; or (c) an attempt by physical

menace to put another in fear of imminent serious bodily injury. *See United States v. Duran*, 96 F.3d 1495, 1509 (D.C. Cir. 1996).[1]

The case of Mr. DaSilva boils down to whether there is actual proof of either (1) the causation of bodily injury, or (2) evidence of Mr. DaSilva's attempt to cause bodily injury.

A) Evidence Presented

The evidence presented by the Government is that Mr. DaSilva made his way through the crowd in front of the Capitol Building, up a few steps, and towards the outdoor tunnel where law enforcement officers were standing with hand-held plastic shields. He then, for a period of about 16 or 17 seconds, pressed and glided his hands against a slippery police shield that was held with two hands by one officer — and with one hand by another officer, Officer Sterling, who testified at trial. The clearest depiction of this incident is recorded in the first 22 seconds of Government Exhibit 302 — the body cam of the officer who did not testify, the officer who was holding the shield.

Since it was made of transparent plastic, the hands of the defendant are clearly visible through the shield on the body camera recording, in Government Exhibit 302. Three seconds into this video, we see the defendant make first contact with the shield, putting his two hands on the shield. Then, we see his hands gliding left to right on the shield. The testimony of Officer Sterling corroborated the slipperiness of the shield, attributing it to the material and the oily OC spray that was covering the surface of that shield.

---

[1] "Bodily injury" means physical pain, illness, or any impairment of physical condition. Model Penal Code § 210.0(1). "Serious bodily injury" means bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ. Model Penal Code § 210.0(2).

Mr. DaSilva's hands are continuously gliding throughout most of his contact with the shield, up until his hand slips to the edge and he leaves by walking backward. At 23 through 25 seconds on Government Exhibit 302, you can see Mr. DaSilva's legs — he is wearing blue jeans — and you can see him walking backward, stepping over people and objects behind him.

At some point, as he is walking back, Mr. DaSilva either falls over or is thrown over by a protester. We see his feet off the ground at 47 seconds into Government Exhibit 303, and he takes about 15 full seconds to get back up.

On Government Exhibit 305, from 1:40-2:09, we see him help a lady and a man down the stairs, then he makes his way to the side of the tunnel wall. He pats a protester on the shoulder, appearing to say— "good job, man," after that man picks up a knife and hands it to the officers. The rest of the video shows him making a few statements, before leaving the area.

The audible statements of Mr. DaSilva and accompanying subtitles are on Defense Exhibit 4B.

- "What is that [inaudible]? How can we be inside the building when we're not inside the building?"

- "I, uh, didn't think this was how this day was going to end."

- "These are law-abiding citizens, all taxpayers. They just wanna go home every night like you."

- "All right, this is getting kind of…"

Mr. DaSilva then turns around and leaves the tunnel area.

B) Lack of Evidence on Causation of Bodily Injury

Officer Sterling testified that he can tell from the bodycam video that he put his left hand on top of the right hand of the officer originally holding the shield. Officer Sterling then observed himself spraying toward the defendant. In Defense Exhibit 5, we see this moment in slower motion. Mr. DaSilva turns his head to the side, away from the spray, and his hand appears to instinctually go up to the spray. He brings it back down and onto the shield. Government Exhibit 304 shows this moment at normal speed at 25 through 28 seconds.

Officer Sterling testified that he thought the defendant was applying force, but even if this court agreed, the magnitude of the force is limited by the continuous slippage of the hands. Going back to the moment that his hands are on the shield — if we look at how Mr. DaSilva's hands are slipping around that shield in Government Exhibit 302, we can see that Mr. DaSilva's ability to apply pressure to that shield appears very limited by the continuous slippage of his hands.

Officer Sterling testified that each time someone clashes with the shield there is a vibration, a feeling that there is force being applied to the shield. He then went on to say — "typically, any given day you ask me how does it feel to hold the shield, I mean, I'm going to think about it like it's nothing, but to analyze it, and, you know, break down the specs" — he explains that the vibrations "feel like it's nothing." But then the prosecutor asked him a leading question — she asked: "Is that experience, feeling that pressure that you've described, feeling that pressure in this moment that you've just talked about, was that painful? Yes. I mean, it's not crippling but, yes, it's definitely, you know, painful."

The testimony jumped from "it's nothing" to it's "painful" with a simple suggestion from the prosecutor — just like that.

But the reason is simple — Officer Sterling simply didn't remember this incident and was open to suggestions. He confirmed on cross-examination not remembering his interaction with Mr. DaSilva. He didn't remember how it felt when Mr. DaSilva pushed on the shield at all. Most importantly — it wasn't Officer Sterling holding that shield with both hands, it was another officer. Officer Sterling was a third hand on that shield. Realistically, common sense tells us that the two men would divide between them anything felt on the officer's side of that shield.

Whatever pain Officer Sterling might have been commenting on, would not and could not have been in this particular incident with Mr. DaSilva because Officer Sterling did not testify about the sensation felt when two officers are holding onto a shield — he instead testified to the sensation he recalled when he alone held the shield.

On top of that, it was likely a different shield that he was remembering the sensation from — a larger shield that rests on the ground, one that his local department had, as opposed to the shorter Capitol Police shields from this incident on January 6. Officer Sterling's testimony about a shield resting on the ground was not corroborated by any video evidence, which instead depicted smaller shields that moved readily and continuously off the ground.

Whatever Officer Sterling was remembering or describing, it simply isn't this incident. Officer Sterling's recollection about January 6, 2021 appears to have been adversely affected by the length of his shift. He testified that he worked a 20-hour shift day that day. It's certainly understandable that he was tired, and the interaction with Mr. DaSilva wasn't direct or memorable — after all, Mr. DaSilva was interacting with a shield being held by another officer,

not by Officer Sterling, Officer Sterling simply added a hand to that shield. And Officer Sterling encountered many other protesters that day.

There is no specific testimony from Officer Sterling on how it feels when a smaller Capitol Police shield is impacted by a protester, there is no testimony on how it feels when he's not alone in holding it, and there is no testimony on how the specific interaction with Mr. DaSilva felt to Officer Sterling.

The testimony of Officer Sterling simply does not a reliable recollection of this incident and any testimony indicative of recollection appears suggested by the government through leading questions.

The reality of the Mr. DaSilva incident is that the slipperiness of the outside of the shield reduced the ability of a consistent force to be applied to the shield, and the two officers divided between them any sensation might be felt as it reverberated through — reducing any potential for sensation even further. This scenario is simply inconsistent with the force of vibrations that Officer Sterling testified to. It's simply a different incident.

Accordingly, the Government did not present evidence beyond reckless speculation as to whether a bodily injury occurred as a result of Mr. DaSilva's interaction with the shield. The evidence is insufficient to withstand a Rule 29 motion for Counts Two, Five, and Seven. See *United States v. Recognition Equipment Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989) (the court should not "indulge in fanciful speculation or bizarre reconstruction of the evidence" to aid the government).

C.  Insufficient Evidence of Mr. DaSilva's Intentional Attempt to Cause Bodily Injury

Another avenue for an assault conviction under Counts Two, Five, and Seven is for the Government to prove that the defendant *attempted to cause bodily injury* to an officer. But the Government did not present evidence of that either.

While the evidence is consistent with a defendant deliberately walking toward officers and deliberately pressing his hands on a shield, there is no evidence that this behavior was intended to cause bodily injury through such conduct.

"Bodily injury" means physical pain, illness, or any impairment of physical condition. Model Penal Code § 210.0(1). There is no evidence presented that Mr. DaSilva, by pressing against a shield, had the intent to cause pain or impairment to any officer — certainly not to the officer who was standing next to, or to the side of, the officer directly holding the shield which Mr. DaSilva pressed against. There is no evidence that Mr. DaSilva was even aware that another officer was holding that shield. As a reminder, Officer Sterling, while standing to the right of another officer, simply grabbed onto the handle of the shield of the officer who was already holding it. And we know that Mr. DaSilva did not intend to hurt any officer he was speaking to just a few moments later, standing directly next to officers without a shield.

The intent of Mr. DaSilva was one of a protester pushing against a police shield; not one of a man intending to assault or harm anyone. The evidence showed Mr. DaSilva amind a Trump protest in front of the Capitol Building. He was wearing a Japanese-lettered MAGA hat. He was holding a Trump flag. And, during a protest, in the heat of the protest, he intentionally pressed his hands against a plastic shield. But what evidence is there that this behavior was known to Mr. DaSilva as one that would cause a bodily injury? What evidence is there of any reasonable

person knowing that pressing against a police shield could result in a bodily injury? The word

shield means a type of physical protection from force. The purpose of a *shield* is to *shield* from

force. How could pressing hands against a shield be known to the defendant as the type of force

that could result in pain or physical impairment — if it even is such a thing?

We can see Mr. DaSilva sitting in court— an older man, and with no criminal record. See

Government Exhibit 702. After the shield incident, he stayed and chatted. He didn't act like

someone who believed he just acted with intent to cause pain or impairment to any officer.

Each of Mr. DaSilva's words indicates the opposite of an intent to commit some act to

obstruct, impede, or interfere with a law enforcement officer. His intended act is to leave when

he observes others getting more aggressive toward officers.

For a conviction of attempted assault under Count Two, the evidence must not just show

that the defendant intended to commit some act, the evidence must show that the defendant

*intentionally and voluntarily* attempted to cause pain or physical impairment. For Count Five, the

defendant had to have *knowingly* attempted to cause pain or physical impairment. For Count

Seven, the defendant would have to have acted *willfully and knowingly* as he attempted to cause

pain or physical impairment. There is no evidence beyond complete conjecture and speculation

as to whether Mr. DaSilva's actions were an attempt to cause pain or physical impairment.

Acquittal under Rule 29 is thus warranted. *See Cooper v. United States*, 218 F.2d 39, 42 (D.C.

Cir. 1954); *Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir.), cert. denied, 331 U.S. 837,

reh'g denied, 331 U.S. 869 (1947) (if "a reasonable mind must be in balance as between guilt and

innocence, a verdict of guilt cannot be sustained").

D. Insufficient Evidence of Mr. DaSilva's Intentional Attempt to Cause Bodily Injury Through

Physical Contact

For purposes of the physical contact provision of Count Two, the government has to

prove that the defendant intentionally and voluntarily used force to cause pain or physical

impairment through direct physical contact. The Government does not have evidence of this

either.

The contact that appears to have occurred when Mr. DaSilva's hand went up to block

Officer Sterling's OC spray was a natural reaction. Any person would have the same natural

reaction if we were sprayed with an irritant. The prosecutor admitted during her rebuttal at

closing argument that putting up her hand towards the irritant spray would be her reaction to the

spray as well.

Defense Exhibit 5 shows that Mr. DaSilva wasn't even looking at where his hand was

going; he was just blocking the spray. He had no intent to touch the officer's hand, a natural

reaction to block irritant spray coming towards him, *let alone for that touch to cause pain or*

*bodily impairment*. This is an older man with a squeaky-clean record.

For Count Two, the Government must prove through evidence that the physical contact

was intentional <u>and</u> voluntary <u>and</u> an attempt to cause pain or physical impairment. There is

simply no evidence to support this beyond complete speculation and conjecture. Indeed, how

could touching a hand cause pain or physical impairment of the hand? All handshaking would be

illegal if that were the case. The moment of Mr. DaSilva's hand meeting the OC spray, observed

on the video, which was not independently recalled by the witness who claimed it was his hand,

does not show a contact that is capable of causing a bodily injury as the Model Penal Code

defines it. Nor is there any evidence to suggest that that contact indeed caused an injury as the

Model Penal Code defines it. Acquittal under Rule 29 is thus warranted. *See Cooper v. United*

*States*, 218 F.2d 39, 42 (D.C. Cir. 1954); *see also Curley v. United States*, 160 F.2d 229, 232

(D.C. Cir.), cert. denied, 331 U.S. 837, reh'g denied, 331 U.S. 869 (1947) (if "a reasonable mind

must be in balance as between guilt and innocence, a verdict of guilt cannot be sustained");

*United States v. Recognition Equipment Inc.*, 725 F. Supp. 587, 588 (D.D.C. 1989) (the court

should not "indulge in fanciful speculation or bizarre reconstruction of the evidence" to aid the

government).

### Acquittal

For all of the reasons stated herein, the Defense requests and judgment of acquittal on

Counts Two, Three, Four, Five, and Seven.

Respectfully submitted,

By Counsel:

_____/s/_____

Marina Medvin, Esq.
*Counsel for Defendant*
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com



<u>**CERTIFICATE OF SERVICE FOR CM/ECF**</u>

I hereby certify that on July 21, 2023, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

<u>          /s/          </u>
Marina Medvin, Esq.