## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| ) | |
| **v.** ) | CRIMINAL CASE NO: 1:21-CR-00564 |
| ) | |
| **MATTHEW DASILVA,** ) | SENTENCING: OCTOBER 25, 2023 |
| ) | |
| DEFENDANT. ) | |

## DEFENDANT'S SENTENCING MEMORANDUM

Matthew DaSilva is a 51-year-old veteran, husband, and Good Samaritan who resides in Collin County, Texas, a suburb in the Dallas area.

Mr. DaSilva was found guilty of six charges related to his participation in the January 6 protest outside of the Capitol Building following a bench trial, which included two felony offenses — civil disorder and assault on law enforcement with physical contact — in addition to three misdemeanors and one petty offense. The facts at trial showed that Mr. DaSilva walked up to officers securing the Capitol Building tunnel and pushed both of his hands against a clear plastic shield being held by two of the officers. As one of the officers was spraying pepper spray toward or near Mr. DaSilva, their hands made contact. No officer was injured in this case. Matthew was acquitted of possessing the intent to commit another felony during the commission of an assault on a law enforcement officer, and he was acquitted of a misdemeanor disorderly conduct charge. Prior to being convicted for his conduct on January 6, Mr. DaSilva had a completely clean record.

For an entire year prior to his trial, Mr. DaSilva, on his own volition, consistently attended behavioral therapy sessions during which he addressed emotional regulation and worked on rehabilitating his behavioral responses to emotional events. *See* Defense Exhibit 1. Prior to January 6, Mr. DaSilva spent his free time helping to care for his elderly neighbor and his wife's elderly sister.

Considering the defendant's age, character, clean record, extensive efforts at post-offense rehabilitation, and the lack of injury or property damage resulting from Mr. DaSilva's conduct — as well as the sentences from other similar cases — a sentence of 3 months of incarceration is a fair penalty — time which has already been served as imprisonment. This is an appropriate penalty that is consistent with other January 6 shield-pushing case dispositions, especially for a defendant highly unlikely to re-offend and is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

The defendant submits the foregoing memorandum of fact and law to substantiate his argument regarding the appropriateness of this sentence recommendation and downward departure from the applicable Sentencing Guidelines Range of 12-18 months under base offense U.S.S.G. §2A2.4 (or §2A2.3, both of which produce the same final recommendation).

## I. MATTHEW DASILVA, A VETERAN AND A GOOD SAMARITAN

Matthew DaSilva is 51 years old. He was born in Michigan. Matthew had a troubling, tumultuous, and impoverished upbringing, the details of which Mr. DaSilva will keep out of public pleadings out of respect for his family. The defense will rely on the court's review of the PSR for further details on his childhood.

Mr. DaSilva graduated from the University of Wisconsin-Madison in 1997 with a major in Japanese. He worked as a linguist, fluent in English, Japanese, and Mandarin Chinese.

In 1993, while an exchange student living in Japan, he met Christina, who would later become his wife. The couple has struggled for many years to conceive children. The fact that he has been unable to become a father has caused Mr. DaSilva great pain. Matthew and Christina nonetheless remain a very strong and loving couple.

His wife describes Matthew as kind and gentle, someone who is beloved by everyone. In his spare time, he likes to cook, preparing full meals for family and friends. He helps his wife with cleaning and maintaining their home; the two live in a genuine partnership. During his trial, Matthew would call Christina at every break.

In response to the attack on our nation on September 11, 2001, Mr. DaSilva enlisted in the military. He served for 12 years in the Navy as a cryptologic technician interpreter, among other roles, before being honorably discharged. He received the following commendations: Joint Service Commendation Medal, Navy/Marine Corps Achievement Medal, Navy Unit

Commendation, Good Conduct Medals, National Defense Service Medal, Global War on

Terrorism Medal, Letter of Commendation Flag, Letter of Appreciation, and Electronic

Information Dominance Warfare Insignia. *See* Defense Exhibit 2. In 2003, a General in the office

of the Chief of Staff of the United States Army personally congratulated Mr. DaSilva for

representing the military and beating out Ivy League graduates in a prestigious Mandarin

Chinese linguistics competition held at Breklely.

One day in 2005, when he was deployed abroad in the Pacific, Matthew DaSilva was on

his way to the airport when he passed by a boy whom he saw bleeding profusely. In his own

words, Matt retold the story as such: "I saw a kid with the biggest gash in his bare foot. I

recognized that the bleeding was serious, so I threw him into my car and had him direct me to his

house. We pulled up, the parents came rushing outside, and I quickly explained the wound

needed constant pressure." Matt is humble. His commanding officer provided more details. *See*

Defense Exhibit 3. **Using his "own shirt as a bandage" Matthew DaSilva "took action and rendered first aid"** before driving the boy home. **Matthew DaSilva is the embodiment of the kind of person who will give you the shirt off his back** when you need it — a rarity in today's modern world. "The act of defending any of the cardinal virtues has today all the exhilaration of a vice," Matthew responded



DEPARTMENT OF THE NAVY
NAVAL COMPUTER AND TELECOMMUNICATIONS
AREA MASTER STATION, PACIFIC
500 CENTER STREET
WAHIAWA, HAWAII 96786-3090

1650
00
28 Apr 05

From:  Commanding Officer, Naval Computer and Telecommunications
       Area Master Station, Pacific
To:    CTI3 Matthew C. DaSilva, USN
Via:   Commanding Officer, Naval Security Group Activity Hawaii

Subj:  LETTER OF APPRECIATION

1.  You have my sincere appreciation for your selfless efforts
to render aid and comfort to Nathan Carl, a dependent child of a
housing resident on Naval Computer and Telecommunications Area
Master Station, Pacific.  You immediately noticed that Nathan
was injured and required assistance, and using your own shirt as
a bandage, you took action and rendered first aid to Nathan's
lacerated foot and then drove him to his residence.  During the
flurry of activity to get Nathan follow-on medical attention,
you departed without a thought to the need of thanks for your
good deed.  Your assistance and actions ensured Nathan received
the 17 stitches necessary mend his wound in a timely manner.
Your act truly exemplifies Navy Core Values and the work of a
Good Samaritan.

2.  I join Nathan's parents, LCDR Charlie and Marie Carl, in a
sincere thank-you for your compassion and willingness to act.
Your dedication and unswerving devotion to duty reflected credit
upon yourself and were in keeping with the highest traditions of
the United States Navy.

M. B. McLENDON

to his counsel when asked what was going through his mind when he did it, quoting G.K. Chesterton. He finds the feeling of being a good person fulfilling, he later explained. Matthew isn't interested in seeking credit for his good deeds, however. His attorney had to pry details out of him for purposes of composing this memorandum.

Matthew is a devout Catholic, having converted two decades ago. Upon his conversion, he became an active member of the Knights of Columbus, a Catholic charity organization. Matthew then became a founding member of and went on to launch the Knights at Holy Family Church in Honolulu, which still operates today. After it launched, Matthew also volunteered with administrative tasks and acted as the recorder at meetings.

In his spare time these days, Matthew takes care of his wife's elderly sister and his elderly neighbor. He drives the neighbor, who has cancer, to medical appointments and to the grocery store, as well as running errands for him— once driving the grateful man to a medical appointment at 4 a.m. Matthew always cares for and makes time for others. A genuinely humble man, he did not discuss these incredible acts of kindness with his attorney— the information was learned through his wife and neighbor. *See* Defense Exhibits 4 and 5.

Mr. DaSilva has always been interested in politics and spirituality. He was a supporter of Al Gore when Gore ran on a platform opposing war. After he discovered Catholicism and converted, Matthew became interested in politicians who opposed abortion. He has attended various pro-life rallies throughout the years. When Trump became the Republican nominee in 2016 opposing both war and abortion, he was a perfectly matched candidate for Mr. DaSilva. His support of Donald Trump continued through the 2020 election, which led to Matthew DaSilva attending the protest in support of Trump on January 6, 2021.

## II. January 6th

On January 6, 2021, Matthew DaSilva attended the political protest alone, without his wife. After listening to Donald Trump's speech, he walked with the crowd towards the Capitol.

Getting carried away with the spirit of the protest, Mr. DaSilva did things he had never done before and could never again imagine himself doing — he held closed a door to the Capitol Building, approached a line of officers and pushed against a police shield, and he remained in a crowd that was being gassed with irritants. He never intended to hurt or injure anyone. Matthew cannot really explain what was happening around him or in his mind at the time other than saying "chaos" — nor could he explain why it made sense to him at the time to do any of the things he did in those moments.

In an attempt to explain what happened on January 6, 2021, Mr. DaSilva made the following statement:

I never intended to hurt any officer. My intention was not to inflict any kind of harm.

I was saying things I couldn't put together. The things that I saw that day just didn't add up to me. I wasn't thinking clearly, and I couldn't explain to you what I did and why I did it. I am an introvert, and I am easily overpowered by a lot of stimuli. I was definitely overstimulated at that moment. I had a very difficult time processing that day. I have a very difficult time with a lot of noise. There was a lot of noise and chaos. I don't have an explanation for why I stayed there. I came there alone and I trusted the crowd, people I didn't know.

I will never again participate in any protest that does not have a clear leader and a clear itinerary that I know is legal. I have been to many pro-life protests and I have never done anything I regretted at a protest, until this one. I have never even interacted with counter-protesters.

I regret interacting with the officers in the manner that I did. I respect police officers. Obviously, if I could do this all over again, I would not have remained in that

chaos, and I wouldn't have interacted with the officers. I would have just gone home. It's a hard lesson. I deeply regret putting my hands on that shield.

The man that you saw in that video is not who I am and not who I want to be. I spent my life being a good person and doing charity work. That is who I am.

I have been engaging in self-improvement and introspection since that day and I have been in behavioral therapy for a year now. What happened that day will not happen again.

After the protest, Mr. DaSilva flew back home. His wife tells the story of how he fell into her arms when he saw her, crying. *See* Defense Exhibit 5. "Matthew said he deeply regretted putting his hands on a police shield," Christina explained. Matthew DaSilva didn't like who he was at the protest or what he did there. He quickly decided to turn his life around. He cut his hair and shaved his untamed facial hair. Matthew and his wife started spending more time together, concentrating on more of the important parts of life.

He eventually realized that he needed professional help to continue his transformation. He started attending behavioral therapy counseling. Matthew has devoted a substantial amount of time to self-repair, attending counseling sessions regularly for the course of a year prior to being ordered into incarceration. *See* Defense Exhibit 1. During the therapy sessions, Matthew addressed emotional regulation and worked on rehabilitating his behavioral responses to emotional events. According to Dr. Michael Lynch, who conducted a neuropsychological assessment of Mr. DaSilva in February of 2022, before the behavioral therapy began, and then again just a few weeks before sentencing in October 2023— Mr. DaSilva greatly benefitted from the behavioral therapy and Dr. Lynch is optimistic about Mr. DaSilva's progress. *See* Defense

Exhibit 6. The same sentiment was conveyed by Mr. DaSilva's behavioral therapy counselor in Defense Exhibit 1.

Moreover, Mr. DaSilva asked his counsel early on to reach out to the Government to work out a plea deal so that he could take responsibility for his actions. The plea discussions were unfruitful because the DOJ offers were incongruent with his conduct and included penalties for things he did not do, and so Mr. DaSilva was left with no choice but to proceed to trial. Each plea offer from the Government required Mr. DaSilva to admit that he possessed the intent to commit another felony as he interacted with the officers holding the shield — an intent Mr. DaSilva did not have and could not admit to having. *See* discussion in Section V, *infra*. In line with the lack of evidence and the lack of actual intent to commit another felony, Mr. DaSilva was acquitted of possessing such intent in his trial verdict.



### III. Sentencing Guidelines

As then-Judge Gorsuch once stated: the purpose of sentencing is to "wisely weigh things that cannot be easily weighed." *United States v. Sabillon-Umana*, 772 F. 3d 1328, 1330 (10th Cir. 2014).

> How much punishment is enough to protect the public? To deter future wrongdoing? To reflect the gravity of the offense? And how much punishment suffices to accomplish all these things without verging on cold revenge or needless retribution? …our system depends, as perhaps it must, on the discretion of thoughtful judges.

*Id*.

The first step of this monumental task is to determine the applicable advisory Sentencing Guidelines. *Gall v. United States*, 128 S.Ct. 586, 590 (2007) ("Guidelines are the starting point and initial benchmark but are not the only consideration"). From there, a judge must "tailor every sentence to the case and defendant at hand." *Sabillon-Umana*, 772 F. 3d at 1330. A judge "may not presume that the Guidelines range is reasonable but must make an individualized assessment based on the facts presented." *Gall,* 128 S. Ct. at 597. The judge must carefully weigh each of the § 3553(a) factors to determine whether they support the sentence argued for by each party. *Id*. at 596-97. The final sentence ordered by the Court "must… promote the perception of fair sentencing." *Id*. at 597.

### A) Applicable Guidelines

Mr. DaSilva was convicted of two felony counts: assault on law enforcement with physical contact under 18 U.S.C. §111(a) and civil disorder under 18 U.S.C. § 231(a)(3), in addition to three misdemeanors and one petty offense, for the same conduct.

Per defense review of the Sentencing Guidelines, there are two potentially applicable guidelines in this case.[1] [2] Both produce the same Sentencing Recommendation under the Guidelines — Offense Level 13, Category I — a 12 to 18 month sentence in Zone C.

- Option 1: U.S.S.G. § 2A2.3 guides sentencing for a conviction under 18 U.S.C. §111(a). The base offense level is 7 when the conduct includes physical contact. If the victim was a government officer, the *offense of conviction* was motivated by such status, and the offense was against a person, there is a 6-point increase under U.S.S.G. § 3A1.2— bringing the defendant's Guideline under § 2A2.3 to 13.

- Option 2: U.S.S.G. § 2A2.4 guides sentencing for a conviction under 18 U.S.C. § 231(a)(3). The base offense level under § 2A2.4 is 10, and if the offense involves physical contact, there is a 3-point increase. Thus, the defendant's Guideline under § 2A2.4 is also 13.

Regardless of how the start of the applicable Offense Level is computed, the math comes out to 13.

An Offense Level of 13 for a first-time offender yields a Zone C, 12-18 month sentence.[3]

Pursuant to U.S.S.G. § 5C1.1(d), a Zone C penalty can be served as community confinement or home detention for half of the sentence.

This Court can nonetheless give Mr. DaSilva a 2-level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1 — which permits a reduction in offense level "if the defendant clearly demonstrates a recognition and affirmative acceptance of personal responsibility for his criminal conduct." Note 2 to § 3E1.1 states, "a defendant may clearly

---

[1] The Government believes that the applicable Guideline is U.S.S.G. § 2A2.2. The Defense addresses the argument in opposition to the Government in a separate memorandum, in the *Defendant's Motion for Resolution of Disputed Sentencing Factor,* ECF No. 107.

[2] Objection to PSR calculations: a final Pre Sentence Report ("PSR") noting the Defense objections has not been filed by the probation office. While the defense asks this Court to review the portions of the draft PSR, ECF No. 104, with respect to Defendant's background and character, we ask that the calculations of the draft PSR be disregarded as improperly calculated, see ECF No. 105.

[3] See also Objections to PSR, ECF No. 105. The PSR's calculations are based on improper Guideline U.S.S.G. § 2A2.2 and the improper separation of Ofc. Sterling from the other officers into his own separate group.



demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." Mr. DaSilva's significant pretrial self-rehabilitation measures and pretrial attempts to plead guilty, as well as a lack of opportunity/offer to enter into a pretrial plea to a non-aggravated offense, qualifies Mr. DaSilva for this Court's consideration of the application of an acceptance of responsibility credit pursuant to U.S.S.G. § 3E1.1. *See United States v. Harrington*, 947 F.2d 956 (D.C. Cir. 1991) (holding that post-offense but pretrial rehabilitation effort may justify a two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1). *See* pages 42-43, *infra*.

The Sentencing Guidelines at all times "are advisory only." *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007). Instead, it is 18 U.S.C. § 3553(a) that directs Sentencing in Federal Courts. *Id*. at 575. Section 3553(a) provides the Courts with an "overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in § 3553(a)(2)." *Id*. Most importantly, **"§ 3553(a)(3) directs the judge to consider sentences other than imprisonment," even when the Guidelines recommend imprisonment.** *Gall v. United States*, 128 S. Ct. 586, 602 (2007).


**B) § 3553(a) Sentencing Factors:**

The seven factors for this court to consider under 18 U.S.C. § 3553(a) are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant, [*discussed in Sections I and II*]

(2) the need for the sentence imposed to reflect the four primary purposes of sentencing, i.e., retribution, deterrence, incapacitation, and rehabilitation, [*discussed in Section IV*]

(3) the kinds of sentences available [*see Gall v. United States*, 128 S. Ct. 586, 602 (2007) (a sentencing judge must consider sentences other than imprisonment)], [*discussed in Section III*]

(4) the sentencing range established through the application of the sentencing guidelines and the types of sentences available under the guidelines, [*discussed in Section III*]

(5) any relevant "policy statements" promulgated by the Sentencing Commission, [*discussed in Motion for Resolution of Disputed Sentencing Factors*]

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of ***similar conduct***, *and,* [*discussed in Section V*]

(7) the need to provide restitution to any victims of the offense. [*discussed in Section IV*]

## C) Sentencing Limitations

While the sentencing court has discretion over imposing an appropriate penalty, Congress has placed limits. This court's ability to impose an available penalty is limited by 18 U.S.C. §§ 3551 and 3561(a)(3). *See United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023); *United States v. Martin*, 363 F.3d 25, 35 (1st Cir. 2004) ("both § 3551(b) and § 3561 require a district court to choose between probation and imprisonment when imposing its original sentence"). This court only has the power to impose (1) a term of probation, (2) a fine as authorized, **or** (3) a term of imprisonment. "Probation and imprisonment are alternative sentences that cannot generally be combined." *United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023). An exception is carved out in 18 U.S.C. § 3551 for a fine — a fine is explicitly permitted to be tacked to another penalty. No other tacking or conjunctive exceptions are noted in the Code.

Supervised release is the Code's exclusive form of post-confinement monitoring and may only be ordered if a defendant is sentenced to a term of imprisonment. *See* 18 U.S.C. §3583; *United States v. Little*, Case No. 22-3018 (D.C. Cir. Aug. 18, 2023). Supervised release conditions are subject to the mandatory and discretionary conditions outlined by Congress in 18 U.S.C. §3583.

The probationary conditions that this Court may order *in lieu of incarceration* are limited to the mandatory and discretionary conditions outlined in 18 U.S.C. § 3563. Imposition of a discretionary condition must be "reasonably related to the factors set forth in section 3553(a)(1) and (a)(2) and to the extent that such conditions involve only such deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 3553(a)(2)." *See* 18 U.S.C. § 3563(b).

Additional limitations on the imposition of a penalty include the underlying justification for the penalty. For example, a term of imprisonment cannot be imposed or lengthened for rehabilitative purposes, see 18 U.S.C. § 3582(a) and 28 U.S.C. § 994(k); and, a sentence upon revocation of supervised release cannot be imposed for retributive purposes, see 18 U.S.C. § 3583(e). *See also Tapia v. United States*, 131 S.Ct. 2382 (2011).

An appropriate sentence is defined as "**sufficient, but not greater than necessary**, to comply with the purposes set forth in [18 U.S.C. § 3553(a)(2)]." *See* 18 U.S.C. § 3553. Moreover, any sentence imposed by this Court is limited by the Eighth Amendment's restrictions on excessive fines and cruel and unusual punishment.

**IV. Incapacitation, Rehabilitation, Retribution, Restitution, and Deterrence**

(A)      ***Specific deterrence*** for this 51-year-old Catholic man has been achieved through the humiliation of an arrest, extensive pretrial supervision with conditions lasting for a period of over 2 years, the process of being publicly shamed in the media for his conduct, a public trial during which he has been found guilty, a permanently marred criminal record, as well as having been incarcerated for a period of 3 months leading up to sentencing.

The reality is that Mr. DaSilva regretted his participation immediately. But the experience of being arrested, going through court appearances in two federal jurisdictions, conferences with counsel, public shaming in the media and on social media, constant contact with a probation officer — and federal criminal prosecution in and of itself — followed by a conviction and incarceration has made it crystal clear to Mr. DaSilva that the First Amendment freedom of expression and freedom to protest is not without limitation. The defendant has come to a solid and permanent understanding of the bounds of getting carried away with a crowd.

Moreover, as a first-time offender, this defendant has the lowest likelihood to re-offend, according to the U.S. Sentencing Commission's research on the recidivism of federal offenders.[4]

Further efforts to deter this defendant are simply unnecessary.

---

[4] *Recidivism of Federal Offenders Released in 2010*, U.S. SENTENCING COMMISSION (Sep. 30, 2021), https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010.

(B)      **_Rehabilitation_** in this case has been achieved through Mr. DaSilva's voluntary

engagement in behavioral therapy sessions for the duration of one year leading up to the trial.

_See_ Defense Exhibit 1.

Mr. DaSilva voluntarily engaged the services of a professional counselor to work on

addressing his mental health and behavioral responses, which he believes played a role in his

decision to engage in conduct otherwise unbecoming of his character on January 6. Matthew

engaged in both Cognitive Behavioral Therapy and Person-centered Therapy to hone his

emotional regulations and make adjustments. The therapist saw progress, writing that, "he gained

in self-awareness, emotional regulation skills and insight into how not all behavior is productive

or useful to gain what he seeks. He also increased his awareness of his emotional challenges and

identified ways to question his thinking and make adjustments." _See_ Defense Exhibit 1. Mr.

DaSilva's rehabilitation efforts lasted for one year until he was imprisoned following the verdict.


(C)      In addition to the deterrent effect, pretrial supervision has already served an

**_incapacitative_** effect on Mr. DaSilva, a first-time offender. And, additionally, he has been

incarcerated for 3 months leading up to sentencing.

Mr. DaSilva has been on pretrial supervision with restrictions from this court for the

duration of 2 years, a significant period of pretrial supervision. He has remained perfectly

compliant with his restrictions. Pretrial services have served as an effective mode of supervision

and **_incapacitation_** for this defendant, rendering additional incapacitation unwarranted. On top of

that, he turned himself in as this Court had ordered upon conviction and has served 3 months in

jail without causing any problems.

Additional incapacitation is not necessary for this defendant, but if ordered, should be served as home confinement or community confinement. There is no justification to order Mr. DaSilva to more than time served as imprisonment.

(D)     ***Restitution*** is not a significant issue in this case as Mr. DaSilva has offered to prepay some restitution, even though he did not individually damage or destroy any property at the Capitol. Due to his participation, Mr. DaSilva feels a sense of responsibility to assist in paying for the cleanup of the Capitol Grounds. Mr. DaSilva even attempted to prepay $500 in restitution at the Clerk's Office and filed a motion to allow prepayment of restitution upon his conviction.

(E)     In observing the arrests, pretrial restrictions and confinements, and relentless prosecution of January 6 participants through the meticulous reporting of the mainstream media, the public has been provided with more than sufficient ***general deterrence***. Hundreds of thousands of news articles have been published about the arrests and prosecutions of January 6 defendants and numerous congressional hearings related to January 6 have taken place. Donald Trump himself has been indicted for his role in the events of January 6. On top of that, the DOJ has created unique public-shaming web pages for every January 6 defendant, a digital version of tar and feathering.[5] The public has been put on clear notice that transgressions against the Capitol or the operation of the Federal Government will not be tolerated.

Conservatives and Trump supporters have been uniquely deterred as political groups— having grown genuinely frightened by engaging in any protest against the Government, a much

---

[5] Mr. DaSilva's devoted DOJ web page can be found here: https://www.justice.gov/usao-dc/defendants/DaSilva-Matthew.

deeper (and more troubling) general deterrence than is called for by penal law. For example, when a protest was organized in support of improving detention conditions for January 6 arrestees in September of 2021, only about 100 people arrived to protest, with police and media vastly outnumbering the protesters.[6] When Donald Trump was called into this courthouse for his initial appearance in August of 2023, protesters were difficult to find.[7] "[O]nly around a dozen supporters of the former president were outside the courthouse," reported Politico.[8]

Other political groups have also been deterred from staging protests by the January 6 arrests. The Virginia militia chapter leader of the "Boogaloo" movement (A.K.A. "Virginia Knights" and "Last Sons of Liberty") stated in a recorded video interview on August 18, 2023: "I haven't done any protests since January 6, 2021."[9]

Accordingly, the DOJ has already achieved general deterrence through its unprecedented, unyielding prosecution of all defendants, no matter the magnitude of involvement, top to bottom — from the former President of the United States himself to individuals who briefly trespassed.

---

[6] *Police outnumber protesters at right-wing Capitol rally*, BBC NEWS (Sep. 19, 2021), https://www.bbc.com/news/world-us-canada-58612965.

[7] Kyle Cheney (@kyledcheney), Twitter (Aug 3, 2023, 8:05 AM), https://twitter.com/kyledcheney/status/1687072114359103488.

[8] Andrew Zhang, *Subdued crowd gathers outside Washington courthouse where Trump was arraigned*, POLITICO (Aug. 3, 2023), https://www.politico.com/news/2023/08/03/trump-indictment-courthouse-arraignment-00109643.

[9] Ford Fischer (@FordFischer), Twitter (Aug 18, 2023, 11:32 PM), https://twitter.com/FordFischer/status/1692741297717535039.

(F)   **Retribution** in this case has also been accomplished before the imposition of sentence — by the general public contributing significantly to the arrest of the individuals photographed inside of the Capitol.[10]

A substantial portion of the January 6 defendants have been identified and brought to FBI attention through "crowdsourcing" with the public's assistance.[11] Civilian groups such as *Sedition Hunters* have formed to identify and report those who were involved.[12] Friends, coworkers, and even family members have reported a substantial portion of January 6 participants.[13] The FBI, in turn, has provided a sense of satisfaction to those who assisted law enforcement by arresting the identified individuals, no matter the extent of their role on January 6. Retribution, accordingly, had been accomplished through the public's partnership with the FBI and the DOJ— and the arrests and prosecutions that followed.

**Therefore, each of the aims of sentencing — rehabilitation, retribution, restitution, specific deterrence, general deterrence, and even incapacitation — have been met in this case pre-sentencing.**

---

[10] Phil Rogers, '*Sedition Hunters' Seek to Identify Participants in Jan. 6 Capitol Attack,* NBC CHICAGO (11/24/2021), https://www.nbcchicago.com/investigations/sedition-hunters-seek-to-identify-participants-in-jan-6-capitol-attack/2693284; Sukrit Venkatagiri, Tianjiao Yu, Vikram Mohanty, and Kurt Luther, *Sedition Hunters: A Quantitative Study of the Crowdsourced Investigation into the 2021 U.S. Capitol Attack,* WWW '23: PROCEEDINGS OF THE ACM WEB CONFERENCE 2023 (April 2023), https://dl.acm.org/doi/pdf/10.1145/3543507.3583514.

[11] *Researchers study the crowdsourced investigation of Jan. 6, 2021*, VIRGINIA TECH (May 3, 2023), https://liberalarts.vt.edu/news/articles/2023/05/liberalarts-crowdsourced-investigation-study.html.

[12] Will Carless, *After Jan. 6 riot, hundreds of identifiable people remain free. FBI arrests could take years*, USA TODAY (Mar. 2, 2023), https://www.usatoday.com/story/news/nation/2023/03/02/sedition-hunters-hundreds-jan-6-rioters-pending-fbi-arrests/11283885002.

[13] Hannah Knowles and Paulina Villegas, *Pushed to the edge by the Capitol riot, people are reporting their family and friends to the FBI*, THE WASHINGTON POST (Jan. 16, 2021), https://www.washingtonpost.com/nation/2021/01/16/capitol-riot-family-fbi; Cassidy McDonald, *Dozens of Capitol rioters were turned in by childhood friends, family members, colleagues and ex-lovers who watched them storm the building*, CBS NEWS (Mar. 9, 2021), https://www.cbsnews.com/news/capitol-riot-arrests-friends-turned-in.

## V. Avoiding Sentencing Disparities

According to the Government, January 6 cases are incomparable to preceding criminal cases, and thus exempt from fair comparison with any cases that are not January 6 cases. As such, the Government seeks a disproportionately high sentence for all January 6 participants. The problem with the Government's proposition is that the Government is responsible for creating the uniqueness of the January 6 prosecutions.

### A. DOJ Approach to 2020 Political Riot Cases

The BLM political riots of 2020, which preceded the January 6, 2021 Capitol incident by a few months, show a glaring disparity in DOJ treatment of similarly situated defendants.[14] Around 300 individuals (this is a total number from 29 states and Washington, D.C.) were charged by the DOJ, though only for violent or serious offenses such as attempted murder, arson, burglary, assaulting law enforcement, damaging federal property, malicious destruction of property using fire or explosives, felon in possession of a firearm and ammunition, possession of a destructive device, and civil disorder.[15] Unlike its relentless dedication to convict January 6 participants, the DOJ decided to dismiss many of the violent charges against BLM protesters, including charges of assaults on law enforcement.[16]

---

[14] Available video footage of the 2020 riots has been collected and stored at https://riotarchive.com.

[15] Press Release, *Over 300 People Facing Federal Charges For Crimes Committed During Nationwide Demonstrations*, DOJ (Sep. 24, 2020), https://www.justice.gov/opa/pr/over-300-people-facing-federal-charges-crimes-committed-during-nationwide-demonstrations.

[16] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested have cases scrapped, while 32 more are left pending*, DAILYMAIL (May 4, 2021), https://www.dailymail.co.uk/news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.



### i. __Portland, Oregon__

In Portland, Oregon, the federal courthouse —
along with its police officers, local police department, and
surrounding neighborhood— was continuously attacked
by left-wing protesters for a sustained period lasting over
100 days.[17] While the federal crimes were deliberate and
premeditated, only about 103 individuals were arrested
throughout the four-month ordeal, most for arson and
serious assaults on police officers.[18] The DOJ put out a
press release on the relentless riots, saying: "violence
instigated and carried out by Antifa and other similar
groups in connection with the rioting is domestic
terrorism and will be treated accordingly."[19] Yet, **the
overwhelming majority of the riot defendants had
their federal charges _dismissed_.**[20] *See also* Defense



---

[17] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested
have cases scrapped, while 32 more are left pending*, DAILYMAIL (May 4, 2021), https://www.dailymail.co.uk/news/
article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.

[18] Unlike their public searchable list of January 6 prosecutions, the DOJ does not publicize its list of Portland cases.
A collection of federal cases can be found by private individuals tracking and archiving publicly-revealed individual
case data on AntifaWatch.net. See also *Seventy-four face federal charges from Portland protests*, AP NEWS (Aug.
27, 2020), https://apnews.com/article/1c1901dd9c286794791dacc39b0a6727.

[19] Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, DOJ (May 31,
2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism.

[20] James Gordon, *Most Portland rioters have charges DISMISSED by US Attorney: 58 suspects of the 97 arrested
have cases scrapped, while 32 more are left pending*, DAILYMAIL  (May 4, 2021), https://www.dailymail.co.uk/
news/article-9540207/58-suspects-97-arrested-Portland-Oregon-cases-scrapped-32-left-pending.html.*; Bradford
Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*,
FOX NEWS (Dec. 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-assaulting-police-case-
dismissed-30-hours-community-service.

Exhibit 7, *Examples of 2020 Riot Case Dismissals in Portland*. These dismissal decisions were made despite the aforementioned DOJ press release calling the relentless riots "domestic terrorism."

In what world would it be considered "*justice*" for those who committed numerous felonious assaults, with injuries, on police officers to receive more lenient treatment than a man who pressed his hands on a police shield? Yet that is exactly the word that the DOJ used when dismissing the case of Joshua Warner (AKA "Eva"). Warner was arrested *three separate times* during the 2020 Portland riots for assaults on police, resisting arrest, criminal mischief, another assault on police, etc.[21] Warner was charged under federal law with civil disorder for "targeting the eyes of multiple law enforcement officers with a high-powered laser during an August 8, 2020 riot in North Portland," a DOJ press release read.[22] Yet, the DOJ did not pursue federal assault charges and dismissed the civil disorder charge in exchange for just 30 hours of community service, saying it was "in the best



---

[21] Bradford Betz, *Portland Antifa rioter charged with assaulting police has case dismissed after 30 hours community service*, FOX NEWS (Dec. 30, 2021), https://www.foxnews.com/us/portland-antifa-rioter-charged-assaulting-police-case-dismissed-30-hours-community-service.

[22] *Press Release, Beaverton Woman Charged with Civil Disorder After Targeting Police Officers with High-Powered Laser*, UNITED STATES ATTORNEY'S OFFICE DISTRICT OF OREGON (Sep. 3, 2020), https://www.justice.gov/usao-or/pr/beaverton-woman-charged-civil-disorder-after-targeting-police-officers-high-powered-laser.



interests of justice." *United States v. Warner*, Case 3:20-cr-00442-HZ, ECF No. 26 (D. Or. Dec. 21, 2021).[23]

This is the same Department of *Justice* that decided that Matthew DaSilva's January 6 participation rendered him ineligible for deferred prosecution and ineligible for a misdemeanor plea deal — even though his conduct on January 6 fell well below the actions of Defendant Warner in Portland.

Thus, even though his conduct was nowhere near the level of the Portland defendant, Mr. DaSilva will live out his life as a convicted felon, while the person who assaulted and seriously endangered the eyesight of multiple police officers in Portland (then came back two additional times after being arrested to commit more crimes) walked away above reproach.

Adding insult to injury, the small handful of individuals who were actually convicted of their federal crimes in Portland received *significant* leniency from the DOJ at sentencing. For example, after securing a conviction for Kevin Benjamin Weier for the felonious depredation of Government property for the act of setting fire to the Portland federal courthouse— a felony

offense punishable by up to 10 years in prison, a $250,000 fine, and three years supervised release— the Government filed a five-page, bare-bones sentencing memorandum that asked to sentence the defendant to a one-year term of probation. *See United States v. Weier*, Case No. 3:20-cr-00263-IM, ECF No. 39, *5 (D. Or. Nov.

---

[23] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.ord.155702/gov.uscourts.ord.155702.26.0.pdf.

10, 2021).[24] For perspective, compare the DOJ's request for Mr. Weier to the sentence requested for January 6 defendant Michael Stepakoff, a rabbi who was convicted of a petty misdemeanor for walking into the Capitol on January 6, shaking hands with a police officer, thanking him for his service, and walking out after only 5 minutes inside the building — "14 days in custody followed by three years' probation, 60 hours of community service and $500 in restitution." *See United States v. Stepakoff*, 1:21-cr-00096-RC, ECF No. 36, *27 (D.D.C. January 11, 2022).[25] In Mr. DaSilva's case, the Government has already hinted that they will be seeking a sentence of about 3 years of imprisonment to be served fully in prison. Unlike Mr. Weier's acts of arson, Mr. DaSilva's conduct resulted in no injuries and no permanent damage and did not endanger anyone's life.

Furthermore, Mr. Weier's probation recommendation for a felony arson offense was agreed to via plea agreement which <u>did not</u> reserve the right for the DOJ to seek a terrorism enhancement even though the described activity was deemed terrorism by the Attorney General. *See United States v. Weier*, Case No. 3:20-cr-00263-IM, ECF No. 35 (D. Or. Aug. 19, 2021). Yet, all felony plea offers made to January 6 defendants, even *Class 1 misdemeanor* plea agreements for some of the nonviolent January 6 trespassers, reserve the option for the DOJ to attempt to seek an upward departure for terrorism under U.S.S.G. § 3A1.4, n. 4. *See, e.g.*, *United States v. Kuehne*, Case No. 1:21-cr-160-TJK, ECF No. 197, *4 (D.D.C. Sep. 7, 2023)[26]; *United States v.*

---

[24] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.ord.153765/gov.uscourts.ord.153765.39.0.pdf.

[25] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227275/gov.uscourts.dcd.227275.36.0.pdf.

[26] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.228126/gov.uscourts.dcd.228126.197.0.pdf.

*Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 75, *4 (D.D.C. Oct. 13, 2021).[27] While Mr. DaSilva never received plea paperwork from the Government, the paperwork would have been the standard plea paperwork offered to all January 6 defendants which reserved the DOJ's right to seek a terrorism enhancement.

### ii. Seattle, Washington

In Seattle, BLM protests led to similar arson and violence as in Portland — with similar commiseration from the DOJ.

While the destruction in Seattle during the summer riots was extensive, only two defendants were federally charged for their conduct.[28] (Additional riots in Seattle took place in later months and are discussed separately, *infra*).



The first Government sentencing memorandum filed in these cases was for a woman charged with felony arson of five police vehicles. The Government memo revealed how the DOJ

---

[27] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.75.0_1.pdf.

[28] Amy Radil, *These are the people who face criminal charges in Seattle after the protests*, KUOW (Jul. 9, 2020), https://www.kuow.org/stories/who-faces-criminal-charges-related-to-seattle-area-protests-here-s-a-roundup.



viewed the progressive BLM protest in Seattle: "an important cause" that "should have been an inspiring event" with an "important message." *See United States v. Channon*, Case No. 2:20-cr-00129-JCC, ECF No. 76 (W.D. Wash. Feb 8, 2022).[29]

The second sentencing memorandum that the Government filed for these cases was for a man accused of bringing a firearm to the BLM protest with the intent to kill police officers — he was arrested after throwing a 16-ounce can of beer through the window of a police cruiser and striking an officer in the face. In this memo, the Government described the BLM riot that resulted in millions of dollars in property damage in Seattle as "a peaceful but volatile protest." *See United States v. Parker*, Case No. 2:20-cr-00084-RSM, ECF No. 116 (W.D. Wash. Jun. 2, 2023).[30] (It's almost as if the DOJ chose such language to taunt conservatives, who were outraged at CNN for referring to the arsonous BLM riots in Kenosha, Wisconsin as "firey but mostly peaceful."[31])





---

[29] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.wawd.288533/gov.uscourts.wawd.288533.76.0.pdf.

[30] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.wawd.287719/gov.uscourts.wawd.287719.116.0.pdf.
*See also* Katherine Anne Long and Paul Roberts, *Downtown businesses assess damage, weigh reopening after nights of riots, looting and chaos,* THE SEATTLE TIMES (May 31, 2020), https://www.seattletimes.com/business/local-business/downtown-businesses-assess-damage-weigh-reopening-after-nights-of-looting-and-chaos; Claire Sprang, *Seattle To Pay $3.6 Million in Damages to Businesses Over 2020 BLM Riots*, THE WASHINGTON FREE BEACON (Feb. 22, 2023), https://freebeacon.com/democrats/seattle-to-pay-3-6-million-in-damages-to-businesses-over-2020-blm-riots.

[31] *See* Joe Concha, *CNN ridiculed for 'Fiery But Mostly Peaceful' caption with video of burning building in Kenosha,* THE HILL (Aug. 27, 2020), https://thehill.com/homenews/media/513902-cnn-ridiculed-for-fiery-but-mostly-peaceful-caption-with-video-of-burning.

In comparison, the rally on January 6 has only been described by the DOJ in sentencing memoranda as "a violent attack" and "a large and violent riot." *See, e.g.*, *United States v. Cudd*, Case No. 1:21-cr-68-TNM, ECF No. 90, *1-2 (D.D.C. March 16, 2022).[32] The Government has never, in any pleading known to undersigned counsel, made any sympathetic statements in commiseration with the underlying non-criminal protest on January 6 outside of the Capitol— a protest that could technically also be described as an "*important cause*" that "*should have been an inspiring event*." The hundreds of thousands of January 6 protesters who came to DC to protest election integrity on January 6 or to support their political candidate, who they earnestly believed had won the 2020 election, and who remained outside the Capitol and broke no laws — were not given any credit by the Government in the way that credit was given by the DOJ to non-criminal protesters in Seattle.[33] January 6 has never been described by any DOJ prosecutor as "*a peaceful but volatile protest,*" even though, under the Government's own logic, it certainly could have received such adoration.

---

[32] Also available at:
https://storage.courtlistener.com/recap/gov.uscourts.dcd.227066/gov.uscourts.dcd.227066.90.0.pdf.

[33] See, e.g., Jenni White, *What I Saw At The 'Save America Rally' In Washington, DC On Jan. 6*, The Federalist (Jan. 11, 2021), https://thefederalist.com/2021/01/11/what-i-saw-at-the-save-america-rally-in-washington-dc-on-jan-6 ("There were hundreds of thousands of people all standing together peacefully in one spot for more than five hours. A small percentage of this group entered the capitol and perpetrated mayhem while hundreds of thousands were peacefully milling around outside. Video of the event shows other attendees remonstrating with some who broke windows or stood on statues, telling them to stop.").

### iii. Minneapolis, Minnesota

Perhaps the most startling disparity of all can be seen in a memorandum filed by the Government in the District of Minnesota, where hundreds of BLM rioters engulfed Minneapolis in flames— burning homes, businesses, and even people.

On May 28, 2020, in the middle of a BLM riot, a convicted felon, who was on probation at the time, set fire to a pawn shop, saying: "Fuck this place. We're gonna burn this bitch down." *United States v. Lee*, Case No. 0:20-cr-00168, ECF No. 67, *2 (D. Minn. Nov. 4, 2021).[34]  A 30-year-old man was burned to death in that fire. *Id*. at *3.

In its sentencing memorandum, the DOJ brazenly excused the homicide— "[the defendant] appears to have believed that he was, in Dr. King's eloquent words, engaging in 'the language of the unheard.'" *Id*. *9. The Government's memo did not attempt to resolve the issue of how the defendant's words at the time of the offense were entirely inconsistent with his post-arrest political explanations. Instead, citing Dr. Martin Luther King, Jr., the Government requested a downward departure from the Guidelines, seeking *half* of the Guidelines sentence for the homicide. *Id*. *7, 12. The Government's sentencing memorandum read more like that of a defendant's, with the DOJ advocating on behalf of the felon, sympathizing with his alleged political views, and justifying his allegedly political actions.

---

[34] Also available at
https://storage.courtlistener.com/recap/gov.uscourts.mnd.189358/gov.uscourts.mnd.189358.67.0_2.pdf.

### iv. Washington, D.C.



In May 2020, BLM protesters set fires around the White House, caused the President to retreat to a bunker, and clashed with federal law enforcement for days on end.[35] Depicted in the video released by the Department of the Interior, protesters were pushing police shields, assaulting federal officers, and disobeying orders.[36] CNN televised protesters tugging a protective barrier away from federal officers.[37] None of these individuals were investigated or charged for their conduct. But January 6 defendants who committed the same acts were investigated, arrested, and charged.[38]



On May 31, 2020, then-Attorney General William Barr announced that "*violent radical agitators*" from the BLM protests in D.C. would be investigated and charged.[39] Indeed, the DOJ apprehended and charged individuals for



---

[35] *Secret Service Statement on Pennsylvania Avenue Demonstrations*, UNITED STATES SECRET SERVICE, (May 31 2020), https://www.secretservice.gov/newsroom/releases/2020/05/secret-service-statement-pennsylvania-avenue-demonstrations-0; Shawn McCreesh, *Protests Near White House Spiral Out of Control Again*, THE NEW YORK TIMES (May 31 2020), https://www.nytimes.com/2020/05/31/us/politics/washington-dc-george-floyd-protests.html.

[36] Department of the Interior Press Secretary (@DOIPressSec45), Twitter (Jun 24, 2020, 1:53 PM), https://twitter.com/DOIPressSec45/status/1275849473701433345.

[37] Andy Ngô (@MrAndyNgo), Twitter (May 30, 2020, 1:30 AM), https://twitter.com/MrAndyNgo/status/1266602847182786567.

[38] See, e.g., *United States v. DaSilva*, Case No. 1:21-cr-00564, ECF No. 48 (D.D.C. May 19, 2023).

[39] Press Release, *Attorney General William P. Barr's Statement on Riots and Domestic Terrorism*, U.S. DEPARTMENT OF JUSTICE (May 31, 2020), https://www.justice.gov/opa/pr/attorney-general-william-p-barrs-statement-riots-and-domestic-terrorism.

acts of bank robbery, bank burglary, arson at the Supreme Court, Molotov cocktail attacks on police, and attacks on the Lincoln Memorial.[40] The January 6 investigation, on the other hand, was not limited to "*violent radical agitators*." Instead, on January 7, 2021, Christopher Wray announced the investment of the full resources of the FBI into an indiscriminate search of "*those involved*" in January 6 misconduct, irrespective of nonviolence or the severity of an individual's involvement.[41] The result is that two-thirds of the individuals arrested for January 6 participation were charged with only nonviolent conduct.[42]





The overt disparity between the Government's choice to only pursue *violent agitators* from left-wing protests, and yet *all individuals* from the January 6 protest, yields an unavoidable conclusion: had a January 6 protester committed certain acts in the middle of a BLM protest he

---

[40] *See United States v. DaSilva*, Case No. 1:21-cr-00564, ECF No. 59, *9 (D.D.C. Jun. 9, 2023).

[41] FBI Press Release, *Director Wray's Statement on Violent Activity at the U.S. Capitol Building* (Jan. 7, 2021), FBI, https://www.fbi.gov/news/press-releases/director-wrays-statement-on-violent-activity-at-the-us-capitol-building-010721.

[42] *See 32 Months Since the Jan. 6 Attack on the Capitol*, U.S. DEPARTMENT OF JUSTICE (Sep. 6, 2023), https://www.justice.gov/usao-dc/32-months-jan-6-attack-capitol.

would have gotten off scot-free, but because he committed such acts in the middle of a Trump protest he was charged. That political discrepancy is very troubling.

As is stated in Mr. DaSilva's Reply on his Motion to Dismiss based on Selective Prosecution, the Government's memorandum in opposition affirms that **had Mr. DaSilva pushed on a police shield during a left-wing protest in front of the White House in May 2020, he would not have been prosecuted**. *See* ECF No. 60. Indeed, angry protesters pushed against police shields during the May 2020 protests in front of the White House. They were not charged for their conduct.



**Man not prosecuted.**



**Man prosecuted and convicted.**

*The difference between a felony conviction and a non-prosecution for the same conduct has to feel gutting for a defendant sitting in a D.C. jail cell, awaiting sentencing.*

As discussed in ECF No. 48 and 60, prior to January 6 of 2021,  the Government has never charged any protester for pushing against a police riot shield — ever — not even once.

**<u>v. DOJ's Disparate Treatment of January 6 Participants Requires Consideration of</u>**

**<u>Non-prosecuted Cases</u>**

The Government's disparate treatment of the January 6 protesters, as compared to the

BLM and other 2020 protesters — as well as the DOJ's cherry-picked view on the righteousness

of only certain kinds of political riots — provides much-needed context to the otherwise

incomparable arrests and sentencing requests for January 6 defendants, including the anticipated

disproportionately high sentence the request the Government will make for Mr. DaSilva. Had the

DOJ treated all riots in the same manner and prosecuted all rioters similarly, this sentencing

memo would have been a lot more simplistic. But alas, the DOJ has forced this argument.

The DOJ's deliberate omission from federal prosecution of BLM protesters is how the

Government justifies the claim that January 6 participants could only be compared to other

January 6 participants for purposes of criminal penalty imposition. Indeed, there are very few

cases to compare to the January 6 defendants under 18 U.S.C. § 3553(a), which asks the Court to

compare sentences of defendants found guilty of "similar conduct." The reason is that the *DOJ*

*has caused this disparity* by *only* having prosecuted certain conduct when it was done by the

January 6 defendants — by intentional choice.

In Mr. DaSilva's case, an entire class of individuals who pushed on police shields during

protests were deliberately omitted from sentencing comparables. But as we learned **from the**

**logic of *Wickard v. Filburn*, 317 U.S. 111 (1942), a deliberate decision *not to do something***

**can create a legally significant and substantial impact through that inaction**. The discussion

*supra* illustrates the Government's clear decision not to prosecute or to dismiss various offenses

from other political protests that plagued the country in 2020. But as a result, an entire class of

politically-motivated criminal defendants was omitted from sentencing comparables.

Accordingly, a question can be posed: *does the DOJ's decision not to charge BLM*

*protesters for pushing on police shields "exert a substantial effect" on the comparable*

*sentencing cases available to this court?* (To borrow phrasing from *Wickard)*. The inevitable

answer, as we have explored here, is — yes. *See also United States v. Griffin*, 549 F. Supp. 3d 49,

59 (D.D.C. 2021) ("Disparate charging decisions in similar circumstances may be relevant at

sentencing.") *United States v. Sandlin*, 575 F. Supp. 3d 16 (D.D.C. 2021) (citing *Griffin* for the

same proposition); *United States v. Judd*, 579 F. Supp. 3d 1 (D.D.C. 2021) (same); *United States*

*v. Robertson*, 588 F. Supp. 3d 114 (D.D.C. 2022) (same).

The defendant thus asks this Court to consider his conduct in the context of the BLM

protests of 2020 and the dismissal or non-prosecution dispositions of those cases in order to

render a fair sentence.


**B. Considering the DOJ's Recommendation in the Context of Other Riot Sentencings**

The Government has indicated that it will seek a sentence in the range of 33-41 months

for Mr. DaSilva, for the act interpreted as pushing and pulling on a police shield. *See* ECF No. 91

at *19. It is important to place this range into context.

As explained *supra*, there are very few protest cases that have comparable conduct —

none exactly similar that can be compared to the actions of Mr. DaSilva. The Defense,

accordingly has to discuss comparables from the perspective of much more serious cases in order

to illustrate the scope of an appropriate penalty.

i. Comparison to a Case with a Similar Sentence Request

In the recently sentenced Seattle BLM protest case of *United States v. Justin Christopher Moore*, the Government requested a sentence of 41 months for a man who plotted to burn the Seattle Police Officers Guild building in downtown Seattle and admitted to making and carrying a box of 12 Molotov cocktails to a September 2020 BLM protest in furtherance of his plan.[43] See *United States v. Moore,* 2:22-cr-00013-LK-1, ECF No. 52 (W.D. Wash. Aug. 23, 2023). The reason for the 41-month sentence request was that "Moore's offense was extremely dangerous and created a substantial risk of injury to numerous bystanders… Moore carried the box of twelve Molotov cocktails in a crowd of over 1,000 people who were participating in the protest march. All of them were in harm's way if one of the devices had exploded." *Id.* at *3. But that's not all. "[T]he evidence recovered at Moore's residence revealed his broader involvement with explosive devices and emphasized that he was a dangerous and volatile actor… Moore also characterized himself in the notebook as, among other things, 'borne [sic] to kill . . . that is what I am. I am a killer. I have killed.'" *Id.* at *5. Mr. Moore was ultimately sentenced to 40 months in prison by the Court.

In comparison, Matthew DaSilva put his hands on a police shield during a riot in front of the Capitol, then came home to his wife and cried her arms wishing he hadn't done that.

Mr. DaSilva's conduct and character may as well be on another planet. Yet, the Government has the audacity to request a similar sentence for both men. The Government's sentencing memo in the *Moore* case implies that politics is the reason for the discrepancy. The

---

[43] *Renton, Washington, man pleads guilty to unlawful possession of destructive devices*, U.S. ATTORNEY'S OFFICE WESTERN DISTRICT OF WASHINGTON (Sep. 22, 2022), https://www.justice.gov/usao-dc/32-months-jan-6-attack-capitol.

DOJ described the left-wing protest as a "gathering[] in protest of police brutality … support for important causes involving equal justice." *United States v. Moore,* 2:22-cr-00013-LK-1, ECF No. 52, *1 (W.D. Wash. Aug. 23, 2023). (As discussed earlier, the DOJ has no warm words to give the protest in front of the Capitol.) The DOJ simply has a bias.

Of note — the DOJ's characterization of the Seattle protest is particularly incongruent with how the Seattle Police Department described it in their Blotter. The police department described a day on which officers were pelted with rocks, bottles, and explosives and 22 people were arrested for acts of arson, assault, obstructing, and failure to disperse.[44]



## ii. Comparison to a Case with a Similar Charge

For the most important context in sentencing Mr. DaSilva, this Court should consider the case of *United States v. Christian Rea*, a man who intentionally threw a firework at a group of

---

[44] *22 Individuals Arrested During Labor Day Demonstration*, SPD BLOTTER (Sep. 7, 2020), https://spdblotter.seattle.gov/2020/09/07/22-individuals-arrested-during-labor-day-demonstration.

police officers at a Naperville, Illinois BLM protest in June of 2020.[45] Several officers suffered injuries as a result of his assault on police, but Mr. Rea was only charged with one count of Civil Disorder. *See United States v. Rea,* Case: 1:20-cr-00316, ECF No. 55, *3 (N.D. Ill. Dec 15, 2021). This charging decision led to a Guidelines Level of 10, with a Sentencing Range of 6-12 months. *Id. at* *6. Of note — **the Government decided that an assault on officers with a lit firework, that resulted in multiple bodily injuries, was an obstructive impediment under U.S.S.G. §2A2.4, not an aggravated assault under U.S.S.G. §2A2.2**. *Id.*

More interestingly, what the DOJ omitted from its filings in the *Rea* case, even from the Government's sentencing memo, was the permanent serious injury of one of the officers attacked by Mr. Rea. *See United States v. Rea,* Case: 1:20-cr-00316, ECF No. 65,  (N.D. Ill. May 9, 2022). According to the District Judge's findings at sentencing, "Mr. Rea threw a lit commercial firework toward a group of police officers during a protest, resulting in several serious injuries, including one officer having *permanent hearing loss*."[46] (Emphasis added). The Judge applied U.S.S.G. §2A2.4, and Mr. Rea was ultimately sentenced to 12 months for what he did to those officers.

Mr. DaSilva's Sentencing Guidelines, as calculated by the defense, call for a sentence of 12-18 months. Considering the nature of Mr. DaSilva's actions in the context of the *Rea* sentence, a sentence within the Guidelines range would be disproportionately high. As compared to Mr. Rea, who injured multiple officers by throwing an explosive device at them, Mr. DaSilva

---

[45] *Man Sentenced to a Year in Federal Prison for Throwing Incendiary Device at Police in Chicago Suburb*, UNITED STATES ATTORNEY'S OFFICE NORTHERN DISTRICT OF ILLINOIS (May 25, 2022), https://www.justice.gov/usao-ndil/pr/man-sentenced-year-federal-prison-throwing-incendiary-device-police-chicago-suburb.

[46] *Letter from Hon. Thos. M. Durkin, U.S. Dist. J., to U.S. Sentencing Comm'n* (May 25, 2022), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20221017/judge-durkin.pdf.

pushed on a police shield and did not cause any injuries, certainly none that were permanent. Mr.

DaSilva's conduct never posed the level of danger that was posed by the actions of Mr. Rea. The

sentences of the two men should proportionately reflect the nature of their actions. Accordingly,

Mr. DaSilva's penalty should be lower than that of Mr. Rea.


### C) Comparison to Other January 6 Defendants

The Government outlined some January 6 cases that it believes are factually comparable

to that of Mr. DaSilva in ECF No. 59 at *4. Three of these cases indeed pose similarities and

have resulted in sentences that should be considered in sentencing Mr. DaSilva.


### i. Sentences of January 6 Defendants Who Were Convicted at Trial for Pushing, Pulling, or Grabbing Riot Shields

On October 16, 2023, in the case of *United States v. Wren*, Judge Walton applied U.S.S.G.

§ 2A2.4 instead of § 2A2.2 to a defendant convicted at trial of both § 111(a) and § 231, as well as

one misdemeanor offense. *See United States v. Wren,* 1:21-cr-00599-RBW (docket entry not yet

available). On January 6, 2021, Mr. Wren pushed

back against the police line by placing his hands

on an officer's shield and leaning all his weight

into the riot shield, preventing the police officer

from advancing forward. Mr. Wren's actions

then instigated a fight between rioters and police

attempting to clear the area, according to the



Government.[47] Mr. Wren was sentenced to 12 months and one day in jail for his conduct, followed by 24 months of supervised release and a fine. He was not ordered to pay restitution. The conduct of Mr. Wren was similar to, but more serious than, that of Mr. DaSilva.

The Defense is not aware of any other cases that were sentenced after a trial with similar conduct.

### ii. Sentences of January 6 Defendants Who Pleaded Guilty After Having Pushed, Pulled, and Grabbed a Riot Shield

1. *United States v. Ronnie Presley*, 1:21-cr-000257-RDM: Mr. Presley both entered the Capitol Building and engaged with officers trying to stop rioters from entering. Mr. Pressley is described by the Government as grabbing an officer's shield and pulling it as the officer guarded the entry doors to the Capitol. Mr. Presley was indicted with a count of 18 U.S.C. § 231(a)(3) as well as 18 U.S.C. § 1512(c)(2), in addition to misdemeanor offenses for the same conduct. He was not indicted under § 111(a). This case presented facts more serious than those in Mr. DaSilva's case, as Mr. DaSilva did not actually pull a shield away from an officer and did not enter the Capitol Building — nor was Mr. DaSilva charged with § 1512(c)(2). The



---

[47] Press Release, *Two Men from Mississippi and Alabama Sentenced for Actions During Jan. 6 Capitol Breachtions*, DOJ (Oct. 16, 2023), https://www.justice.gov/usao-dc/pr/two-men-mississippi-and-alabama-sentenced-actions-during-jan-6-capitol-breach.

Government agreed that Mr. Pressley should be sentenced pursuant to U.S.S.G. § 2A2.4.[48]

*See United States v. Presley*, 1:21-cr-000257-RDM, ECF No. 40 *3 (D.D.C. Jul. 28, 2022).

He received a sentence of  12 months' incarceration, 26 months' supervised release, and

$2,000 of restitution.

2. *United States v. Luke Michael Lints*, 1:22-cr-259-TNM: Mr. Lints obtained a police riot

   shield and used it to push back against a law enforcement officer who was also holding a

   shield. Lints also used his shield to prevent an

   officer from closing a door to create a barrier

   between the rioters and law enforcement. While

   Mr. Lints was indicted for civil disorder, he was

   not indicted under § 111(a).

   The facts of Mr. DaSilva's

   case are less egregious

   than those of Mr. Lints'.

   The Government,

   nonetheless, decided that

   Mr. Lints should be

   sentenced pursuant to



---

[48] Of note— Mr. DaSilva was not offered a plea of this nature. Every plea offered to Mr. DaSilva included an aggravated assault component with a required Guideline computation range under U.S.S.G. § 2A2.2, yielding a sentence recommendation that would be more than double that of the one for Mr. Presley.

U.S.S.G. § 2A2.4.[49] *United States v. Lints*, 1:22-cr-259-TNM, ECF No. 40 (D.D.C. Feb. 24, 2023). Mr. Lints was sentenced to 4 months' incarceration, 4 months' home detention, 36 months' supervised release, and $2,000 in restitution.

3. *United States v. Bernard Joseph Sirr*, 1:22-cr-259-TNM: Mr. Sirr pleaded guilty to 18 U.S.C. 231(a)(3) for being inside the tunnel for an extended period of time, pushing back on officers together with a group, and at one point pushing on riot shields.[50] The fact pattern of this case most closely resembles that of Mr. DaSilva. But while Mr. Sirr was indicted for civil disorder, he was not indicted under § 111(a). The DOJ agreed that the Sirr case should be sentenced pursuant to U.S.S.G. § 2A2.4. *See United States v. Sirr*, 1:22-cr-259-TNM, ECF

---

**Department of Justice**

U.S. Attorney's Office

District of Columbia

SHARE

FOR IMMEDIATE RELEASE                                   Friday, January 27, 2023

### Rhode Island Man Pleads Guilty to Felony Charge For Actions During Jan. 6 Capitol Breach

**Defendant Took Part in Confrontation With Law Enforcement Officers on the Lower West Terrace**

WASHINGTON - A Rhode Island man pleaded guilty to a felony charge for his actions during the breach of the U.S. Capitol on Jan. 6, 2021. His actions and the actions of others disrupted a joint session of the U.S. Congress convened to ascertain and count the electoral votes related to the presidential election.

Bernard Joseph Sirr, 47, of North Kingstown, Rhode Island, pleaded guilty in the District of Columbia to interference with officers during a civil disorder, a felony. A sentencing hearing is scheduled for May 12, 2022.

According to court documents, on Jan. 6, Sirr was among rioters who illegally entered the Capitol grounds. He joined a line of rioters that was engaged in a confrontation with law enforcement officers in the tunnel area of the Lower West Terrace. At approximately 3:08 p.m., video showed Sirr entering the tunnel. During a video taken inside the tunnel, Sirr was at the front of the police line pushing against rioters who were assaulting officers. He was seen pushing against the police line with his hand pressed against a police shield. He also participated in a struggle in which a group of rioters chanted "Heave! Ho!" in unison as they moved together as a team against law enforcement.

Sirr exited the tunnel at approximately 3:14 p.m. About an hour later, however, he reappeared at the Lower West Terrace doorway, pushing other rioters who were pushing against police officers. Sirr ultimately was ejected from the tunnel area.

---

Case 1:22-mj-00144-ZMF    Document 1-1    Filed 06/21/22    Page 6 of 11

From approximately 19:47 - 20:07 of the video, SIRR is seen pushing against the police line with his hand pressed against a police shield, as seen in Figure 8:

Figure 8
*https://www.youtube.com/watch?v=cJOgGsC0G9U&feature=youtu.be&has_verified=1*

From approximately 20:46 – 21:03 of the video, SIRR is seen with the group of rioters as they continue to assault members of law enforcement. During this portion of the video, the group of rioters can be heard chanting "heave! ho!" in unison as they move back and forth together as a team against the police. See Figure 9:

---

[50] Of note— Mr. DaSilva was not offered a plea of this nature. Every plea offered to Mr. DaSilva included an aggravated assault component with a required Guideline computation range under U.S.S.G. § 2A2.2, yielding a sentence recommendation that would be more than double that of the one for Mr. Sirr.



No. 37 *3 (D.D.C. Jan. 27, 2023). Mr. Sirr was sentenced to 2 months' incarceration, 12 months' supervised release, and $2,000 restitution.

### iii. Disparate Charging Decision and Treatment of Matthew DaSilva

Mr. DaSilva's conduct is in no way more egregious or more assaultive in nature than that of the three January 6 defendants described above. Yet, Mr. DaSilva was charged with § 111(a), assault, while the others were not. The actions of the defendants did not present disparity warranting for Mr. DaSilva to face higher charges. The original charging decisions and the disparity in the charges for this group of defendants are inexplicable. There is no reason why Mr. DaSilva was charged with assault while the others were not.

And, as noted for each comparison case, the plea offer extended to those defendants was not offered to Mr. DaSilva. Although Mr. DaSilva requested plea offers of this nature, the only offers that the "supervisors" would approve for Mr. DaSilva were ones forcing agreement to U.S.S.G. § 2A2.2, for an aggravated assault guideline that required admission to having the intent to commit another felony. The DOJ specifically declined defense counsel's offers for Mr. DaSilva to plead guilty to an offense with an agreed-upon Guideline of U.S.S.G. § 2A2.4, which would have resulted in the completion of this case in the year 2022. The Government also rejected undersigned counsel's offers to plead guilty without an agreement on Guidelines and rejected defense counsel's offer for a stipulated trial instead of a plea, where guidelines can be determined by the judge. Mr. DaSilva, through his counsel, engaged in extensive attempts to negotiate a fair plea but the DOJ remained impenetrable on the issue of U.S.S.G. § 2A2.2. A trial was all that Mr. DaSilva had as an option to fairly resolve his case.

There is no legal or factual basis on which to distinguish Mr. DaSilva's case from that of Mr. Sirr. There is no reason to believe that Mr. DaSilva's conduct is more aggravated than that of Mr. Lints. And surely there is no reason to believe that Mr. DaSilva engaged in conduct less deserving of sentencing under U.S.S.G. § 2A2.4 than Mr. Pressley. The DOJ's disparate treatment of Mr. DaSilva's case is simply inexplicable.

While the Court cannot force the DOJ to offer equitable plea agreements to defendants, this Court can consider the disparate treatment of each defendant at sentencing, as well as the Government's nonsensical requests for the application of higher sentencing Guidelines for certain



defendants without a legal basis or factual basis for doing so. Aside from the Government's *claim* that Mr. DaSilva committed an aggravated assault, there is no evidence to substantiate it. This Court in fact acquitted Mr. DaSilva of the aggravated assault at trial.

To sentence Mr. DaSilva under U.S.S.G. § 2A2.2 for the same or even lesser conduct than similarly situated defendants have been sentenced under U.S.S.G. § 2A2.4 would yield an unwarranted, unjust, and unfair sentencing disparity.

Mr. DaSilva does not deserve a penalty higher than that of Mr. Sirr and Mr. Lints, certainly not one higher than Mr. Presely. Already, Mr. DaSilva has served a penalty higher than that of Mr. Sirr. That is why the defense argues that no additional time is warranted.

Moreover— this Court can give Mr. DaSilva a 2-level reduction under U.S.S.G. § 3E1.1, n.2, which states that "a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial." *See also Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) (punishing a person "because he has done what the law plainly allows him to do is a due process violation of the most basic sort").

Mr. DaSilva's pretrial attempts to plead guilty and his pretrial self-rehabilitation measures, as well as a lack of opportunity/offer to enter into a pretrial plea to a non-aggravated offense, qualifies Mr. DaSilva for this Court's consideration of the application of an acceptance of responsibility credit pursuant to U.S.S.G. § 3E1.1. The following factors weigh in favor of applying the reduction:

- Mr. DaSilva reached out to the DOJ numerous times before trial to attempt to reach a plea deal.

- Every time, he was only offered a deal that included the requirement that he admit to having possessed the intent to commit a felony offense — thus, only offered an aggravated assault plea — even though the government offered a Civil Disorder plea deal in at least three other January 6 shield-pushing cases that contained more serious

allegations. *See United States v. Presley*, 1:21-cr-000257-RDM, ECF No. 40 (D.D.C. Jul. 28, 2022); *United States v. Sirr*, 1:22-cr-259-TNM, ECF No. 37 (D.D.C. Jan. 27, 2023); *United States v. Lints*, 1:22-cr-259-TNM, ECF No. 40 (D.D.C. Feb. 24, 2023).

- Mr. DaSilva did not commit an aggravated assault, did not have such intent, and thus could not enter the pleas offered to him. And, after a trial, **the court acquitted Mr. DaSilva of an aggravated felony, of possessing the intent to commit another felony**.

- For the duration of an entire year before the trial, Mr. DaSilva engaged in behavioral therapy sessions to address and rectify his conduct; and, has demonstrated a positive change to his character post-therapy. *See* Defense Exhibits 1 and 6.

- Mr. DaSilva then made a strong statement post-trial, accepting responsibility for his actions.

The reduction under U.S.S.G. § 3E1.1 would yield a lower sentencing range, with an offense level of 11 and a sentencing range of 8-14 months in Zone B. This sentencing range, however, is still higher than the sentence appropriate for Mr. DaSilva. Mr. DaSilva, therefore, moves for a downward departure.

### VI. Motion for Downward Departure

Based on all the arguments in this memorandum, a downward departure from the Guidelines Recommendation is warranted in this case for six main reasons:

1) in order to balance the inequities resulting from the Government's charging decisions *and* the Government's plea offers and dismissals in 2020 protest cases and in other January 6 cases;

2) in order to achieve a sentence commensurate with sentences ordered in other cases for similar conduct and even more serious criminal conduct;

3) in consideration of the Defendant's genuine remorse, acceptance of responsibility, and significant rehabilitative efforts for a period lasting one full year prior to his conviction;

4) in consideration of the difficulties and challenges experienced by the defendant in his childhood and the effects of his upbringing on his psyche, (see PSR),

5) in consideration of the Defendant's age and clean criminal history for a period of 51 years; (see *United States v. Ward*, 814 F. Supp. 23, 24 (E.D. Va. 1993)); and,

6) in consideration of Mr. DaSilva's superb moral character that was exhibited in his everyday life for 51 years, to the complete exception of the one day for which he stands before this court.

## VII. Appropriate Sentence for this Defendant

Considering Matthew DaSilva's character and clean record, his age, his significant efforts at self-rehabilitation, the downward departure factors outlined in the PSR, and the facts of his case in light of other January 6 riot shield cases *and* the Government's position on and treatment of the BLM protest cases, a reasonable penalty (*in addition to the already-imposed penalty of a conviction with a criminal record, 2-year-long pretrial supervision, and post-verdict*

*incarceration*) is a sentence of 3 months of incarceration. This would amount to time served. Yet this is the equitable penalty in light of the arguments presented by the defense. The defendant's recommendation is a downward departure from the Guidelines computation. As articulated herein, the departure is warranted and well-grounded.

The sentence recommended by the defense is sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a), is supported by the facts and the law, and falls within the limitations placed on this Court by Congress and the Eighth Amendment.

Respectfully submitted,
By Counsel:
_____/s/_____
Marina Medvin, Esq.
*Counsel for Defendant*
MEDVIN LAW PLC
916 Prince Street
Alexandria, Virginia 22314
Tel:  888.886.4127
Email: contact@medvinlaw.com

## CERTIFICATE OF SERVICE FOR CM/ECF

I hereby certify that on October 18, 2023, I will electronically file the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

_____/s/_____
Marina Medvin, Esq.