**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-564 (CJN)** |
| **MATTHEW DASILVA,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence the defendant, Matthew DaSilva, to 52 months of imprisonment, at the midpoint of DaSilva's advisory Guidelines range, three years of supervised release, restitution of $2,000, and a mandatory assessment of $285 (consisting of $100 for each of Counts 1 and 2, $25 for each of Counts 3, 4, and 5, and $10 for Count 7).

## I.    INTRODUCTION

The defendant, Matthew DaSilva, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts,

On January 6, DaSilva entered the West Plaza of the Capitol at approximately 2:35 p.m., shortly after rioters had breached the established police line along the perimeter of the West Plaza. Minutes later, DaSilva used all of his strength to push a flagpole against a door leading to the Lower West Terrace in an attempt to stop police officers whom he believed would be deploying through that door. DaSilva then remained in the crowd on the Lower West Terrace, watching the assault on law enforcement for over an hour before approaching the "tunnel," and participating in a "heave-ho" push with other rioters trying to enter the tunnel. After that attempt failed, and DaSilva was ejected from the tunnel, DaSilva approached the officers again, this time physically assaulting the line of officers and trying to wrest a riot shield from them while other rioters pressed their attacks.

The government recommends that the Court sentence DaSilva to 52 months of incarceration, within the advisory Guidelines' range of 46-57 months, which the government submits is the correct Guidelines calculation. A 52-month sentence reflects the need for deterrence, DaSilva's lack of genuine remorse, and the gravity of DaSilva's conduct, given that DaSilva was, both literally and figuratively, in the middle of the violence in the Lower West Terrace on January 6.

## II.      FACTUAL BACKGROUND

### A.       The January 6, 2021 Attack on the Capitol

The government refers the court to the Statements of Facts filed in this case, Doc. 1-1, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters,

---

but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.       Breach of the West Front of the Capitol Grounds

On January 6, the outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the Capitol Police were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with Capitol Police officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of Capitol Police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier.

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of Capitol Police officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.

At 2:03 p.m., Metropolitan Police Department officers responding to Capitol Police officers' calls for help began broadcasting a dispersal order to the crowd. Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. The police retreated through temporary doors built into the inauguration stage up to the Lower West Terrace.





*Image 1: Breakthrough on the West Plaza*

**C.     The Battle in the Tunnel Leading to the Doors of the West Front of the U.S. Capitol Building**

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the area known as the Lower West Terrace. The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day. Image 2; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



*Image 2*

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the United States Capitol Police, assisted by officers from the District of Columbia Metropolitan Police Department ("MPD"), were arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the law enforcement officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging law enforcement with batons, poles, chemical

spray, bottles and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.

The violent and physical battle for control over the Lower West Terrace entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat law enforcement officers. The battle for the Lower West Terrace entrance involved intense hand-to-hand combat, and some of the most violent acts against law enforcement, including the abduction and tasering of MPD Officer Michael Fanone and the assault of MPD Officer Daniel Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5 p.m. Despite being under constant assault, these officers provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.

**D.      Matthew DaSilva's Role in the January 6, 2021 Attack on the Capitol at the Lower West Terrace**

1.    DaSilva's Attempt to Stop Police from Entering the West Plaza

On January 6, DaSilva was part of the mob that surged into the West Plaza of the Capitol at approximately 2:35 p.m., shortly after the 2:28 p.m. breach described in Section I.B. While on

the West Plaza, at approximately 2:45 p.m., DaSilva joined a group of rioters outside a temporary door leading to steps up to the Lower West Terrace. Believing that police officers would try to enter the West Plaza through this door, DaSilva tried to barricade the door in an effort to obstruct those police officers. DaSilva remained at the door for several minutes, straining to push a flagpole against the outside of the door while other rioters leaned on him from behind to support his efforts. As DaSilva did so, the other rioters in DaSilva's immediate vicinity (including one rioter who placed his hand on DaSilva's back) shouted that police officers were waiting behind the door and that "they [the police] are trying to come out and tear gas." *See* Trial Exhibit 402.



*Image 3: Screenshot from Trial Ex. 402*

In its oral verdict, the Court held that this conduct was one of the bases for finding DaSilva guilty of Civil Disorder (Count 1), finding that through these efforts, DaSilva was attempting to commit an act with the intended purpose of obstructing, impeding or interfering with law enforcement officers. *See* Verdict Tr. 13:18-23. The Court observed that while DaSilva himself did not "explicitly state[] his intent," one of the other rioters "who helped DaSilva block the door" said that "[t]hey are trying to come out and tear gas." *Id.* at 14:1-3. The Court further observed that DaSilva "can be seen on video leaned over and pressing against the door, in a clear effort to block it, along with multiple other protesters." *Id.* at 14:4-6.

2.  <u>DaSilva's Observation of the Attacks on the Lower West Terrace and Personal Efforts to Enter the Tunnel</u>

Eventually, law enforcement or other rioters opened the West Front door that DaSilva had been trying to barricade, and DaSilva went through, climbing the temporary stairs to the Lower West Terrace, where he remained for more than two hours. During that time, he witnessed law enforcement officers' repeated efforts to deter and disperse the crowd and countless assaults on officers, including the incident in which rioters dragged police officer Michael Fanone out of the police line and into the crowd. He witnesses the mob repeatedly try to use its numbers to force its way past police and enter the Capitol, in so-called "heave-ho" pushes against the police. And he saw rioters repeatedly attacking police with makeshift weapons.



*Image 4: Open-source photo of DaSilva outside the entrance to the tunnel*



*Image 5: DaSilva looks on as rioters shove a large flagpole into the tunnel*



*Image 6: DaSilva watches a rioter kick officers as he hangs off of the building*



*Image 7: A screenshot from Trial Ex. 405 in which DaSilva peers into the tunnel and surveys the violence inside*

He pressed forward through the crowd and pushed his way to the front of the rioters directly confronting police. At around 4:20 p.m., DaSilva was among a group of rioters engaged in "heave-ho" maneuver, pushing against officers defending the tunnel. This effort was unsuccessful, and the rioters were pushed back from the tunnel. Because DaSilva was so tightly pressed against the other rioters, he fell with the mass of rioters back down the steps leading to the tunnel.



*Image 8: Screenshot from Open-source Video*

**3.**   <u>DaSilva's Assault On Officers Defending the Lower West Terrace Tunnel</u>

Minutes after being repelled, at approximately 4:30 p.m., DaSilva "force[d] his way through [the] massive crowd to reach the police line" guarding the tunnel leading into the building. Verdict Tr. 17:22-23. As the Court found at trial:

> As DaSilva approached the Tunnel, he could see the mayhem that was unfolding. Other protesters were throwing objects that the police line and violently attacking officers with dangerous weapons. Yet DaSilva continued to press forward, until he eventually reached the police line and confronted officers who were blocking an entrance into the Capitol building.

*Id.* at 16:19-25.



*Image 9: A screenshot from Trial Ex. 407. Seconds before his assault, DaSilva pulls the front and back of his ballcap down, securing it to his head.*

As DaSilva approached the assembled line of officers, he lowered his head and forcibly pushed against a riot shield held in part by MPD Officer Jason Sterling and in part by another officer. At trial, Officer Sterling described the pain he felt as a result of DaSilva's pushing, and the pressure DaSilva applied to the riot shield. *See* 7/17 AM Trial Tr. 137:3-8. Body-worn camera videos from several officers present in the tunnel show DaSilva pressing his full weight into the riot shields. The Court found that the "[b]ody cam footage show[ed] DaSilva bending his knees, lowering his head and using his fully body and body weight to push against and grab a riot shield." Verdict Tr. 17:1-3. As a result, "Officer Sterling struggled to hang on, given the amount of force DaSilva applied." *Id.* at 17:3-5.





*Images 10 and 11: Screenshots from Trial Ex. 304. DaSilva pushing on officers' riot shields.*

DaSilva made further, direct, physical contact with Officer Sterling when he swatted Officer Sterling's outstretched hand away as the officer attempted to deploy a handheld cannister of OC spray at DaSilva. *See id.* at 18:17-20.



*Image 12: Trial Exhibit 302c, showing DaSilva swatting Officer Sterling's outstretched hand*

DaSilva also grabbed the edges of a riot shield and attempted to pull the shield away from an officer. *See* Verdict Tr. 7:11-16. As a result, the officer was pulled off balance. Another rioter threw a desk drawer into the tunnel, and, having been pulled off balance by DaSilva, one of the officers was left exposed to the flying desk drawer, which hit him in the head.



*Image 13: Screenshot from Trial Ex. 305. A thrown desk drawer flies into the tunnel and strikes an officer in the head. The shield DaSilva pulled on occupied the space in front of the officer just seconds earlier.*

DaSilva's attacks also diverted the officers' attention from other violent acts that other

rioters were directing at the officers at that point. As the Court found based on the trial evidence, DaSilva engaged with officers' riot shields "while scores of other protesters were attacking the police line repeatedly with dangerous weapons." Verdict Tr. 17:5-7. In other words, as the Court found, "DaSilva's conduct made it harder for officers to protect themselves from flying debris and physical attack, facts of which DaSilva was undoubtedly aware." *Id.* at 17:5-11.



*Image 14: Screenshot from open-source video showing a rioter repeatedly use a pole to jab officers while DaSilva is in the middle of his attack*

After assaulting the officers, DaSilva remained at the mouth of the tunnel, verbally taunting the officers for several more minutes. In doing so, DaSilva encouraged the officers to abandon their duties and allow the rioters into the building. As DaSilva told the officers, "It's time for a very simple risk reward scenario," or alternatively, "a very simple risk reward assessment scenario." *See* 7/18 AM Trial Tr. 17:2-4; Gov't Trial Ex. 306 at 16:34:06. DaSilva then further prodded the officers, asking, "are you law enforcement or are you order enforcement?" *See* 7/18 AM Trial Tr. 17:10-11; Gov't Trial Ex. 306 at 16:34:14.

DaSilva also asked, "how can we be inside the building when we're not inside the building?" and gestured to the crowd. Despite having witnessed violence, and having engaged in violence himself, DaSilva claimed that the individuals behind him were "law-abiding citizens, all taxpayers." *See* 7/17 PM Trial Tr. 220:22-221:4; Gov't Trial Ex. 306 at 16:35:37 and 16:36:26.[2] He noted that the rioters "just want to go home every night like you." 7/17 PM Trial Tr. 221:2-4.

These statements demonstrate DaSilva's intent: to help the rioters enter the Capitol and interfere with the peaceful transfer of power. Perhaps more importantly, they demonstrate that, in the heat of battle, DaSilva was fully capable of rational thought and able to generate what he believed were "clever" taunts appealing to the officers' emotions. DaSilva's manipulative ploy contradicts his belated and self-serving claim that, on January 6, he "wasn't thinking clearly" and was "overpowered by a lot of stimuli." PSR ¶ 33. This evidence establishes the opposite: on January 6, DaSilva was coldly rational, and his actions were entirely deliberate.

When his attempts to harangue the officers failed, DaSilva receded into the crowd. DaSilva did not leave. Rather, he remained on the Lower West Terrace for at least another 30 minutes, watching as other rioters attacked law enforcement.

---

[2] In his objections to the PSR, DaSilva points out the statements that the parties stipulated to during trial, in part because of audio issues playing certain exhibits in Court. *See* Def. Obj., Doc. 105 at 3; *see also* 7/17 PM Trial Tr. 220-21. The stipulated statements, however, were not the only statements that DaSilva made, and Special Agent Ray later clarified the additional statements made by DaSilva. *See* 7/18 AM Trial Tr. 17. At sentencing, the Court should consider *all* of DaSilva's statements, not merely those to which the defense stipulated during trial. The government is prepared to make all trial exhibits available to the Court by electronic means and is prepared to address any questions about those exhibits at sentencing.



*Image 15: Screenshot from open-source video showing DaSilva, after his attacks, watching as smoke billows from an explosive device rioters threw into the tunnel*

DaSilva left only after officers, reinforced by law enforcement agencies from outside of the District, cleared the area using more aggressive crowd-control measures shortly after 5:00 p.m. As he left the area, DaSilva boasted to rioters around him that he had been tear-gassed three or four times. *See* 7/18 AM Trial Tr. 21:8-10. In total, DaSilva remained in the Lower West Terrace area for nearly two and a half hours.

## III.   THE CHARGES AND CONVICTIONS

On May 31, 2023, a federal grand jury returned a second superseding indictment charging DaSilva with seven counts, including Obstructing, Impeding, or Interfering with Officers during a Civil Disorder (Count 1); Assaulting, Opposing, Resisting Certain Officers (Count 2); Entering or Remaining in a Restricted Building or Grounds (Count 3); Disorderly or Disruptive Conduct in a Restricted Building or Grounds (Count 4); Engaging in Physical Violence in a Restricted Building or Grounds (Count 5); Disorderly or Disruptive Conduct in a Capitol Building or on Capitol Grounds (Count 6); and Engaging in Physical Violence in a Capitol Building or on Capitol Grounds (Count 7). *See* Doc. 54. DaSilva was convicted of Counts 1, 2, 3, 4, 5, and 7 on July 19, 2023, following a bench trial. He was acquitted of Count 6.

18

## IV.    STATUTORY PENALTIES

DaSilva now faces sentencing on Counts 1, 2, 3, 4, 5, and 7. As noted by the Presentence Investigation Report ("PSR") issued by the U.S. Probation Office, the defendant faces up to five years of imprisonment, a term of supervised release of not more than three years, a fine of $250,000, restitution, and a mandatory special assessment of $100 as to Count 1; eight years of imprisonment, a term of supervised release of not more than three years, a fine of $250,000, restitution, and a mandatory special assessment of $100 as to Count 2; one year of imprisonment, one year of supervised release, a fine of $100,000, restitution, and a mandatory special assessment of $25 on each of Counts 3, 4, and 5; one year of imprisonment, a fine of $5,000, restitution, and a mandatory special assessment of $10 as to Count 7.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.  Guideline Range

The government agrees with the Presentence Report ("PSR") calculations of the Sentencing Guidelines. As the PSR correctly found, DaSilva's offense level computation for counts One, Two, and Four—which drive DaSilva's overall offense level—is as follows:

*Count One, 18 U.S.C. § 231(a)(3)*

| | | |
|---|---|---|
| U.S.S.G. §2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. §3A1.2(b) | Victim Related Adjustment | +6 |
| **Adjusted Total Offense Level** | | **20** |

*Count Two, 18 U.S.C. § 111(a)(1)*

| | | |
|---|---|---|
| U.S.S.G. §2A2.2(a) | Base Offense Level | 14 |

|  |  |  |
|---|---|---|
| U.S.S.G. §3A1.2(b) | Victim Related Adjustment | +6 |
| **Adjusted Total Offense Level** | | **20** |

*Count Four, 18 U.S.C. § 1752(a)(2)*

|  |  |  |
|---|---|---|
| U.S.S.G. §2A2.2(a) | Base Offense Level | 14 |
| **Adjusted Total Offense Level** | | **14** |
| | | |
| U.S.S.G. §3D1.4 | Multiple Count Adjustment | +3 |
| **Final Offense Level** | | **23** |

Under the Guidelines' grouping rules, the offense levels for Counts One, Two, and Four result in an aggregate total offense level of 23. The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 82. Accordingly, based on the PSR's calculation of the defendant's total adjusted offense level of 23,[3] DaSilva's Guidelines imprisonment range is 46 to 57 months' imprisonment.

## B.  Acceptance of Responsibility

In his PSR objections, DaSilva argues that he is eligible for acceptance of responsibility credit under USSG § 3E1.1. *See* Def. Obj., Doc. 105 at 4-5. This argument is meritless. Contrary to DaSilva's assertions, Application Note 2 to USSG § 3E1.1 makes clear that "[t]his adjustment is *not* intended to apply to a defendant who," like DaSilva, *"*puts the government to its burden of proof at trial by denying the essential factual elements of guilt." USSG § 3E1.1, Note 2 (emphasis added). It is only "[i]n *rare* situations" that a defendant "may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial"—"for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (e.g., to make a constitutional challenge to a statute or a challenge to the

---

[3] The PSR, in ¶ 79, contains a scrivener's error that DaSilva's Total Offense Level is 22, which is incorrect. Paragraph 76 of the PSR correctly states the Total Offense Level of 23, consistent with the PSR's substantive analysis.

applicability of a statute to his conduct)." *Id.* (emphasis added).

At every stage of this prosecution, DaSilva has denied essential elements of his offenses, through *six* Motions to Dismiss and related filings (*see* Docs. 30, 34, 36, 40, 47, 48, 57) and *three* Motions for Acquittal (*see* Docs. 88, 90, 93). In these filings and his presentation at trial, DaSilva repeatedly denied the facts establishing the elements of his offenses, downplayed his conduct, and deflected responsibility for his actions.[4] This is not the "*rare*" case in which a defendant sought to preserve a constitutional right (or some other purely legal claim) but otherwise demonstrated acceptance of responsibility for his conduct.

Indeed, contrary to his suggestion that his post-trial statement was "strong" and demonstrated acceptance of responsibility, *see* Doc. 105 at 5, DaSilva's statement to the probation officer again deflects blame for his conduct and fails to take any accountability for his participation in a riot that injured dozens of officers and derailed, temporarily, the certification of the electoral college as prescribed by the Constitution. He says he will "never again participate in any protest that does not have a clear leader and a clear itinerary."[5] But this statement again deflects blame at "leadership," falsely downplays the riot as a "protest," and fails to grapple with DaSilva's own role in the riot. DaSilva also says he regrets "interacting" with officers. But he does not acknowledge that his "interaction" with officers was felonious assault. He says he regrets "put[ting his] hands on that shield." But he fails to acknowledge why he did it and the import and weight of that conduct. At every turn, DaSilva's statement minimizes his conduct and ignores the reality and context of January 6, 2021.

---

[4] While DaSilva stipulated to the existence of a civil disorder on January 6, 2021, that single stipulation—to an incontrovertible fact that said nothing of DaSilva's own conduct—does not constitute acceptance of responsibility.

[5] PSR ¶ 33.

DaSilva's reference to plea offers made in other cases, involving different facts (Doc. 105 at 5) is irrelevant to the question of whether DaSilva himself is entitled to a reduction in his sentence. While there are some defendants who have demonstrated extraordinary acceptance of responsibility, DaSilva is not one of them. He did not turn himself in after January 6 (as many remorseful defendants have done), he did not speak with investigators (as many remorseful defendants have done), and he did not plead guilty to any of his offenses (as many remorseful defendants have done). His post-trial motions continue to dispute the elements of even his misdemeanor offenses, and his belated "regret" falls far short of remorse.

## VI.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As explained below, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, DaSilva's conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. During the first moments after the West Plaza breach, DaSilva used force in an effort to block officers he thought were coming through a door to stop the riot. He watched repeated attacks against law enforcement on the Lower West Terrace, and unfazed by the violence, tried to enter the tunnel himself. When that failed, DaSilva decided to physically engage with officers himself, by pushing and pulling on officers' riot shields in the midst of the violence of January 6. The nature and circumstances of DaSilva's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 52 months of imprisonment.

## B.  The History and Characteristics of the Defendant

The defendant is a highly educated Navy veteran and expert in multiple foreign languages. He has no criminal history, but claims to suffer from certain mental health conditions.

DaSilva's circumstances are not of a type, or to a degree, that warrant a downward variance from the advisory guidelines range. First, DaSilva's lack of criminal history has already been reflected in his advisory guidelines range by virtue of the criminal history calculation. Second, DaSilva's educational and vocational background demonstrates that DaSilva is a highly intelligent, careful, and deliberate person. This is consistent with his conduct on January 6, where he spent a significant amount of time on the West Plaza and Lower West Terrace before physically engaging with officers himself. If he had found those situations "overwhelming," he had ample opportunity to leave, at the very least, and avoid physical confrontation with officers. But despite those opportunities, he decided to attack the line of officers. And his post-attack comments to the officers demonstrate that he was coldly rational at the time of his attack.

Moreover, while his service in the U.S. Navy is commendable, in this case, it is a double-edged sword. By virtue of his training and education, DaSilva knew better than most that what he was doing on January 6 was wrong. His actions violated his oath to defend and support the Constitution and betrayed the ideals and values of the Navy that DaSilva once swore to uphold.

23

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. DaSilva's criminal conduct on January 6 was the epitome of disrespect for the law. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[6] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs in favor of a lengthy term of incarceration. Again, though DaSilva offers some platitudes of regret about his conduct in his statement to Probation, *see* PSR ¶ 33, his statements fall far short of true remorse. While DaSilva blames others, and blames circumstances, he has still not taken personal responsibility for his deliberate choices. That he is *still* unwilling or unable to accept personal responsibility is troubling and raises the concern that DaSilva will once again engage in

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

violent conduct in pursuit of his political goals.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[7]

---

[7] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

26

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *ee id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[8]

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Thompson*, 21-cr-461-RCL, the defendant pled guilty to assault of a federal officer with a deadly or dangerous weapon, in violation of 18 U.S.C. § 111(b), pursuant to a plea agreement. Like DaSilva, Thompson physically engaged with officers in the tunnel, in his case by throwing objects at officers and hitting one on the hand with a metal baton. As in this case, Thompson's assault on its own was relatively short-lived, but was part and parcel of a prolonged, brutal attack on the officers in the Lower West Terrace tunnel. Unlike DaSilva, Thompson showed extraordinary acceptance of responsibility, turning himself in to law enforcement, cooperating with the government by providing information at multiple debrief meetings, and pleading guilty rather than going to trial. Like DaSilva, Thompson faced a guidelines range of 46 to 57 months. Judge Lamberth sentenced Thompson to 46 months of incarceration, noting that Thompson's

---

[8] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

participation in the violence of January 6, and specifically the violence in the tunnel on that day, warranted a significant sentence. A comparable, but more severe, sentence of 52 months of incarceration is warranted in this case, in which DaSilva has shown no genuine remorse for his violence on January 6.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But DaSilva was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall"

impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[9]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative

---

[9] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment.").

More specifically, the Court should require DaSilva to pay $2,000 in restitution for his convictions on Counts 1, 2, 3, 4, 5, and 7. This amount fairly reflects DaSilva's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where defendants convicted of felony offenses were not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 52 months of imprisonment, three years supervised release, restitution of $2,000, and a mandatory assessment of $285 (consisting of $100 for each of Counts 1 and 2, $25 for each of Counts 3, 4, and 5, and $10 for Count 7).

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:      */s/ Katherine E. Boyles*
          Katherine E. Boyles

30

Assistant U.S. Attorney
D. Conn. Fed. Bar No. PHV20325
United States Attorney's Office
601 D Street NW Washington, D.C. 20001
Phone: 203-931-5088
Email: Katherine.Boyles@usdoj.gov

*/s/ Eric W. Boylan*
Eric W. Boylan
Assistant U.S. Attorney
Texas Bar No. 24105519
United States Attorney's Office
601 D Street NW Washington, D.C. 20001
Phone: 202-815-8608
Email: Eric.Boylan@usdoj.gov

31