<div align="center">

**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

</div>

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:21-cr-564 (CJN)** |
| | : | |
| **MATTHEW DASILVA,** | : | |
| **Defendant.** | : | |

<div align="center">

**GOVERNMENT'S RENEWED BRIEF IN OPPOSITION TO THE**
**DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL ON COUNTS 3, 4, and 5**

</div>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully files this renewed response in opposition to Defendant Matthew DaSilva's first Motion for Acquittal, Doc. 88, as well as the defendant's subsequent briefing, including: the defendant's Supplemental Argument, Doc. 90; the defendant's Reply to Government's Opposition to Defendant's Motions, Doc. 92; the defendant's second Motion for Judgment of Acquittal, Doc. 93, and the defendant's second Reply, Doc. 103.

Consistent with the Court's directive at the October 25 Motion Hearing, *see* 10/25/23 Minute Entry, this Renewed Opposition focuses only on the argument, made for the first time in the defendant's Supplemental Argument, Doc. 90, that the defendant's convictions under 18 U.S.C. § 1752 (Counts Three, Four, and Five) require proof that DaSilva knew that the Vice President would be temporarily visiting the Capitol on January 6, 2021.

## I.   Background

### A.  Pretrial Litigation

On September 8, 2021, a federal grand jury indicted Defendant Matthew DaSilva on seven counts related to his participation in the riot at the U.S. Capitol on January 6, 2021. Doc. 9. After this case was reassigned to this Court, DaSilva filed several motions to dismiss and related filings.

*See* Motion to Dismiss Count One and Two, Doc. 30, and Reply, Doc. 33; Motion to Dismiss Count One, Two, Five, and Seven, Doc. 34, and Reply, Doc. 36; Notice of Supplemental Authority, Doc. 38; Supplemental Brief, Doc. 40; Motion for Bill of Particulars, Doc. 47; and Motion to Dismiss for Selective Prosecution, Doc. 48, Reply, Doc. 60, and Supplement, Doc. 61. Among other issues, these motions raised several statutory construction arguments with respect to the assault charges that ultimately were reflected in the Court's Final Legal Instructions.

On May 31, 2023, the grand jury returned a superseding indictment charging DaSilva with the same seven counts. At that time, DaSilva again moved to dismiss Counts One, Two, Five, and Seven. *See* Doc. 57. DaSilva also filed motions in limine, *see* Docs. 45 and 46, and moved to strike an aiding and abetting instruction from the Court's legal instructions, *see* Doc. 69.

The Court denied DaSilva's motions to dismiss, the motion for a bill of particulars, and one of DaSilva's motions in limine at the pretrial conference. *See* 7/12/23 Minute Entry. The Court held the second motion in limine and the motion to exclude the aiding and abetting instruction in abeyance, to be taken up as appropriate, during trial. *See id.*

B. Trial

Trial then commenced on July 17, 2023, and concluded on July 19, 2023. *See* 7/17/23, 7/18/23, and 7/19/23 Minute Entries. On July 19, at the close of the defendant's case, the defendant moved for Judgment of Acquittal pursuant to Federal Rule of Criminal Procedure 29. *See* 7/19/23 Minute Entry. With agreement from the parties, the Court reserved ruling on the motion until after the parties' closing arguments and issuing the verdict. *See* Fed. R. Crim. P. 29(b); 7/19/23 Minute Entry.

Later that same day, the Court issued its verdict, finding DaSilva guilty of Count 1 (Civil Disorder), Count 2 (Assault on a Federal Officer), Count 3 (Entering and Remaining on Restricted

Grounds), Count 4 (Disorderly and Disruptive Conduct on Restricted Grounds), Count 5 (Physical Violence on Restricted Grounds), and Count 7 (Physical Violence on Capitol Grounds). The Court acquitted DaSilva of Count 6 (Disorderly and Disruptive Conduct on Capitol Grounds).

    C. <u>Post-trial Litigation</u>

DaSilva filed an initial Motion for Acquittal, Doc. 88, as well as a Motion to Modify Detention Order, Doc. 89, on July 21. The Court then ordered the government to respond to the Motion to Modify Detention Order by July 24, and to the Motion for Acquittal by July 28. Shortly before the deadline for the government's response to the Motion to Modify Detention Order, DaSilva filed his Supplemental Argument for Rule 29(a) Motion, Doc. 90.

The government responded to both DaSilva's Motion for Acquittal, Doc. 88, and his Motion to Modify Detention Order, Doc. 89, on July 24. Doc. 91. In its response, the government acknowledged the supplemental briefing defendant filed at Doc. 90, but did not respond to it in substance, explaining that it would expand on its argument in a forthcoming filing. Doc. 91 at 3. DaSilva filed a reply to the government's opposition, Doc. 92, and a second Motion for Acquittal, Doc. 93, both on July 24.

Ultimately, the Court denied DaSilva's Motion to Modify Detention Order. *See* Order for Post-Conviction Detention, Doc. 98. In doing so, the Court found that DaSilva's Motion for Acquittal was not likely to succeed: "at this juncture, the Court cannot conclude that there is a 'substantial likelihood' of acquittal or new trial on Count Five or any other count of conviction." *Id.* at 1. Later that day, the Court ordered DaSilva to file all post-trial motions by August 9, and the government to respond by August 30. *See* 7/27/2023 Minute Order. The government then filed its Amended Memorandum in Opposition to the defendant's motions, Doc. 102, to which DaSilva filed a reply, Doc. 103.

The Court held oral argument on DaSilva's motions on October 25, 2023. Following oral argument, the Court denied the aforementioned motions in most respects from the bench but requested additional briefing and reserved judgment on the argument first raised in DaSilva's Supplemental Argument, Doc. 90. Specifically, the Court reserved judgment on the question of whether DaSilva's convictions on Counts 3, 4, and 5 required proof that DaSilva knew that the Vice President would be visiting the Capitol on January 6, 2021.

The government fully incorporates by references its previous response on this question, *see* Amended Response, Doc. 102 at 8-17, and supplements that response as follows.

## II.   DaSilva's new interpretation of the knowledge requirement under 18 U.S.C. § 1752 is wrong as a matter of law.

Despite the lengthy history of pretrial briefing in this case, DaSilva argued *for the first time* after trial that the Court's legal instructions required the government to prove "that the defendant knew this was an area where the Vice President was or would be temporarily visiting" for each of the Counts brought under 18 U.S.C. § 1752 and that the government failed to do so. *See* Doc. 90, 1; *see also* Doc. 92, 3. DaSilva's argument is wrong as a matter of law.

A. <u>The statutory text does not require proof of the defendant's knowledge of the Secret Service's protectee's presence within the restricted perimeter.</u>

For ease of reference, the full text of 18 U.S.C. § 1752 is as follows:

(a) Whoever—

(1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

(2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions;

(3) knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions, obstructs or impedes ingress or egress to or from any restricted building or grounds; or

(4) knowingly engages in any act of physical violence against any person or property in any restricted building or grounds;

(5) knowingly and willfully operates an unmanned aircraft system with the intent to knowingly and willfully direct or otherwise cause such unmanned aircraft system to enter or operate within or above a restricted building or grounds;

or attempts or conspires to do so, shall be punished as provided in subsection (b).

(b) The punishment for a violation of subsection (a) is—

(1) a fine under this title or imprisonment for not more than 10 years, or both, if—

(A) the person, during and in relation to the offense, uses or carries a deadly or dangerous weapon or firearm; or

(B) the offense results in significant bodily injury as defined by section 2118(e)(3); and

(2) a fine under this title or imprisonment for not more than one year, or both, in any other case.

(c) In this section—

(1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

(A) of the White House or its grounds, or the Vice President's official residence or its grounds;

(B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

(C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

(2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under

> section 3056 of this title or by Presidential memorandum, when such person
> has not declined such protection.

Subsection (a) of the statute describes five different species of violating the statute. Subsection (b) describes the misdemeanor penalties for committing any of the five previously described offenses and includes a felony enhancement for individuals who commit any of the five offenses with a deadly or dangerous weapon or firearm or whose conduct results in significant bodily injury. Finally, Subsection (c) defines certain terms used in Subsection (a) of the statute.

Relevant here, DaSilva stands convicted of misdemeanor violations of §§ 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds), (a)(2) (Disorderly or Disruptive Conduct in a Restricted Building or Grounds), and (a)(4) (Engaging in an Act of Physical Violence within a Restricted Building or Grounds) for his conduct on January 6, 2021.

Taking just one of those convictions for the purposes of illustration, DaSilva argues that to be found guilty of Entering or Remaining in a Restricted Building or Grounds, in violation of § 1752(a)(1), the government must have introduced evidence that he *knew* that the Vice President would be visiting the U.S. Capitol on January 6 when he entered the restricted area. In other words, the *mens rea* term – *knowingly* – travels from Subsection (a)(1) to Subsection (c)(1)(B).

The "most natural grammatical reading" of the statute suggests that knowingly only modifies those terms in its immediate vicinity. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68 (1994); *see also Flores-Figueroa v. United States*, 556 U.S. 646, 650 (2009) ("As a matter of ordinary English grammar, it seems natural to read the statute's word "knowingly" as applying to all the subsequently listed elements of the crime.") (holding that "knowingly" in the Aggravated Identify Theft statute, 18 U.S.C. 1028A(a), travels to the "another person" element

contained within the same subsection of the statute[1]); *United States v. Cox*, 577 F.3d 833, 836 (7th Cir. 2009) (holding that "§ 2423(a) does not require that the Government prove that a defendant knew his victim was a minor. ... [I]n our view the most natural reading of § 2423(a) is that the adverb 'knowingly' modifies only the verb 'transports' and does not extend to the victim's minor status. To adopt Cox's argument would mean that we would have to read the adverb 'knowingly' to modify not only the verb 'transports' but also the noun and the dependent clause. As the Fourth Circuit noted, this would be a grammatically absurd result."). In this case, the statute's structure strongly suggests that "knowingly" does not travel into the definitional subsection of the statute, which is consistent with the clear intent of the statute and the *mens rea* canon as discussed more fully below.

The grammar of the statute also supports reading "knowingly" to apply to the opening clause of Subsection (c)(1), but no farther. Where, as here, "the modifier 'knowingly' introduces a long statutory phrase, . . . questions may reasonably arise about how far into the statute the modifier extends." *Rehaif*, 139 S. Ct. at 2196. In this case, the facts that constitute the offense, and that differentiate criminal conduct from innocent conduct, are that a defendant knew he was entering a restricted area and that he knew he lacked authority to do so. *See Bryan v. United States*, 524 U.S. 184, 193 (1998) (Unless "the text of the statute dictates a different result, the term 'knowingly' merely requires proof of knowledge of the facts that constitute the offense."). In this way, § 1752(a)(1) resembles typical trespassing statutes. *See* 3 Wayne R. LaFave, Substantive Criminal Law § 21.2(c) (3d ed. 2022) ("[T]he common requirement of criminal trespass offenses

---

[1] The statute provides: "Whoever, during and in relation to any felony violation enumerated in subsection (c), *knowingly* transfers, possesses, or uses, without lawful authority, a means of identification *of another person* shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years." 18 U.S.C. § 1028A(a)(1) (emphasis added).

is that the actor be aware of the fact that he is making an unwarranted intrusion, which serves to exclude from criminal liability both the inadvertent trespasser and the trespasser who believes that he has received an express or implied permission to enter or remain.") (quotation marks omitted); *see generally Flores-Figueroa*, 556 U.S. at 652 ("the inquiry into a sentence's meaning is a contextual one"). If the initial definition of "restricted building or grounds" from Subsection (c)(1) is inserted into Subsection (a)(1), that Subsection would read: "whoever—knowingly enters or remains in any [posted, cordoned off, or otherwise restricted area] without lawful authority to do so." § 1752(a)(1), (c). Under this construction, the statute still reads logically and maintains Congress' intent of providing broad protections for Secret Service protectees.

By contrast, there is nothing natural or logical about applying "knowingly" to Subsection (c)(1)(B). *See United States v. Collazo*, 984 F.3d 1308, 1323 (9th Cir. 2021) ("[T]he word "knowingly" does not necessarily apply to every word in 'a long statutory phrase, such that questions may reasonably arise about how far into the statute the modifier extends.'") (quoting *Rehaif v. United States*, 139 S. Ct. 2191, 2196 (2019)); *cf. Ruan v. United States*, 142 S. Ct. 2370, 2378-79 (2022) (applying knowingly to a statutory clause contained within the same clause of the same subsection of the statute).

Such a construction would defy Congress's clear intent, and there is no principled limitation on DaSilva's proposed interpretation. Imposing the *mens rea* term of "knowingly" on the entire definitional provision in Subsection (c) invites more questions than it answers. Subsection (c)(2), for example, makes additional references to other sections of the U.S. Code that are carried into the definitional subsection by reference. *See* § 1752(c)(2) ("the term 'other person protected by the Secret Service' means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such

8

person has not declined such protection"). By the defendant's logic, knowingly should also apply to those referenced sections, including knowledge that the person has not declined Secret Service protection, despite the grammatical unwieldiness of such a construction. Congress simply cannot have intended that result. *See generally Rehaif*, 139 S. Ct. at 2195 (Whether "a criminal statute requires the Government to prove that the defendant acted knowingly is a question of congressional intent.").

  B.  The "*Mens Rea*" Canon: Section 1752 poses "no snare for the unsuspecting."

It is true that in general, American criminal law employs a presumption favoring *mens rea* where Congress has not explicitly included a *mens rea* requirement. *See Staples v. United States*, 511 U.S. 600, 606 (1994). "The Supreme Court developed the presumption in favor of *mens rea* for one particular reason: to avoid criminalizing otherwise lawful conduct." *United States v. Burwell*, 690 F.3d 500, 505 (D.C. Cir. 2012) (en banc) (citing *Morissette v. United States*, 342 U.S. 246, 250 (1952)). Thus, Supreme Court "precedents 'can be fairly read as establishing, at least with regard to crimes having their origin in the common law, an interpretative presumption that *mens rea* is required.'" *Id.* (quoting *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 437 (1978)).

The D.C. Circuit has also "made clear [that] the presumption in favor of *mens rea* [is] triggered by the need to avoid imposing substantial penalties – including jail sentences – on innocent citizens who *had no idea* they were committing a crime." *United States v. Burwell*, 690 F.3d 500, 506-07 (D.C. Cir. 2012) (en banc). But as the late Justice Scalia observed, "[i]t is one thing to infer the common-law tradition of a *mens rea* requirement where Congress has not addressed the mental element of a crime. It is something else to expand a *mens rea* requirement that the statutory text has carefully limited." *Flores-Figueroa v. United States*, 556 U.S. 646, 658

(2009) (Scalia, J., concurring) (citing *Staples v. United States*, 511 U.S. 600, 605 (1994); *U.S. Gypsum Co.*, 438 U.S. at 437–438). "Moreover, when asked to infer *mens rea* requirements in other criminal statutes, … [the D.C. Circuit] and other [courts] have frequently found that certain offense elements do not require proof of an additional *mens rea*, so long as the offense as a whole carries a scienter requirement that separates innocent from criminal conduct." *Burwell*, 690 F.3d at 508 (collecting cases).

For example, in *Ruan v. United States*, 142 S. Ct. 2370 (2022), the Supreme Court recently held that to convict two medical doctors of violating the Controlled Substances Act, 21 U.S.C. § 841(a), the government needed to introduce proof of the defendants' knowledge that their dispensing of controlled substances was *unauthorized*, because it is the *unauthorized* dispensation of controlled substances that "plays a critical role in separating a defendant's wrongful conduct from innocent conduct" for doctors, who may otherwise lawfully dispense controlled substances pursuant to valid prescriptions for legitimate medical purposes. *Id.* But the Court said nothing about requiring proof that the defendant-doctors know precisely *why* their dispensation of the controlled substances was unauthorized.

Similarly, in *Liparota v. United States*, 471 U.S. 419 (1985), the Supreme Court held that to convict a defendant of the unauthorized use of food stamps under 18 U.S.C. § 2024(b)(1), the government needed to introduce proof of the defendant's knowledge that the defendant had acted "in any manner *not authorized* by [the statute] or the regulations." *Id.* at 423 (emphasis added). The Court reasoned that "[t]his construction is particularly appropriate where, as here, to interpret the statute otherwise would be to criminalize a broad range of apparently innocent conduct." *Id.* at 426. But again, the Court did not suggest that a defendant would need to know precisely *why* their use of food stamps was illegal.

In *United States v. Holland*, the D.C. Circuit concluded that a conviction for distribution of controlled substances within 1000 feet of a school under 21 U.S.C. § 841a does not require knowledge that the defendant was distributing controlled substances within 1000 feet of a school. 810 F.2d 1215, 1222-23 (D.C. Cir. 1987). "Section 845a does not criminalize a broad range of apparently innocent conduct. Nor would it be appropriate to apply the rule of lenity here, where the application of it would 'undercut [the] unambiguous legislative design' of this section.'" *Id.* at 1223 (quoting *United States v. Falu*, 776 F.2d 46, 48–50 (2nd Cir. 1985)). "It is easily concluded here that Congress' heightened interest in protecting children from both the indirect and the direct perils of drug traffic amply supports its decision not to require a showing of *mens rea* of the proximity of a school." *Id.* There, as here, the government therefore needed to prove that the defendant was physically located within the area identified and defined by the statute, but the defendant's subjective knowledge of the definition of his location was not required.

"The concerns animating the presumption in favor of *mens rea* in *Morisette*, *U.S. Gypsum*, *Staples*, *X-Citement Video*, and *POGO*,[2] simply are not present here." *Burwell*, 690 F.3d 500, 507. Congress *has* included a *mens rea* term in § 1752(a)(1), and has further included even more specific *mens rea* terms in Subsections (a)(2) ("and with intent to impede or disrupt the orderly conduct of Government business or official functions"), (a)(3) ("and with the intent to impede or disrupt the orderly conduct of Government business or official functions"), and (a)(5) ("and willfully operates an unmanned aircraft system with the intent to knowingly and willfully direct…"). A defendant who enters an area he knows to be restricted while knowing that he lacks authority to be there has engaged in wrongful conduct regardless of whether he knows the area is restricted *because*, for example, a former First Lady or a "distinguished foreign visitor[ ] to the

---

[2] *United States v. Project on Government Oversight*, 616 F.3d 544 (D.C. Cir. 2010).

United States" is present. 18 U.S.C. § 3056(a)(3), (6). As written, each of the five species of violating § 1752(a) already require both conduct and mental culpability that separates innocent conduct from wrongful conduct; "[i]t is no snare for the unsuspecting." *United States v. Feola*, 420 U.S. 671, 685 (1975) (assault of a federal officer under 18 U.S.C. § 111 does not require knowledge of the officer's status); *see also, e.g., United States v. Morgan*, 45 F.4th 192, 208 (D.C. Cir. 2022) (transportation of a minor with the intent to engage in criminal sexual activity under 18 U.S.C. § 2423(a) does not require proof that the defendant knew that the minor was underage); *United States v. Chin*, 981 F.2d 1275, 1280 (D.C. Cir. 1992) (quoting *Liparota*, 471 U.S. at 426) ("We have taken into account, in reaching our decision, that this is not an instance in which a broad interpretation of a statute threatens to criminalize 'apparently innocent conduct.'"); *Bryan v. United States*, 524 U.S. 184, 194 (1998) ("The danger of convicting individuals engaged in apparently innocent activity that motivated [the Court's] decisions in the tax cases and *Ratzlaff* [*v. United States*, 510 U.S. 135 (1994)] is not present… [where the factfinder] found that [the defendant] knew that his conduct was unlawful."); *United States v. Crowder*, 656 F.3d 870, 875 (9th Cir. 2011) (holding that the word "knowingly" in the Sex Offender Registration and Notification Act (SORNA), 18 U.S.C. § 2250(a)—which imposes criminal penalties on any person who "knowingly fails to register or update a registration as required by [SORNA]"—does not apply to the phrase "as required by [SORNA]" because a defendant would know failing to register was "not an innocent act").

To crystallize the takeaway as it applies in this case, a defendant cannot "innocently" enter or remain in a restricted building or grounds without lawful authority to do so, even if they do not subjectively know that a Secret Service protectee is present. *See* § 1752(a)(1). More so, a defendant cannot "innocently" engage in disorderly or disruptive conduct in a restricted area, or obstruct the

entrances to such an area, while intending to disrupt government business, even if they are unaware

of who is or may be inside. *See, e.g.* § 1752(a)(2) and (3). Finally, a defendant cannot "innocently"

engage in physical violence against persons or property within a restricted building or grounds,

even if they do not subjectively know that a Secret Service protectee is present. *See* § 1752(a)(4).

The bottom line is that in no case under § 1752 does the wrongfulness of a defendant's conduct

under any of these five subsections turn on whether the defendant was aware that a Secret Service

protectee was or would be within the restricted perimeter. "Nor is it unusual to punish individuals

for the unintended consequences of their unlawful acts." *Burwell*, 690 F.3d at 507; *see also United*

*States v. Dean*, 556 US 568 (2009) (Roberts, C.J.) (declining to read in a *mens rea* requirement for

discharging a weapon under 18 U.S.C. § 924(c)(1)(A) where the statute already required specific

intent with regard to the possession of the weapon, because the possession of the weapon in

furtherance of a drug trafficking crime or crime of violence was already unlawful conduct).

Thus, this is not a case in which the *mens rea* canon suggests that the Court should set aside

the natural grammatical reading of the statute in order to draw the critical line between innocent

and wrongful conduct. *See United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68-69 (1994).

Congress has already drawn that line, so the *knowledge* requirement need travel no farther down

the statute to avoid ensnaring the innocent.

C. Statutory history and congressional intent confirm the government's reading of the statute.

As dictated by the Supreme Court, determining whether a criminal statute imputes a

knowledge requirement is a question of congressional intent. *Rehaif*, 139 S. Ct. at 2195. Section

1752 was created by the Omnibus Crime Control Act of 1970, Pub. L. No. 91-644, 84 Stat. 1880,

1891-92 (1971). Enacted as part of a bill meant to address the "disturbingly high levels of

assassination and political violence" in America, S. Rep. 91-1249, at 2 (1970), Section 1752 was

13

intended to help "[en]sure that the President is fully protected at all times against the isolated deranged individual . . . [and to] protect the President from organized premeditated attempts on his life." S. Rep. 91-1252, at 6 (1970). Recognizing that "security is of paramount importance when the President is away from the White House," at which point he or she is "most vulnerable," and that it had "become increasingly difficult to maintain the necessary level of security," Congress enacted § 1752. *Id.* at 6-7. The statute made it a crime to, among other things, "willfully and knowingly enter or remain in . . . any posted, cordoned off, or otherwise restricted area of a building or grounds where the President is or will be temporarily visiting, in violation of the regulations governing ingress or egress thereto." 84 Stat. at 1892. The statute delegated to the Secretary of the Treasury authority "to prescribe regulations governing ingress or egress . . . to posted, cordoned off, or otherwise restricted areas where the President is or will be temporarily visiting." *Id.*

Congress subsequently expanded § 1752's protections so that they applied to any "other person protected by the Secret Service." Pub. L. No. 97-308, 96 Stat. 1451, 1451 (1982). This change was meant to "extend to all persons protected by the United States Secret Service the same 'zone of protection' authority which presently exists for the protection of the President[.]" H.R. Rep. 97-451, at 1 (1982). Congress later eliminated the references to regulations, making it a crime "willfully and knowingly to enter or remain in any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, 120 Stat. 192, 252 (2006).

Most recently, Congress amended § 1752 as part of the Federal Restricted Buildings and Grounds Improvement Act of 2011, Pub. L. No. 112-98, 126 Stat. 263 (2012). That amendment, which enacted § 1752 in its present form, was meant "to correct and simplify" the statute. H.R.

14

Rep. No. 112-9, at 1 (2011). It also "clarifie[d] that the penalties in Section 1752 of title 18 apply to those who knowingly enter or remain in any restricted building or grounds without lawful authority to do so." *Id.* at 2. Section 1752 thus no longer requires a defendant to have acted "willfully."

Since it initially enacted § 1752, Congress has consistently expanded its protections, first by extending it to Secret Service protectees other than the President, then by eliminating the need for a defendant to violate regulations as an element of the crime, and most recently by eliminating the requirement that a defendant act willfully. Congress has thus made clear its intent that § 1752 apply broadly, maximizing the Secret Service's ability to protect the President, Vice President, their families, and other dignitaries.

Given this history, Congress has expressed a clear intent to expand the reach of § 1752 and its protections over time. Accordingly, there are significant and obvious reasons to believe that Congress did not intend to require a defendant to know why a particular area is restricted—for example, because "the President or other person protected by the Secret Service is or will be temporarily visiting" or because it is "so restricted in conjunction with an event designated as a special event of national significance." § 1752(c)(1)(B)-(C). The clear goal of the statute, as evidenced by the text and history of the statute, is to ensure the safety of Secret Service protectees. *See United States v. Caputo*, 201 F. Supp. 3d 65, 72 (D.D.C. 2016) (rejecting facial and as-applied First Amendment challenges to § 1752, in White-House-fence-jumping case, in part because of "the Government's *profound* interest in protecting the White House complex, the President, and the functionality of the executive branch.") (emphasis added). "As evidenced by the legislative history, the goal of Section 1752 is to provide the fullest protection possible for Secret Service protectees." *United States v. Puma*, 596 F. Supp. 3d 90, 114 (D.D.C. 2022); *cf. United States v.*

*Holland*, 810 F.2d 1215, 1223 (D.C. Cir. 1987) ("Congress' heightened interest in protecting children from both the indirect and the direct perils of drug traffic amply supports its decision not to require a showing of *mens rea* of the proximity of a school.").  A requirement that a defendant know or be on notice of a particular protectee's location in order to violate the statute is clearly antithetical to that goal. *See United States v. Couy Griffin*, 21-CR-92, Doc. 110; *cf. United States v. McHugh*, 583 F. Supp. 3d 1, 31-32 (D.D.C. 2022) (opining that the defendant's theory that the Secret Service, not another law enforcement agency, must set up the restricted perimeter "would contravene the statute's manifest purpose: to ensure that federal law criminalizes (and thereby deters) misconduct that may threaten a Secret Service protectee").

Moreover, requiring that a defendant know *the reason* an area is restricted is difficult to square with Congress's elimination of the statute's requirement that the defendant act "willfully." That change was meant to "correct and simplify" the statute, and to "clarif[y] that the penalties in Section 1752 of title 18 apply to those who knowingly enter or remain in any restricted building or grounds without lawful authority to do so." H.R. Rep. No. 112-9, at 1-2. When it eliminated the statute's "willfully" requirement, Congress moved the language "any posted, cordoned off, or otherwise restricted area of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting" from § 1752(a)(1) to a separate definitional provision. *Compare* 18 U.S.C. § 1752(a)(1) (2011) *with* 18 U.S.C. § 1752(a)(1) (2023). Nothing in this statutory amendment suggests that Congress meant to require a defendant to know *why* an area is posted, cordoned off, or otherwise restricted. To the contrary, by eliminating the statute's requirement that a defendant act willfully and moving the relevant language to a separate statutory section, Congress made clear its intent to lower the bar for prosecutions under § 1752. *See United*

16

*States v. Griffin*, 549 F. Supp. 3d 49, 56 (D.D.C. 2021) ("But Congress did lower the *mens rea* requirement, striking the requirement that a defendant act 'willfully.'").

    D.  <u>The government's reading of the statute does not create anomalous results.</u>

    At oral argument, the Court inquired about the propriety of any incongruity between requiring a general awareness of the restricted perimeter for purposes of proving that the defendant had the required *mens rea*, but requiring a more particular definition of the restricted perimeter for purposes of proving that the defendant committed the *actus reus* required by the statute.

    The D.C. Circuit, sitting en banc, rejected this concern in *United States v. Burwell*, 690 F.3d 500 (D.C. Cir. 2012). There, the court considered "whether 18 U.S.C. § 924(c)(1)(B)(ii), which imposes a mandatory thirty-year sentence for any person who carries a machinegun while committing a crime of violence, requires the government to prove that the defendant knew the weapon he was carrying was capable of firing automatically." *Id.* at 502.  The Court answered: to be convicted, the defendant must possess the weapon "in furtherance of" a drug trafficking crime or crime of violence, but need not subjectively know that the weapon possessed was a machinegun. *Id.* at 504-05. To be clear, the court was not writing on a blank slate; the petitioner's argument asked the court to set aside existing circuit precedent. *See id.* at 504. Still, the court declined the defendant's invitation to depart from its precedents, and the court's explanation provides meaningful guidance here: "Finally, the argument that the machinegun provision in § 924(c)(1)(B)(ii) must carry an implicit *mens rea* requirement simply because the Court has construed it as an offense element ignores the practical distinction between proving objective facts and subjective mental states. The kind of weapon used, like the type and quantity of drug, is a physical fact, readily susceptible to proof beyond a reasonable doubt. As such, Congress could well intend such factors to be offense elements without intending to include an implicit, subjective

*mens rea* requirement." *Id.* at 509. Here too, Congress intended the objective fact of a Secret Service protectee's presence to be an offense element, without intending to include a subjective *mens rea* requirement with respect to that objective fact.

There are innumerable examples of statutes throughout the U.S. Code that require proof of an objective fact to which scienter or *mens rea* is not applied. For example, assaults on federal officers, under 18 U.S.C. § 111, require proof that the victim of the assault was a federal officer performing an official duty, or any person assisting a federal officer in performing an official duty. But the defendant need not know that their victim was such an officer. *See* 18 U.S.C. § 111; *United States v. Feola*, 420 U.S. 671, (1975). As noted by the Court:

> This interpretation poses no risk of unfairness to defendants. It is no snare for the unsuspecting. Although the perpetrator of a narcotics 'rip-off,' such as the one involved here, may be surprised to find that his intended victim is a federal officer in civilian apparel, he nonetheless knows from the very outset that his planned course of conduct is wrongful. The situation is not one where legitimate conduct becomes unlawful solely because of the identity of the individual or agency affected. In a case of this kind the offender takes his victim as he finds him.

*Id.* at 685. Here too, the defendant takes a restricted area, where the government has proven he knows he is not supposed to be, as he finds it.

Still other cases have held that defendants need not be aware of their victim's age, where the conduct proscribed by the statute is already wrongful. For instance, in *United States v. Chin*, the D.C. Circuit held that in a "use-of-a-juvenile" prosecution under 21 U.S.C. § 861(a), the defendant need not know that the juvenile that the defendant used to distribute controlled substances is under the age of eighteen. 981 F.2d 1275, 1279-80 (D.C. Cir. 1992). "The objective of protecting juveniles as a class strongly indicates that Congress meant to impose on the drug dealer the burden of inquiry and the risk of misjudgment." *Id.* at 1280. The court also noted that, like here, "this is not an instance in which a broad interpretation of a statute threatens to criminalize

'apparently innocent conduct.'" *Id.* (quoting *Liparota*, 471 U.S. at 426). Accordingly, a conviction under the -use-of-a-juvenile statute would require the factfinder to find a fact required to establish the actus reus and attendant circumstances, but would not require the factfinder to find that the defendant was aware of those attendant circumstances.

Just last year, the D.C. Circuit "join[ed] every court of appeals to have addressed the question in holding that 'knowingly' in section 2423(a) does not require the defendant to know that the person transported across state lines for criminal sexual activity was under 18." *United States v. Morgan*, 45 F.4th 192, 207 (D.C. Cir. 2022) (citing *United States v. Tavares*, 705 F.3d 4, 18–20 (1st Cir. 2013); *United States v. Griffith*, 284 F.3d 338, 350–51 (2d Cir. 2002); *United States v. Tyson*, 947 F.3d 139, 142–44 (3d Cir. 2020), cert. denied, —— U.S. ——, 141 S. Ct. 307, 208 L.Ed.2d 58 (2020); *United States v. Washington*, 743 F.3d 938, 941–43 (4th Cir. 2014); *United States v. Daniels*, 653 F.3d 399, 409–10 (6th Cir. 2011); *United States v. Cox*, 577 F.3d 833, 836–38 (7th Cir. 2009); *United States v. Taylor*, 239 F.3d 994, 997 (9th Cir. 2001); *United States v. Lacy*, 904 F.3d 889, 897–98 (10th Cir. 2018)). "This reading is consistent with congressional intent that minors need special protection against sexual exploitation. It seems implausible that Congress would want it to be harder to prove a violation of § 2423(a) [], when the purpose of the [] provision is to provide heightened protection for minors against sexual exploitation." *Cox*, 577 F.3d at 837. And, the Seventh Circuit's analysis readily distinguished the issue in cases deciding the knowledge requirement in § 2423(a) from *X-Citement Video*: "That the illicit conduct in § 2423(a) is already unlawful under § 2421 is what distinguishes the Supreme Court's holding in *United States v. X–Citement Video, Inc*." *Id.* Once again, these cases strongly support the government's position that the government does not need to prove the defendant's subjective knowledge of an objective fact, defined by the statute, that the government *would* need to prove beyond a reasonable doubt.

19

E. <u>The *Bingert* decision remains an outlier.</u>

At oral argument, the Court recognized that two other courts within the district, Judges McFadden and Lamberth, had squarely addressed this legal question in *United States v. Couy Griffin*, 21-CR-92 (TNM)[3] and *United States v. Bingert*, Case No. 21-cr-91 (RCL), Note to Counsel, Doc. 163.

Since oral argument, the government has learned of several other courts to have addressed the issue in the context of January 6 prosecutions. First, in response to a jury question, Judge Howell instructed the jury that it did not need to find that the defendant *knew* that the Vice President was visiting for the purposes of the § 1752 offenses. *See United States v. Eicher*, Case No. 22-cr-38 (BAH), Doc. 83 at 1 (jury notes); 6/14/23 Trial Tr. 8:7-22.[4] Judge Chutkan similarly

---

[3] *United States v. Couy Griffin*, 21-CR-92 (TNM), Tr. of Bench Trial, Doc. 106, 330-32 ("The defense's second argument is that Mr. Griffin cannot be convicted under 1752(a) unless the government shows he knew a Secret Service protectee was or would be temporarily visiting in the restricted building or grounds at issue. I disagree. The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes, which are solely creatures of statute. That's according to *Liparota v. United States*, 471 U.S. 419, page 424, from 1985. So determining the mental state required for commission of a federal crime requires "construction of the statute and inference of the intent of Congress." From *Staples v. United States*, 511 U.S. 600, page 605, from 1994. Here, the text of 1752, which is the best evidence of Congress's intent regarding the *mens rea*, forecloses the defendant's argument. I find that Congress specifically included a *mens rea* requirement in those portions of the statute laying out the elements of the offense, while excluding that *mens rea* requirement in the definitional provision. A defendant must act knowingly in committing the offense conduct identified in Subsections (a)(1) through (a)(5). Each of those subsections begins with the word "knowingly." By contrast, that limitation appears nowhere in the definitional provision of (c)(1).[. . .] In sum, the text of the statute makes clear that Congress did not intend for the scienter requirement to apply to 1752's definitional provisions. And I should also say, it doesn't make a lot of sense to me that the government would have to prove somebody knew that a specific dignitary was there. I can't imagine that a provision that is looking to protect Secret Service protectees would require the Secret Service to somehow be telling people and proving that people knew which protectee was in the restricted area at what time.").

[4] *United States v. Eicher*, 22-cr-38 (BAH), 6/14/23 Trial Tr. 8:7-22.

rejected the defendant's construction of § 1752 in the jury instructions in *United States v. Vo*, Case No. 21-cr-509 (TSC), 9/22/23 Trial Tr. 1199:22-1200:13. Most recently, Judge Cobb rejected the defendant's construction of § 1752 in the legal instructions for the bench trial of *United States v. Samsel*, Case No. 21-cr-537 (JMC). *See Samsel*, Case No. 21-cr-537, 11/2/23 Minute Order ("The Court has not adopted Defendants' proposed edits to the 18 U.S.C. § 1752 charges concerning defendant's knowledge of the Vice President's presence at the Capitol on January 6, 2021, agreeing with the reasoning articulated by the Government at the hearing on this issue."). While none of these cases are binding on this Court, the *Bingert* decision appears to be an outlier, and respectfully, without substantial analysis.

F.   <u>The rule of lenity does not apply here.</u>

Finally, at oral argument, defense counsel suggested that if this is a close case, then the rule of lenity counsels that DaSilva should prevail. This argument mischaracterizes the standard for the rule of lenity. The Supreme "Court has held that 'the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a *grievous* ambiguity or uncertainty in the statute such that the Court must simply guess as to what Congress intended.'" *Maracich v. Spears*, 570 U.S. 48, 76 (2013) (emphasis added) (quoting *Barber v. Thomas*, 560 U.S. 474, 488 (2010)). "Only where 'the language or history of [the statute] is uncertain" after looking to 'the particular statutory language, ... the design of the statute as a whole and to its object and policy,' does the rule of lenity serve to give further guidance." *Id.* (quoting *Crandon v. United States*, 494 U.S. 152, 158 (1990)). "The rule [of lenity] comes into operation at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers." *Id.* (quoting *Callanan v. United States*, 364 U.S. 587, 596 (1961)).

Here, after considering the text, structure, purpose, Congressional intent, and statutory history, there is no ambiguity as to what the statute means, and there certainly is no *grievous* ambiguity. The rule of lenity simply does not apply. *Cf. United States v. Holland*, 810 F.2d 1215, 1223 (D.C. Cir. 1987) ("Nor would it be appropriate to apply the rule of lenity here, where the application of it would 'undercut [the] unambiguous legislative design' of this section.'").

III.    **_Even if_ the defendant's interpretation of the knowledge requirement under 18 U.S.C. § 1752 is correct _and_ the Court's legal instructions encompassed this interpretation, there is sufficient evidence in the record to sustain the defendant's conviction.**

The government maintains, as it did in its initial response to this argument, that the defendant is attempting to smuggle in a belated legal objection under the guise of a Rule 29 sufficiency motion. The government analyzes how the Court should approach this alleged legal error in Sections IV and V, *infra*. In the alternative, even if the Court simply *assumes* that DaSilva's new interpretation of the statute is correct, and that the legal instructions encompassed that interpretation, the Court's verdict on the three § 1752 charges must stand because the government introduced sufficient evidence at trial to uphold those convictions.

The legal standard for the Court's review of the evidence at this late stage bears repeating. Federal Rule of Criminal Procedure 29 permits the defendant to move for judgment of acquittal on the ground that the evidence presented is "insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The Court must consider the evidence "in the light most favorable to the government" to determine if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Shi*, 991 F.3d 198, 205 (D.C. Cir. 2021) (citations omitted) (emphasis in original). Stated otherwise, "a judgment of acquittal is warranted 'only when there is no evidence upon which a reasonable mind might find guilt beyond a reasonable doubt.'" *United States v. Khanu*, 675 F. Supp. 2d 55, 60 (D.D.C. 2009) (quoting *United States v. Byfield*, 928 F.2d

1163, 1165 (D.C. Cir. 1991)). When considering a Rule 29 motion after a verdict, the Court "must view the evidence in the light most favorable to the verdict[.]" *United States v. Campbell*, 702 F.2d 262, 264 (D.C. Cir. 1983).

Circumstantial evidence alone may form the basis for the Court's verdict and should be considered with the same deference as direct evidence because, when applying the Rule 29 standard, "no legal distinction is made between circumstantial evidence and direct evidence." *United States v. Watkins*, 519 F.2d 294, 297 (D.C. Cir. 1975). Only when there is "*no evidence* upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt" should a verdict be overturned. *Id.* (emphasis added).

In this case, the record contains ample evidence that would permit a reasonable juror to find that DaSilva knew then-Vice President Pence was present in the U.S. Capitol on January 6, 2021 (adopting the defendant's legal theory here).

***DaSilva heard the crowd chanting "Hang Mike Pence" just seconds after he attacked officers.***

At 4:33 p.m., moments after DaSilva engaged in his attack on police officers in the tunnel, the crowd around him twice loudly chanted "Hang Mike Pence! Hang Mike Pence!"[5] At that moment, DaSilva was standing idly outside the tunnel entrance and was not in the middle of his attack or taking any other action that would make it difficult to hear. A reasonable juror could correctly infer that DaSilva heard the chant, understood it, and knew Pence was inside the building he was trying to enter by pushing into multiple police officers. This is especially so when considering this evidence in the light most favorable to the government.

---

[5] This chant can be heard on several government exhibits, all of which depict the same period of time. It is most clearly audible on Exhibit 304 at video time 1:33 to 1:35, which is approximately 16:34:25 p.m. as shown on the body-worn camera clock in that exhibit. The chant is also audible on Exhibit 303 at video time 1:23 to 1:26 (which shows on that body-worn camera at approximately 16:33:25 p.m.) and Exhibit 306 at video time 1:50 to 1:52.



*Screenshot from Exhibit 304: DaSilva's silhouette can be seen through a riot shield as he stands feet from the tunnel entrance. The crowd chants "Hang Mike Pence! Hang Mike Pence!"*

**DaSilva wore a hat bearing the Japanese characters for "MA" and "GA."**

On January 6, DaSilva wore a hat that bore two Japanese characters that Agent Ray testified

represent "MA" and "GA"—or the Trump-affiliated rallying cry of "Make America Great Again":

> Q. Let's discuss the hat. You said there were white characters. Do you know what they represented?
> A. So initially, they appeared to be either Japanese or Chinese to me, so I just did a basic Google search. Because it was a red hat and compared it to many other subjects that day that were on scene that were wearing either Trump hats or MAGA hats, I just searched Japanese characters—or the Japanese character for the letter M, the first thing that popped up was MA and it was a character that matched the very first character that was on the hat. So because I already had MA, I searched for G and I found a character that matched the second character that was on the hat, that stood for GA or KA, I believe.
> Q. So what's your understanding of what the hat is supposed to represent?
> A. It was my assumption that the hat represented MAGA or Make America Great Again which was like many of the hats that were worn that day.

Trial Tr. 7/17/2023 at 245:3-20. The hat is visible in several government exhibits as well as

Stipulation 701, to the identity of DaSilva.



*Image from Stipulation 701 depicting the Japanese "MAGA" hat DaSilva wore on January 6.*

Again, a reasonable juror could infer that a person having knowledge of former president Trump's "MAGA" campaign slogan was more likely to have knowledge of Trump's claims of election fraud, including his assertion that Vice President Pence could affect the election result from inside the Capitol on January 6, 2021.

### *DaSilva waved a flag saying, "Trump 2020."*

DaSilva also carried and displayed a large blue flag on a pole that read, "Trump 2020." A reasonable juror could find that a person who knew of former president Trump's campaign and supported the former president by waving his flag was more likely to know of his election-fraud claims and his assertion that Vice President Pence could affect the election result from inside the Capitol on January 6, 2021.



*Screenshot from Exhibit 408 at 1:13 showing DaSilva waving the flag.*

25

***DaSilva heard multiple "Stop the Steal" chants around him throughout the day.***

Adding to the circumstantial evidence that DaSilva knew of the Vice President's presence, DaSilva was surrounded by chants of "Stop the Steal!" at multiple points throughout the day on January 6, 2021. Examples of these chants were admitted into evidence at: 8:35 to 8:45 of Exhibit 401; 9:50 to 10:14 of Exhibit 404; and 8:05 of Exhibit 409.

Having been in the crowd for over two-and-a-half hours by the time he left, even if DaSilva did not know Vice President Pence was there or would be there before he arrived, he knew once he got there. A reasonable juror could conclude that, based on DaSilva's knowledge of former president Trump's election fraud claims, that DaSilva knew Vice President Pence was in the Capitol building.

***DaSilva saw "Fight for Trump" signs.***

A reasonable juror could also infer that DaSilva saw one of the many signs saying "Fight for Trump" that were on Capitol grounds on January 6, including the one in close proximity to him as depicted in Exhibit 410, and that he understood his presence at the Capitol was aimed at affecting the vote certification the Vice President was overseeing.



*Screenshot from Exhibit 410 at 1:51 showing DaSilva's proximity to a "Fight for Trump" sign.*

***DaSilva heard a member of the crowd yell, "They did not certify the election today."***

A member of the crowd near DaSilva yelled that "they did not certify the election today," audible at 2:16 of Exhibit 409. DaSilva was in close proximity to this rioter.

***DaSilva heard another member of the crowd say, "You are not going to take away our Trumpy bear. You are not going to take away our votes."***

At 8:18 of Exhibit 407, another member of the crowd, using a megaphone while perched on a broken window, announced to the crowd: "We the people are not going to take it anymore. You are not going to take away our Trumpy bear. You are not going to take away our votes and our freedom that our men died for. This is 1776 and we the people will never give up." DaSilva was in close proximity to this rioter when she made the announcement.

***Stipulation 706 states that then-Vice President Pence was in the Capitol.***

DaSilva stipulated to the fact that then-Vice President Pence was in the Capitol building and presiding over the joint session of congress on January 6, 2021. *See* Stipulation 706, Doc. 79.

All of this evidence cannot be spliced and segregated in artificial fashion. Rather, the evidence, taken in combination and in the context of January 6 (including the background testimony the factfinder heard from Captain Mendoza and Inspector Hawa), provides a firm foundation for a reasonable juror to conclude that DaSilva was aware of Vice President Pence's presence (or his future presence) at the Capitol on January 6. Ultimately, to assess DaSilva's knowledge on January 6, the Court should review all of the evidence—direct and circumstantial— holistically and in light of all the contextual details.

The only question presented to the Court at the Rule 29 stage is one of sufficiency: could "*any* rational trier of fact" find DaSilva had knowledge the Vice President was present? *Shi*, 991

F.3d at 205. The evidence is plentiful, a reasonable juror could arrive at the conclusion DaSilva is guilty, and the Court's verdict must stand.

**IV.** ***Even if* the defendant's interpretation of the knowledge requirement under 18 U.S.C. § 1752 is correct, the defendant's Motions do not raise a factual challenge to the government's proof; instead, the Motions raise a legal challenge to the legal instructions, which are reviewable only for plain error.**

*Even if* DaSilva's new interpretation of the statute is correct, the Court's legal instructions did *not* incorporate this new interpretation of the statute. Accordingly, DaSilva's Motions for Acquittal on this subject are in fact a belated objection to the Court's legal instructions.

DaSilva contends that this Court's legal instructions as announced, *see* Doc. 76, required proof that DaSilva *knew* that the Vice President was or would be temporarily visiting the Capitol on January 6, 2021. *See* Doc. 90 at 2. DaSilva now claims that the legal instructions have always encompassed the defendant's view of § 1752, and that she did not raise this issue in closing arguments because she simply missed the sufficiency problem. *See* OA Tr. 26:5-8, 27:14-15 ("Ms. Medvin: We have already settled this issue through the instructions. The bench instructions in this case have settled that issue for us. I'm not sure if we're reviewing that again. … We're simply asking to enforce that instruction."); *id.* at 27:1-10 ("And that was an issue that I missed, which is why I raised it on a motion to acquit.").

The defendant's position, however, is entirely inconsistent with the full record in this case; the Court's legal instructions clearly did not require such proof. *See* Final Legal Instructions, Doc. 76, 10-14. The fact that the *Bingert* court specifically stated in its legal instructions that it was adopting the government's proposed instructions "*with one exception*" highlights the fact that contrary to DaSilva's argument here, this Court's instructions (which for the purposes of this argument were substantially similar to the government's proposal in *Bingert*) did *not* encompass the *Bingert* court's instructions. *Compare Bingert*, 21-cr-91, Note to Counsel, Doc. 163 and Gov't

Tr. Br. Doc. 160 at 13, *with* Final Legal Instructions, Doc. 76 at 10. At the time of trial here, none of the parties to this case understood the Court's legal instructions to mean what the defendant now claims they mean.

The parties have been litigating the appropriate construction of *other* statutes at issue in this case (particularly the assault on federal officers statute, 18 U.S.C. § 111) since DaSilva's motions to dismiss were filed in December 2022 through February 2023. At no time during all of the voluminous briefing on the meaning of § 111, or during the parties' and the Court's deliberations on the appropriate legal instructions did this issue arise. More, at closing, neither defense counsel nor the Court raised any issues with the government's proof as to DaSilva's knowledge of the Vice President's presence at the Capitol on January 6, 2021. The defendant is now asking for a new interpretation of the statute, and of the Court's legal instructions. As the Court observed at oral argument, "this is really new to all of us." OA Tr. 45:13-14; *see also id.* at 16:16-18 (Court: "[I]t is the case that this question is new."); *id.* at 30:14-17 (Court: "Imagine this had actually been litigated, that the parties – imagine that we had all joined issue on the question of what we're confronting today.") (implying that this issue had *not* been litigated or considered). Given the understanding of the parties in this case, and hundreds of other January 6 cases involving the same statute and same legal instructions, the Court's legal instructions here did <u>not</u> encompass DaSilva's new view of the statute.

Unobjected-to legal instructions are thus reviewed for plain error. *See United States v. Hale-Cusanelli,* 628 F. Supp. 3d 320, 329 (D.D.C. 2022) (holding that post-verdict review of unobjected-to jury instructions must be conducted for plain error) (citing Fed. R. Crim. P. 30(d)); *see also United States v. Khatallah*, 41 F.4th 608, 627-628 (D.C. Cir. 2022), cert. denied, 143 S. Ct. 2667 (2023); *United States v. Hurt*, 527 F.3d 1347, 1354-55 (D.C. Cir. 2008) ("Defense

counsel's actions did not put the district court on notice of his supposed concern. We are not persuaded that counsel objected in the trial court to the lack of a special unanimity instruction."); *United States v. Johnson*, 561 F.2d 832, 854 (D.C. Cir. 1977) ("[T]he issue in determining the applicability of the plain error rule ... is whether the issue was raised by the defense team with sufficient clarity to put the government and the trial court on notice that the issue had been raised."); *United States v. Schalk*, 515 F.3d 768, 776 (7th Cir. 2008) ("If no objection was made that would put the district court (and the other party) on notice of the objecting party's concern, then the standard of review is for plain error.").

On plain error review, a new trial may be ordered where there was: "'(1) error, (2) that is plain, and (3) that affects substantial rights ... [and] if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.' ... 'Meeting all four prongs of plain error is difficult, as it should be.'" *United States v. Khatallah*, 41 F.4th 608, 628 (D.C. Cir. 2022) (quoting *United States v. Purvis*, 706 F.3d 520, 522 (D.C. Cir. 2013)); *Puckett v. United States*, 556 U.S. 129, 135 (2009); *see also United States v. Olano*, 507 U.S. 725 (1993).

Even assuming that the Court's legal instructions were erroneous at that time, *plain* error review is a demanding standard. "The second prong of *Olano's* test is not satisfied unless the instruction given was plainly erroneous under current law at the time of trial." *United States v. Merlos*, 8 F.3d 48, 51 (D.C. Cir. 1993) (citing *Olano*, 507 U.S. at 734 ("[T]he Court of Appeals cannot correct an error pursuant to Rule 52(b) unless the error is clear under current law.")); *see also United States v. Blackwell*, 694 F.2d 1325, 1342 (D.C. Cir. 1982) ("[T]he lack of prior precedent in the circuit and the novelty of the issue presented militate against" finding plain error.). To be "plain" error, erroneous legal instructions must "fail to follow absolutely clear legal norm" or "tread upon a well-established constitutional or legal principle." *Purvis*, 706 F.3d at 524

(cleaned up) (citing *United States v. Bryant*, 523 F.3d 349, 353 (D.C. Cir. 2008); *United States v. Andrews*, 532 F.3d 900, 909 (D.C. Cir. 2008)).

Here, the Court's legal instructions were not plainly erroneous. There is no binding, circuit-level decision deciding this issue, and four other district courts confronted with the same issue in other cases arising out of the January 6 riot have concluded that § 1752 does not require the defendant to subjectively know that the Vice President was visiting the Capitol on January 6. Definitionally, any error in the Court's legal instructions was not plain. And, given the overwhelming number of trials in this district that have used nearly identical instructions for § 1752 offenses, any purported error was not "so obvious" that "the court should have intervened *sua sponte*." *United States v. Weaver*, 281 F.3d 228, 232 (D.D.C. 2002).

V.       **_Even if_ the Court's legal instructions were plainly erroneous, the defendant has not requested a new trial and the Court cannot order a new trial _sua sponte_.**

*Even if* the Court were to conclude that § 1752 requires the defendant's subjective knowledge of the Vice President's presence, the legal instructions in this case did not reflect this requirement, *and* that the legal instructions were plainly erroneous, DaSilva's remedies are now limited.

A.       At best, the defendant has identified a trial error, the remedy for which is a new trial—not an acquittal.

As explained above, although the defendant has framed this argument as a Rule 29 sufficiency-of-the-evidence claim, the claim is in fact a challenge to the Court's legal instructions. *See United States v. Reynoso*, 38 F.4th 1083, 1090-91 (D.C. Cir. 2022) ("Reynoso attempts to cast the district court's instructional error under *Rehaif* as an insufficiency-of-the-evidence error, but that type of claim is unavailable here."). This procedural posture begs the question:

Do we measure the sufficiency of the evidence to convict [the defendant] under the wrong instruction (what was given) or the right one (what would otherwise be given on remand)? Oddly enough, it is the wrong instruction, at least when the instructions omit or inaccurately describe an element of the offense and the defendant fails to object—as here. Otherwise, we would be forced to measure the evidence introduced by the government against a standard it did not know it had to satisfy and potentially prevent it from ever introducing evidence on that element. Nor does this approach create Double Jeopardy problems. Consider this case: If we think about the sufficiency of the evidence with respect to correct jury instructions, the government would not be seeking a second bite at the apple but a first bite under the right legal test. "Permitting retrial in this instance," … "is not the sort of governmental oppression at which the Double Jeopardy Clause is aimed; rather, it serves the interest of the defendant by affording him an opportunity to 'obtai[n] a fair readjudication of his guilt free from error."

*United States v. Houston*, 792 F.3d 663, 669–70 (6th Cir. 2015) (quoting *Lockhart v. Nelson*, 488 U.S. 33, 42 (1988); *Burks v. United States*, 437 U.S. 1, 15 (1978)).

In *Reynoso*, the defendant attempted to mount a sufficiency challenge to his conviction under 18 U.S.C. § 922(g) after the Supreme Court decided *Rehaif* and held that § 922(g) convictions require the government to prove the defendant was aware of his status as a felon (or otherwise prohibited person). 38 F.4th at 1090. "At the time of trial, the prevailing interpretation of § 922(g) required the government to prove that the defendant knew he possessed a gun but not that he knew about the circumstances making his gun possession unlawful." *Id.* The D.C. Circuit therefore held that "a defendant cannot make out a sufficiency challenge as to offense elements that the government had no requirement to prove at trial under then-prevailing law." *Id.* at 1091. Importantly, "[n]o participant in Reynoso's trial—neither the trial judge, the prosecution, the jury, nor Reynoso himself—recognized knowledge of felon status as an element the government needed to prove. ***In that situation, a sufficiency claim is a non sequitur.***" *Id.* (emphasis added).

Similarly, in *Houston*, the Sixth Circuit reversed the defendant's conviction for making threats under 18 U.S.C. § 875(c). *Id.* at 665. Reversal was appropriate, because in the time between the defendant's trial and his appeal, the Supreme Court decided *Elonis v. United States*, 575 U.S.

723 (2015), in which the Court reversed a similar conviction for a similar jury instruction error. *Id.* at 666. Even while granting that the instruction was plainly erroneous, the *Houston* Court held that the defendant's *sufficiency* challenge to his conviction was to be judged on the legal standard in effect at the time of his trial. *Id.* at 669-670.

"Well-established Supreme Court jurisprudence on this subject teaches that 'the Double Jeopardy Clause's general prohibition against successive prosecutions does not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside ... because of some error in the proceedings leading to conviction.'" *United States v. Ellyson*, 326 F.3d 522, 532 (4th Cir. 2003) (quoting *Lockhart*, 488 U.S. at 38-39). In *Ellyson*, like here, the defendant's "claim focuse[d] on what he believes is insufficient evidence." *Id.* at 532. The Fourth Circuit disagreed, however: "[T]he basis for setting aside Ellyson's conviction is not an insufficiency of evidence; rather, we must set aside the verdict because of the erroneous jury instruction. Under circuit law at the time of trial, the government presented more than sufficient evidence to support a guilty verdict against Ellyson." *Id.* The *Ellyson* court held that although the government's proof was insufficient under an intervening legal standard announced between trial and appeal, the government's evidence was sufficient under the legal standard in place at the time of trial. *Id.* at 532-535. "Under circuit law at the time of trial, the government presented more than sufficient evidence to support a guilty verdict against Ellyson." *Id.* at 532. Accordingly, the defendant was entitled to a new trial, but not acquittal. *Id.*; *see also United States v. White*, 810 F.3d 212, 229 n.5 (4th Cir. 2016) (citing *United States v. Wood*, 207 F.3d 1222, 1229 (10th Cir. 2000)); *Ellyson*, 326 F.3d at 532–33).

In *United States v. Wacker*, 72 F.3d 1453 (10th Cir. 1995), modified (Mar. 11, 1996), the Tenth Circuit similarly reversed and remanded where the government introduced sufficient

evidence at trial under the legal standard in place at the time of trial, but where that evidence was insufficient under a new legal standard. "[T]he legal standard under which the jury was instructed and under which the government presented its proof was incorrect. We conclude that 'whenever a conviction is reversed solely for failure to produce evidence that was not theretofore generally understood to be essential to prove the crime, ... double jeopardy does not bar reprosecution.'" *Id.* at 1465 (quoting *Linam v. Griffin*, 685 F.2d 369, 379 (10th Cir. 1982) (Anderson, Dist. J., concurring)).

The Ninth Circuit came to a similar conclusion in *United States v. Weems*, 49 F.3d 528, 531 (9th Cir. 1995). There, the government conceded in a structuring financial transactions case that the evidence at trial was insufficient to prove the defendant's *knowledge* that structuring transactions is illegal. *Id.* at 529. Still, retrial, rather than acquittal was appropriate, because "[t]he government had no reason to introduce such evidence because, at the time of trial, under the law of our circuit, the government was not required to prove that a defendant knew that structuring was illegal. … The government therefore is not being given a second opportunity to prove what it should have proved earlier, and double jeopardy protections do not bar retrial." *Id.* at 531.

For analogous reasons, the Eighth Circuit recently concluded in an interlocutory appeal of the denial of the defendant's motion to dismiss in *United States v. Harrington*, 997 F.3d 812 (8th Cir. 2021) that re-trial of the defendant following habeas review was not barred by the Double Jeopardy Clause. The *Harrington* court reasoned that, "not every instance in which a conviction is set aside due to insufficient evidence is the equivalent of an acquittal. The setting aside of a conviction on this basis is the equivalent of an acquittal when the evidence is found insufficient because the government failed to prove its case under the law *as it existed at the time of trial*." *Id.* at 817.

Instructed under the (incorrect) law as it existed at the time of trial, the jury found the defendant guilty. The post-conviction change in the law shows those instructions were erroneous. The conviction is then set aside not because the government failed to prove its case but because the incorrect instructions allowed the jury to convict under the wrong legal standard.

*Id. See also Commonwealth v. Guardado*, -- NE 3d -- , 2023 WL 7029883 (Mass. Oct. 26, 2023) ("Because the evidence against the defendant was insufficient only when viewed through the lens of a legal development that occurred after trial, the Commonwealth has not 'been given [a] fair opportunity to offer whatever proof it could assemble' at trial. Further, because absence of licensure was not recognized as an essential element at the time of trial, the resulting verdict did not resolve this element of the offenses charged. A new trial is warranted so that the Commonwealth may have one complete opportunity to convict the defendant under the new law.") (quoting *Burks*, 437 U.S. at 16) (some citations and quotations omitted).

Here, even if § 1752 does require proof that DaSilva knew that the Vice President would be present at the Capitol (it does not), and the Court's legal instructions did not accurately reflect this new understanding of the law, the proper remedy is a new trial on the affected counts, not an acquittal. DaSilva here should not escape accountability for his conduct, because the law may be re-interpreted to require proof that neither the parties nor the Court believed was required at the time of trial. "It would be a high price indeed for society to pay were every accused granted immunity from punishment because of any defect sufficient to constitute reversible error in the proceedings leading to conviction." *Burks v. United States*, 437 U.S. 1, 15 (1978) (citations omitted).

The Supreme Court's decision in *Musacchio v. United States*, 577 U.S. 237 (2016) and cases interpreting *Musacchio* require no different result. There, the Court considered the "question [of] whether the sufficiency of the evidence in a criminal case should be measured against the

elements described in the jury instructions where those instructions, without objection, require the Government to prove more elements than do the statute and indictment." *Id.* at 242.

> When a jury finds guilt after being instructed on all elements of the charged crime *plus one more element*, the jury has made all the findings that due process requires. If a jury instruction requires the jury to find guilt on the elements of the charged crime, a defendant will have had a "meaningful opportunity to defend" against the charge. And if the jury instruction requires the jury to find those elements "beyond a reasonable doubt," the defendant has been accorded the procedure that this Court has required to protect the presumption of innocence. The Government's failure to introduce evidence of an additional element does not implicate the principles that sufficiency review protects.

*Id.* at 243-44 (citing *Jackson v. Virginia*, 443 U.S. 307, 314–315 (1979)). The Court did not consider the inverse question that is hypothetically presented by this case: how should sufficiency be judged if there is an erroneous legal instruction that omits an element of the offense? In fact, the Court dropped a footnote to remark that "[i]n resolving the first question presented,[6] we leave open several matters." *Id.* at 244, n.2. In *United States v. Hillie*, the D.C. Circuit repeated *Musacchio*'s holding that the court's "limited determination on sufficiency review … does not rest on how the jury was instructed." 39 F.4th 674, 675 (D.C. Cir. 2022). That decision, however, did not substantively engage with the question of judging sufficiency motions in light of an omission of an element of the offense, rather than the over-inclusion of an element as *Musacchio* had addressed. *See id.* at 679. Indeed, the court noted instead that the parties had *agreed* at oral argument that the court should consider the sufficiency arguments based on the statute, rather than how the jury was instructed. *Id.*; *see also id.* at 695 (dissent). In sum, *Musacchio* and *Hillie* do not provide guidance for addressing the situation presented here. *See United States v. Mansfield*, No.

---

[6] The first question presented was: "Whether the law-of-the-case doctrine requires the sufficiency of the evidence in a criminal case to be measured against the elements described in the jury instructions where those instructions, without objection, require the government to prove additional or more stringent elements than do the statute and indictment?" Petition for Writ of Certiorari, *Musacchio*, 577 U.S. 237 (No. 14-1095).

18-CR-00466-PAB, 2019 WL 3858511, at *5 (D. Colo. Aug. 16, 2019) ("The considerations governing retrial in cases involving a post-trial change in the law are distinct from the concerns present in *Musacchio*. As a result, *Musacchio* does not undermine *Wacker's* holding that 'whenever a conviction is reversed solely for failure to produce evidence that was not theretofore generally understood to be essential to prove the crime, double jeopardy does not bar reprosecution.'") (quoting *Wacker*, 72 F.3d at 1465)).

Accordingly, under *Reynoso* and similar case law from across the circuit courts, the remedy is a retrial, not an acquittal.

B.  But the defendant has not moved for a new trial and the Court is without authority to order one on its own.

Ordinarily, the remedy for a trial error would be a new trial. The problem here, however, is that DaSilva has not requested one and the Court cannot order one sua sponte.

Federal Rule of Criminal Procedure 29 governs motions for judgment of acquittal, but Rule 33 governs motions for new trial. Rule 33 provides that "*Upon the defendant's motion*, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a) (emphasis added). As applicable here, "Any motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty." *Id.* at 33(b)(2). The Notes of the Advisory Committee on the Federal Rules from the 1966 Amendments indicate that "The amendments to the first two sentences make it clear that a judge has no power to order a new trial on his own motion, that he can act only in response to a motion timely made by a defendant. Problems of double jeopardy arise when the court acts on its own motion. *See United States v. Smith*, 331 U.S. 469 (1947)."[7]

---

[7] Once jeopardy has attached, "there are only three ways that a criminal defendant in federal court can be retried for the same offense." *United States v. Alvarez-Moreno*, 657 F.3d 896, 899 (9th Cir.

Accordingly, "[w]here the motion papers cannot be fairly construed as a request for a new trial, a district court does not have the authority, sua sponte, to convert a motion for judgment of acquittal into a motion for a new trial. That choice is the defendant's—and the defendant's alone." *United States v. Moran*, 393 F.3d 1, 9 (1st Cir. 2004) (citing *United States v. Navarro Viayra*, 365 F.3d 790, 793 (9th Cir. 2004); *United States v. Brown*, 587 F.2d 187, 189 (5th Cir. 1979)).  Based on the language of Rule 33, "it is transparently clear that even if a motion for judgment of acquittal contains a substantive basis sufficient to ground the grant of a new trial, a court is without power to treat the motion as a motion for a new trial unless it also contains some overt indication that the movant desires that relief." *Id.* at 9-10. *See also United States v. Alvarez-Moreno*, 657 F.3d 896, 901-02 (9th Cir. 2011) (observing that although the court was "sympathetic" to the trial court's endeavor to correct a legal error, the trial court was without authority to order a new trial on its own motion once double jeopardy attached); *United States v. Martinson*, 419 F.3d 749, 752 (8th Cir. 2005) ("[U]nder the Federal Rules of Criminal Procedure, the district court lacked the power to grant Martinson a new trial because she failed to move for one. Consequently, the district court did not err in not granting Martinson a new trial sua sponte."); *United States v. Wright*, 363 F.3d 237, 247-48 (3d Cir. 2004) (holding that a trial court could not order a new trial on his own motion) (Alito, J.).[8]

---

2011). The defendant can move for a mistrial under Rule 26.3 *before* the verdict is announced; the defendant can move for a new trial under Rule 33 *after* the verdict is announced but within the time limits prescribed by the Rule; or the defendant can appeal his conviction. *See id.* at 899-900. "By appealing or collaterally attacking his conviction on the basis of a legal error, the defendant is taken to have consented to being retried should he succeed." *Id.* (collecting cases).

[8] Two circuit courts have come to a different conclusion. In *United States v. Baker*, the Tenth Circuit, without substantial analysis, construed a Rule 29 motion as a motion for new trial, because the motion "contain[ed] allegations sufficient to constitute a motion for new trial." 432 F.2d 994, 994-95 (10th Cir. 1970). In *United States v. Taylor*, the Sixth Circuit reviewed the district court's

Here, DaSilva has neither explicitly – nor implicitly – moved for a new trial. Nowhere in any of the defendant's filings does the defendant make a colorable claim for a new trial: The defendant styled his first filing "Rule 29(A) Motion for Judgment of Acquittal," entitled the last section of that filing "Acquittal," and concluded, "For all of the reasons stated herein, the Defense requests and [sic] judgment of acquittal on Counts Two, Three, Four, Five, and Seven." *See* Doc. 88 at 1, 14. The Supplemental Argument only requests a "judgment of acquittal." *See* Doc. 90 at 3. The first Reply "requests that his Rule 29(a) motion be granted, and that he be released, or in the alternative, that his order for incarceration is modified to an order of home confinement." Doc. 92 at 6. The second Motion for Acquittal is styled as a "Motion for Judgment of Acquittal," which concludes: "For all of the reasons stated herein, the Defense requests a judgment of acquittal on Counts Two, Three, Four, Five, and Seven." Doc. 93 at 12.

The Court issued its verdict well over three months ago, and the Court's deadline for "all post-trial motions" has long expired, as has Rule 33's default 14-day period. *See* 8/3/23 Minute Order (setting August 9, 2023 as the deadline). Although the proper remedy for a potential trial error would, in theory, be a new trial, the Court is without authority to order one. This is not to say

---

decision to deny a motion for acquittal but order a new trial for abuse of discretion and found no error. 176 F.3d 331, 334-35 (6th Cir. 1999).

Nevertheless, more numerous "and more recent precedent runs counter to *Baker* and *Taylor*." *United States v. Chujoy*, 207 F. Supp. 3d 660, 666-69 (W.D. Va. 2016) (collecting cases); *United States v. Tiari El*, No. 303CR219-1-MU, 2007 WL 2429189 at *3-4 (W.D.N.C. Aug. 22, 2007) ("Indeed the weight of authority holds that a district court may not grant a motion for a new trial on its own motion." (collecting cases)). More, the Sixth Circuit appears to have recently reversed course, albeit in an unpublished opinion. *See United States v. Howard,* 815 F. App'x 69, 80 (6th Cir. 2020) ("Ordering a new trial sua sponte would be reversible error. … For the same reason, it would be error for a district court to grant a new trial for reasons not properly presented in the defendant's motion.").

that DaSilva is entirely without recourse at this juncture. He may still exercise his appellate and collateral review rights, subject to the appropriate standards of review.[9]

As a final matter, to the extent the defendant now attempts to re-characterize the Rule 29 motions as a request for a new trial or argue that the time limitation on Rule 33 motions should somehow be extended, the government objects to any extension of the deadline or construction of the defendant's prior motions as requests for a new trial. *See Eberhart v. United States*, 546 U.S. 12, 19 (2005) (holding that Rule 33's time limitation is a claims processing rule subject to forfeiture by the government); *see also United States v. Marquez*, 291 F.3d 23, 25-26 (D.C. Cir. 2002) (strictly adhering to the deadlines set by Rule 33; holding the trial court could not grant *nunc pro tunc* defendant's motion to extend the deadline for a motion for new trial).

---

[9] As the Ninth Circuit has explained, "it undoubtedly seemed preferable [to the district court] to cut to the chase and simply order a new trial [where the district court recognized an error in the proceedings]. But once jeopardy has attached, 'the defendant retain[s] primary control over the course to be followed in the event of ... error.'" *Alvarez-Moreno*, 657 F.3d at 902 (quoting *United States v. Dinitz*, 424 U.S. 600, 609, (1976)). In seeking only a judgment of acquittal, DaSilva has disclaimed any right to a new trial at this stage of the proceedings and the Court is without the authority, under Rule 33 and Double Jeopardy Clause, to order otherwise.

VI.    **Conclusion**

For all the foregoing reasons, the government respectfully requests that the Court deny DaSilva's Motions for Acquittal in all respects. First, the defendant's theory of the knowledge requirement under § 1752 is wrong. Second, even assuming the defendant's theory is correct, the government introduced sufficient evidence for a rational trier-of-fact to find DaSilva guilty. The Court's verdict was, and remains, correct. Third, DaSilva's motion for acquittal is a belated attack on the Court's legal instructions, which were not plainly erroneous given the in-district precedent at the time of trial on this question. Fourth, even if DaSilva could establish plain error, he has waived any entitlement to a pre-appeal new trial by failing to timely request one.

<div style="margin-left: 40%">

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:    /s/ *Katherine E. Boyles*
Katherine E. Boyles
Assistant U.S. Attorney
D. Conn. Fed. Bar No. PHV20325
United States Attorney's Office
601 D Street NW
Washington, D.C. 20001
Phone: 203-931-5088
Email: Katherine.Boyles@usdoj.gov

/s/ *Eric W. Boylan*
Eric W. Boylan
Assistant U.S. Attorney
Texas Bar No. 24105519
United States Attorney's Office
601 D Street NW
Washington, D.C. 20001
Phone: 202-815-8608
Email: Eric.Boylan@usdoj.gov

</div>