UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>       v.<br><br>MATTHEW DASILVA,<br>           *Defendant*. | Criminal Action No. 1:21-cr-00564 (CJN) |

**MEMORANDUM OPINION**

This matter arises in an extremely uncommon posture. Following a bench trial, the Court convicted Matthew DaSilva of six criminal charges. DaSilva then filed a post-trial brief arguing for the first time that, as to three of those counts, the government was required to prove an additional essential element. The Court agrees and also concludes that the government failed to prove that element beyond a reasonable doubt. The question is whether, in this rare circumstance, the Court can correct those findings of guilt. The Court concludes that it can and now finds the defendant not guilty on all three.

I.

The government prosecuted DaSilva for his conduct on January 6, 2021. The case eventually proceeded to a bench trial on seven counts. The Court found DaSilva guilty on six of the seven.

This opinion concerns three of those counts, all of which charged DaSilva with violations of 18 U.S.C. § 1752. Count Three charged DaSilva with "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so." 18 U.S.C. § 1752(a)(1). Count Four charged him with "knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engag[ing] in disorderly or disruptive conduct

1

in . . . any restricted building or grounds." *Id.* § 1752(a)(2). And Count Five charged him with "knowingly engag[ing] in any act of physical violence against any person or property in any restricted building or grounds." *Id.* § 1752(a)(4). Section 1752(c)(1) defines the term "restricted buildings or grounds." That definition says the term "means" (as relevant here) "any posted, cordoned off, or otherwise restricted area" of "a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." *Id.* § 1752(c)(1).

At trial, the government proved beyond a reasonable doubt that the Capitol grounds on January 6, 2021 was in fact a "restricted building or grounds" because it was "restricted" by barriers and law enforcement and a "person protected by the Secret Service" (the Vice President) was temporarily visiting. The government also proved that DaSilva committed the statutorily prohibited acts in the Capitol grounds. And the government proved that DaSilva knew that the area was "posted, cordoned off, or otherwise restricted." Thinking that was enough, the Court found DaSilva guilty on the three counts.

The problem is that, as the Court later concluded in another case, where the government alleges that the relevant area was restricted because of the Vice President's presence, the statute requires the government to also prove that the defendant knew that the Vice President was or would be visiting. *See United States v. Elizalde*, 23-cr-170, 2023 WL 8354932 (D.D.C. Dec. 1, 2023) (Nichols, J.).

The possibility of this additional requirement did not cross the Court's mind when it found DaSilva guilty. Neither party raised the issue before or during trial, including during closing arguments. And the bench instructions the Court adopted—the relevant portions of which were agreed upon by the parties—were at least ambiguous on the question. The bench instructions for Count Three, for instance, stated that the government must prove:

> 1. The defendant entered or remained in a restricted building or grounds without lawful authority to do so.
>
> 2. The defendant did so knowingly.

Final Legal Instructions, ECF No. 76. The instruction also defined "restricted building or ground" to mean

> [A]ny posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting. The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice president.

*Id.* The instructions for Counts Four and Five were similarly structured. Despite the ambiguity, had the Court's attention been called to the issue, it would have concluded that the instructions, like the statute, require the government to prove that DaSilva knew both that the area was "posted, cordoned off, or otherwise restricted" and that a Secret Service protectee would be temporarily visiting. After all, "knowingly" in the instructions modifies "restricted building or ground" and thus modifies the entire definition of "restricted building or ground." *Cf. Elizalde*, 2023 WL 835492, at *2–*3.

After the Court found DaSilva guilty on these counts, he moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. His post-trial briefing argued for the first time that the government was required to prove he knew of the Vice President's presence and that the proof did not satisfy the Rule 29 standard. After a hearing, the Court allowed the parties to further brief the legal issue as well as the question of whether the government had presented enough evidence to survive a Rule 29 motion even under DaSilva's reading. At a second hearing, the Court sua sponte raised the possibility of reconsidering its findings of guilt, even if it did not grant DaSilva's Rule 29 motion. DaSilva agreed that the Court had the authority to do so. The government was more circumspect. After taking an opportunity to brief its position, the government settled on the

view that it is "not clear" whether the Court has the authority to reconsider its findings of guilt. Gov.'s Second Suppl. Br. at 1, ECF No. 117.

II.

A.

District courts generally have the power to reconsider non-final rulings. As the Supreme Court put it long ago, "[j]urisdiction to correct what had been wrongfully done must remain with the court so long as the parties and the case are properly before it." *Nw. Fuel Co. v. Brock*, 139 U.S. 216, 219 (1891). Thus, "[i]nterlocutory orders are not subject to the law of the case doctrine and may always be reconsidered prior to final judgment." *Langevine v. District of Columbia*, 106 F.3d 1018, 1023 (D.C. Cir. 1997).[1] After all, it is a power "inherent in every court of justice so long as it retains control of the subject-matter and of the parties, to correct that which has been wrongfully done by virtue of its process." *Arkadelphia Milling Co. v. St. Louis Sw. Ry. Co.*, 249 U.S. 134, 145–46 (1919).[2] The Supreme Court has recently reiterated this authority in the civil context, confirming "that a district court ordinarily has the power to modify or rescind its orders at any point prior to a final judgment in a civil case." *Dietz*, 579 U.S. 46–47.

---

[1] *See Schoen v. Washington Post*, 246 F.2d 670, 673 (D.C. Cir. 1957) ("[S]o long as the court has jurisdiction over an action, it should have complete power over interlocutory orders made therein and should be able to revise them when it is 'consonant with equity' to do so."); *Cobell v. Jewell*, 802 F.3d 12, 25–26 (D.C. Cir. 2015) (recognizing an "inherent power of the rendering district court to afford such relief from interlocutory judgments as justice requires"); *see also Greene v. Union Mut. Life Ins. Co. of Am.*, 764 F.2d 19, 22 (1st Cir. 1985) (Breyer, J.) (same).

[2] *See United States v. Morgan* 307 U.S. 183, 197 (1939); *John Simmons Co. v. Grier Bros.*, 258 U.S. 82, 88 (1922) ("If it be only interlocutory, the court at any time before final decree may modify or rescind it."); *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 233–34 (1995) (noting "courts own inherent and discretionary power, firmly established in English practice long before the foundation of our Republic, to set aside a judgment whose enforcement would work inequity" (citations omitted)).

4

This power is not limited to civil cases. Rather, it is a continuation of courts' "common-law power to alter or amend [their] own judgments during the term of court in which they were rendered, prior to any appeal." *See Banister v. Davis*, 140 S. Ct. 1698, 1706 (2020) (cleaned up). (Back then, the term of court "was simply a period in which the court was open for business." *Id.* at 1706 n. 4.). And that power has always applied equally in criminal cases. As the Supreme Court explained in 1873, "[t]he general power of the court over its own judgments, orders, and decrees, in both civil and criminal cases, during the existence of the term at which they are first made, is undeniable." *Ex parte Lange*, 85 U.S. 163, 167 (1873).[3]

Although the concept of a "term of court" has faded over time, courts have continued to recognize that "whether the case . . . be civil or criminal" as "long as the district court has jurisdiction over the case, it possesses inherent power over interlocutory orders, and can reconsider them when it is consonant with justice to do so."[4] And today, it is broadly recognized that district courts have the authority to entertain motions to reconsider in criminal cases even though the Federal Rules of Criminal Procedure make no mention of such motions—an exercise of authority

---

[3] *See also Basset v. United States*, 76 U.S. 38, 41 (1869) (noting in a criminal case: "[W]e see no reason to doubt that the court had power during that term, for proper cause, to set aside the judgment rendered on confession. This control of the court over its own judgment during the term is of every day practice."); *United States v. Howe*, 280 F. 815, 819 (2d Cir. 1922) ("[T]he power of courts to revise their sentences at the term at which they are pronounced, and before anything has been done under them, has long been recognized both in this country and in England, and the cases are numerous in which the power has been exercised." (cleaned up))

[4] *United States v. Jerry*, 487 F.2d 600, 605 (3d Cir. 1973); *see also United States v. LoRusso*, 695 F.2d 45, 52–53 (2d Cir. 1982) (recognizing that a "district court has the inherent power to reconsider and modify its interlocutory orders prior to the entry or judgment" (citations omitted)); *United States v. Washington*, 48 F.3d 73, 79 (2d Cir. 1995) ("An oral grant of a motion for acquittal is no more than an interlocutory order which the court has inherent power to reconsider and modify . . . prior to the entry of judgment" (citations omitted)); *United States v. Quintana*, No. 18-cr-216, 2020 WL 3475216, at *1 (D. Conn. June 25, 2020) ("The court may act sua sponte and reconsider its own orders." (citation omitted)).

that would be proper only if courts have an inherent authority to reconsider non-final orders.[5] As the government has succinctly put it elsewhere, the "long . . . settled" "basic power of a trial court to reconsider its interlocutory rulings exists in criminal cases as well as civil cases." *See* Brief of Amicus Curiae United States in Support of Respondent at 12–15, *Smith v. Massachusetts*, 543 U.S. 462 (No. 03-8661).

This authority logically extends to findings of guilt in bench trials. Findings of guilt are not final orders that divest the court of jurisdiction or permit an appeal. *See Midland Asphalt Corp. v. United States*, 489 U.S. 794, 1488 (1989) (explaining that in criminal cases, there is usually no final appealable order "until after conviction and imposition of sentence"). And unlike an acquittal, a finding of guilt does not "end the case" as to the count. *Cf. Smith v. Massachusetts*, 543 U.S. 462, 471 (2005). Under the long-settled rule, then, district courts have authority to reconsider findings of guilt. *Cf. United States v. Mendoza*, 390 F. Supp. 2d 925, 928 (N.D. Cal. 2005) (case in which the district court "reconsidered its guilty verdict, vacated its finding of guilty, and dismissed the indictment"), rev'd on other grounds, 232 Fed. Appx. 675 (9th Cir. 2007).

B.

Still, as with the exercise of any inherent power, the Court must ensure it does not traverse any "limits" on the power. *Dietz*, 579 U.S. at 45. In particular, the exercise of an inherent power

---

[5] *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014) ("Motions to reconsider are proper in criminal cases even though the Federal Rules of Criminal Procedure do not specifically provide for them . . . A district court should have the opportunity to correct alleged errors in its dispositions."); *United States v. Rollins*, 607 F.3d 500, 502 (7th Cir. 2010); *see also United States v. Ibarra*, 502 U.S. 1, 6 (1991) (observing that "a motion for rehearing in a criminal case . . . renders an otherwise final decision of a district court not final until it decides the petition for rehearing"); *United States v. Dieter*, 429 U.S. 6, 8 & n.3 (1976); *United States v. Healy*, 376 U.S. 75, 77–80 (1964).

(1) "cannot contradict any express rule or statute" and (2) "must be a reasonable response to a specific problem." *Id.* at 45–46.

      1. As to the first limit, the government correctly points out that a court's inherent powers do not allow it to "develop rules that circumvent or conflict with the Federal Rules of Criminal Procedure." Gov.'s Second Suppl. Br. at 2 (quoting *Carlisle v. United States*, 517 U.S. 416, 426 (1996)). If such a codified rule governs reconsideration of findings of guilt in bench trials, any pre-existing inherent authority might be displaced, and courts would be bound to follow the rule.

      The closest potential analogue is Rule 29, which governs motions for a judgment of acquittal. *See* Gov.'s Second Suppl. Br. at 2 (citing *Carlisle*, 517 U.S. at 426). A court can grant such a motion only if the evidence, considered "in the light most favorable to the government," is not "sufficient to permit a rational trier of fact to find all of the essential elements of the crime beyond a reasonable doubt." *United States v. Kayode*, 254 F.3d 204, 212 (D.C. Cir. 2001) (citations omitted). If Rule 29 governs motions for acquittal after a bench trial, the rule may well displace and replace the court's background authority to reconsider findings of guilt in bench-trial cases.

      But it is hardly clear that Rule 29 applies to bench trials. It is true that courts frequently entertain Rule 29 motions during and after bench trials. *See, e.g.*, March 15, 2023 Minute Entry, *United States v. Portlock*, 21-cr-447 (Nichols, J.); *United States v. Jabr*, No. 18-cr-105, 2019 WL 13110682, at *4 (D.D.C. May 16, 2019); *see also United States v. Haggerty*, 997 F.3d 292, 308 (5th Cir. 2021) (Oldham, J., concurring) (arguing that criminal defendants *must* make a Rule 29 motion in bench-trial and jury-trial cases alike to preserve appellate sufficiency-of-the-evidence review). By its terms, however, Rule 29 appears to cover only jury trials.

Start with the text. Rule 29 governs motions for acquittal (1) made "before submission to the *jury*" (Rule 29(a)) and (2) made "after *jury* verdict or discharge" (Rule 29(c)).[6] Once a Rule 29(a) motion is made, the judge can decide it immediately or "proceed with the trial . . . submit the case to the *jury*, and decide the motion either before the *jury* returns a verdict or after it returns a verdict of guilty or is discharged." Fed. R. Crim. P. 29(b). There is no mention of anything other than jury trials in the provisions governing Rule 29(a) motions.

Likewise for Rule 29(c) motions. Rule 29(c) provides only two options for ruling on such motions: "If the *jury* has returned a guilty verdict, the court may set aside the verdict and enter an acquittal. If the *jury* has failed to return a verdict, the court may enter a judgment of acquittal." Similarly, Rule 29(c) specifies that a "defendant is not required to move for a judgment of acquittal before the court submits the case to the *jury* as a prerequisite for making such a motion after *jury* discharge."

Thus, Rule 29's provisions governing when a motion must be made, how a motion must be preserved, when the judge must decide a motion, and what relief a judge should issue are all written in reference to jury trials. There is no mention of bench trials at all.

Context tells us that this is no accident. The rules do not simply use "jury" as a substitute for "any trier of fact." Instead, when the rules discuss jury trials or non-jury trials specifically, they do so intentionally. For example, the rule governing new trials distinguishes between the provisions that apply in "any" case and those that apply "[i]f the case was tried without a jury." *See* Fed. R. Crim. P. 33(a).

More significantly, the rules have specific nomenclature for jury trials as opposed to non-jury trials: Juries return guilty "verdicts," judges render "findings" of guilt. For instance, Rule 23

---

[6] All emphases in quoted language are added.

states that "[i]n a case tried without a jury, the court must *find* the defendant guilty or not guilty" but that a "jury of fewer than 12 persons may return a *verdict*" in certain scenarios. Rule 31(a) likewise specifies that the "jury must return its *verdict* to a judge in open court."

In fact, when a provision applies to both jury and non-jury trials, the rules take pains to use both "verdict" (referring to the jury) and "finding" (referring to the court) in the text. Rule 31(k)(1), for example, states that in a final "judgment of conviction, the court must set forth the plea, the *jury verdict or the court's findings*, the adjudication, and the sentence." Rule 33(b) states that motions for a new trial must generally be "filed within 14 days after the *verdict or finding* of guilty." And Rule 34(b) states that a "defendant must move to arrest judgment within 14 days after the court accepts a *verdict or finding* of guilty."

Rule 29, however, mentions only verdicts. For instance, in contrast to the timing provisions for motions for new trials or motions to arrest judgment, Rule 29(c) states that defendants must "move for a judgment of acquittal, or renew such motion, within 14 days after a guilty *verdict* or after the court discharges the jury, whichever is later." In all, Rule 29 uses the term "verdict" nine times. *See* Fed R. Crim. P. 29(b), (c)(1), (c)(2), (d)(1). It never once mentions "findings."

It would not be anomalous for Rule 29 to apply only to jury trials. *Contra* Gov.'s Second Suppl. Br. at 2. In jury-trial cases, the judge who must adjudicate the motion for judgment of acquittal does not know why the jury found the defendant guilty. Rule 29's standard therefore ensures that the judge does not unduly trample on the jury's determination by making the judge assume the best: As long as there was some basis for a hypothetical reasonable trier of fact to find the defendant guilty beyond a reasonable doubt, the court does not intervene.

In most bench trials, however, the judge adjudicating the motion for judgment of acquittal *is* the trier of fact who found the defendant guilty. In such cases, it makes little sense for the judge

9

to ask whether some hypothetical treasonable trier of fact could have found the defendant guilty beyond a reasonable doubt; the judge *knows* why he found the defendant guilty and whether a mistake was made in the process.

Take this case. The Court knows that, but for its incorrect assumption about the essential elements of the 1752 charges, it would not have found DaSilva guilty based on the record presented at trial. It would be strange to enter a final judgment of conviction based on what a hypothetical juror could have concluded, rather than what the Court knows the trier of fact in this case would have concluded.[7]

This distinction between bench and jury trials is reflected in the Federal Rules of Civil Procedure, which has different standards for issuing judgment as a matter of law (the civil equivalent of a judgment of acquittal) based on who the trier of fact is. Rule 50 governs jury trials. It is structured almost identically to Federal Rule of Criminal Procedure 29 and focuses on whether a hypothetical "reasonable jury" would have a "sufficient evidentiary basis" to find for the party. In contrast, Rule 52(c) governs the equivalent procedure in bench-trial cases (called "judgment on partial findings") and does not require the court to follow a sufficiency-of-the-evidence standard; the court is able to evaluate the evidence for itself. The civil rules thus treat bench and jury trials differently when it comes to directed-verdict-type procedures, which further suggests that it would not be anomalous for the criminal rules to do the same.

---

[7] In this case, a reasonable juror could have found DaSilva guilty on Counts Three, Four, and Five. It is a close call, but a reasonable juror could conclude beyond a reasonable doubt that someone who traveled to be in D.C. on the day of election certification and went to the Capitol knew that then-Vice President Pence would be at the Capitol that day as part of his election-certification duties. Thus, if the Court were limited to proceeding under Rule 29, the Court would not grant DaSilva's motion for a judgment of acquittal. This also means that the government's suggestion that any error can be corrected on appeal, Gov.'s Second Suppl. Br. at 5, is not entirely convincing—after all, the Court of Appeals would also be limited to sufficiency-of-the-evidence review.

In sum, Rule 29 does not preclude this Court from reconsidering its findings of guilt in this case.

2.  The question remains whether reconsideration in this case is a "reasonable response" to the Court's mistake.  *Dietz*, 579 U.S. at 45.  It is.  Criminal convictions are undoubtedly serious, and it is vital to get them right.  Reconsideration would ensure that the Court's own error does not harm the defendant.

Moreover, reconsideration would not harm the government.  The findings of guilt in question came at the conclusion of trial, which means that no party's presentation of evidence was prejudiced by the findings the Court would reconsider.  The government is thus incorrect that reconsideration "is inappropriate because it would deprive the United States of one full and fair opportunity to present its evidence." Gov.'s Second Suppl. Br. at 5 (cleaned up).  In reconsidering its findings of guilt, the Court simply assesses the same evidence the government presented during the trial in light of the same bench instructions the Court issued at the end of trial.  The government had a full and fair opportunity to present that evidence. [8]

Often, mistakes cannot be fixed.  But when a mistake is easily correctable and doing so would not prejudice either party, "[t]here is no benefit to" refusing to fix the error.  *See Dietz*, 579 U.S. at 53.

---

[8] The Court recognizes that the government, like the Court, was also not expressly aware until after trial that DaSilva viewed the statute and bench instructions as requiring the government to prove that he knew that the Vice President was or would be visiting the Capitol.  But DaSilva did not affirmatively waive this argument, nor was he required at any point to affirmatively point out his (fair) reading of the bench instructions.  Especially in light of the fact that Judge Lamberth had already adopted DaSilva's reading in another January 6 case, *see* Note to Counsel, ECF No. 163, *United States v. Bingert*, No. 21-cr-91 (May 18, 2023), the government could have sought clarification here before trial, or it could have attempted to present additional evidence.  The Court therefore declines the government's request to "reopen its case to present additional evidence on the defendant's knowledge of the Vice President's presence at the Capitol on January 6, 2021," Gov.'s Second Suppl. Br. at 5.

C.

The Court therefore reconsiders its prior findings of guilt as to Counts Three, Four, and Five.  It finds the defendant not guilty on all three.  As noted above, the statute and bench instructions require the government to prove beyond a reasonable doubt that DaSilva knew that a Secret Service protectee would be present at the Capitol.  *See supra* pp. 2–3.  The Court cannot conclude beyond a reasonable doubt that DaSilva possessed the requisite knowledge.

There is no direct evidence that DaSilva knew that then-Vice President Pence would be at the Capitol.  And the best circumstantial evidence the government was able to muster does not do the trick.  The government points out that (1) there were chants of "Hang Mike Pence" in the area; (2) DaSilva wore a hat bearing the Japanese characters for "MA" and "GA"; (3) DaSilva waved a flag that read "Trump 2020," (4) there were "Stop the Steal" chants in the area; (5) there were "Fight for Trump" signs in the area; (6) a person near DaSilva yelled "they did not certify the election today"; and (7) a person in the crowd yelled through a megaphone, "you are not going to take away our Trumpy bear."  Gov.'s First Suppl. Br. at 22–27, ECF No. 113.  None of these pieces of evidence can demonstrate DaSilva's knowledge of Pence's presence at the Capitol without a tenuous chain of reasoning.  Take, for example, the chants of "Hang Mike Pence." DaSilva may have simply surmised that the chanter was angry with Mike Pence for any number of reasons.  After all a chant of "Hang Joe Biden" would not have told someone at the Capitol that President Biden was present (he was not)—it would have most likely simply told the listener that the chanter dislikes President Biden.  Moreover, it is not clear that DaSilva even heard many of the chants and or that he saw the relevant sign.  Even when taken together, these pieces of evidence do not establish the requisite knowledge beyond a reasonable doubt.

III.

For these reasons, the Court reconsiders its findings of guilt as to Counts Three, Four, and Five. And on those counts, the Court finds DaSilva not guilty.

DATE: February 8, 2024

CARL J. NICHOLS
United States District Judge